UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Jyan Harris,                      )
                               )
        Plaintiff,          )
                               )
vs.                           )     Case No. 18-cv-2084-JAR-GEB
                               )
City of Kansas City, Kansas     )
Fire Department, et al.,        )
                               )
                               )
        Defendants.      )

**DEFENDANT UNIFIED GOVERNMENT OF
WYANDOTTE COUNTY / KANSAS CITY KANSAS'
MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**COME NOW**, Defendants, City of Kansas City, Kansas Fire Department and Unified Government of Wyandotte County/Kansas City, Kansas, (Defendants) and submit their Memorandum in Support of their Motion for Summary Judgment:

## I.    NATURE OF THE MATTER BEFORE THE COURT

Plaintiff was a firefighter for Defendant Unified Government of Wyandotte County/Kansas City, Kansas (UG)'s Fire Department from 2004 to 2016, when he was suspended pending termination and ultimately terminated. Plaintiff has alleged that he was discriminated against and retaliated against due to both his race and his alleged disabilities, which stem from work injuries in 2013 and 2016. Pretrial Order, ECF Doc.135, p. 13-14. Plaintiff's complaints cover a three-year period of employment, and he alleges that many alleged employment actions were both Title VII and ADA discrimination or retaliation. Because Plaintiff cannot state a *prima facie* case for discrimination and harassment under Title VII and the ADA, Defendant is entitled to summary

judgment. Alternatively, if Plaintiff can establish *prima facie* cases under those theories, Defendant

has legitimate, non-discriminatory reasons for any adverse employment action.

## II.    STATEMENT OF UNCONTROVERTED FACTS

Pursuant to D.KAN.R. 56.1, Defendant states that the following facts are uncontroverted

based upon the pleadings, discovery responses and affidavits[1]:

1.    Plaintiff was suspended pending termination on September 28, 2016. Ex. B, 140:15-21.

2.    Plaintiff filed EEOC Charges on July 19, 2017 and March 6, 2019 alleging continuing

violations. Amended Complaint, ECF Doc. 95, ¶¶6, 9; ECF Doc. 95-1; ECF Doc. 95-4.

### A.    January 21, 2013 Injury

3.    Plaintiff sustained a workplace injury on January 21, 2013 to his back and left leg. Ex. A,

44:21-45:10.

4.    For the January 21, 2013 back injury, Plaintiff's treatment consisted of stretching exercises,

icing, heating, and ibuprofen. Ex. A, 49:8-13.

5.    Plaintiff returned to work on or about August 22, 2013 at full-duty status. Ex. A, 50:3-10.

6.    Upon his return, Plaintiff was able to and did in fact perform the full functions of his prior

job duties as a firefighter, which he agreed were "very strenuous." Ex. A, 50:23-51:7.

7.    He continued to perform these "very strenuous" job duties until his second work injury in

2016. Ex. A, 51:8-11.

8.    After returning from his 2013 work injury, Plaintiff did not require any accommodations.

Ex. A, 51:12-16.

---

[1]    These facts are admitted solely for purposes of summary judgment and should not be deemed admissions for purposes of trial.  *Wright, Miller & Kane, Fed. Prac. & Proc. '* 2722 at 48.

9.   After returning from his 2013 work injury, Plaintiff requested no changes to his duties. Ex. A, 51:17-19.

10.   After returning from his 2013 work injury, Plaintiff did not request a transfer to a different position because he was unable to perform his job duties. Ex. A, 51:20-23.

11.   After returning from his 2013 work injury, no physician assigned any work restrictions to Plaintiff as a result of that injury. Ex. A, 58:23-25.

12.   Instead of being eligible for workers' compensation benefits, injured Kansas City, Kansas Fire Department (KCKFD) firefighters are eligible for Injured on Duty (IOD) leave. Ex. A, 69:4-25; Ex. G, 47:11-22.

13.   IOD leave pays full wages while an employee is off for a work injury. Ex. G, 47:11-22.

14.   The contract between Plaintiff's Union and Defendant (the MOU) specifies that when an injured firefighter is off on IOD leave, they must check-in with the Department every thirty days. Ex. A, 67:23-68:8.

15.   Deputy Chief Kevin Shirley testified that as long as injured KCKFD employees comply with the process and submit medical reports properly, IOD can last for up to a year, unless the injured employee's physician releases the employee sooner. Ex. J, Deposition of Kevin Shirley, 11:10-12:19.

16.   Shirley also testified that in his seven years as Deputy Chief, employees were required to complete the thirty-day reports to continue receiving IOD leave. Ex. J, 67:22-68:9.

17.   Deputy Chief Jack Andrade testified that injured employees must provide a physician statement every thirty days confirming their status. Ex. L, Deposition of Jack Andrade, 24:15-25.

18.   It is the injured employee's responsibility to submit the report. Ex. J, 68, 10-17.

19.   Plaintiff agreed that to be considered for IOD leave, firefighters have to go to a doctor and submit all the proper paperwork. Ex. A, 196:22-197:1.

20.   Plaintiff acknowledged that under the MOU, employees on IOD must sign a medical authorization that allows Defendant to obtain medical records from a physician. Ex. A, 68:21-69:3.

21.   Shirley testified that Plaintiff's IOD would have started on January 22,2013 – the date of his injury – and continued until September 23, 2013 – the date his physician released Plaintiff to full duty – as long as the medical reports were submitted every thirty days during that period. Ex. J, 18:15-19:15.

22.   If reports are not timely submitted, IOD leave can be denied. Ex. J, 19:20-21:1.

23.   Initially, within the first few days of Plaintiff's injury, Deputy Fire Chief Kevin Shirley advised Plaintiff that he needed to present a "long form" medical record for the IOD leave. Ex. A, 74:19-75:8.

24.   Plaintiff has alleged that Shirley harassed him while on IOD leave. Amended Complaint, ECF Doc. 95, ¶24.

25.   Plaintiff described his interactions with Shirley as "decent conversations." Ex. A, 74:19-75:1.

26.   While off work for his 2013 injury, Plaintiff claims that Shirley went to the office of Plaintiff's physician and demanded Plaintiff's medical records. Ex. A, 59:17-22.

27.   Plaintiff was not present at his doctor's office when this occurred. Ex. A, 60:5-15.

28.   When asked if he felt that Shirley asking his physician for records related to his IOD leave was harassment, Plaintiff testified instead that he felt it was "inappropriate." Ex. A, 65:24-66:7.

29.   After Shirley requested records from Plaintiff's physician, Plaintiff testified that he called Shirley and volunteered to provide another long form medical record. Ex. A, 76:4-12.

30.   In response to Plaintiff promising to bring in the proper medical paperwork, Shirley's "initial response was okay." Ex. A, 76: 13-15.

31.   Relative to Shirley contacting him at this time, Plaintiff admitted that Shirley was checking in periodically to check on his status for IOD leave pursuant to the MOU. Ex. A, 73:20-74:6.

32.   Shirley testified that Plaintiff's IOD was only approved to March 15, 2013 because "the paperwork, monthly reports, were not submitted in a timely manner as requested, and so we had no information to go on." Ex. J, 26:21-27:3.

33.   Shirley testified that he tried "several times" to contact Plaintiff and obtain the proper documentation to continue Plaintiff's IOD leave. Ex. J, 27:14-20.

34.   Shirley sent a letter to Plaintiff's physician on March 5, 2013 requesting documentation to approve Plaintiff's IOD leave. Ex. J, 72:8-16.

35.   Shirley also went to Plaintiff's physician's office to request the paperwork so he could continue Plaintiff's IOD leave. Ex. J, 27:21-28:10.

36.   Shirley was advised that Plaintiff's physician was out of the country and asked who would fill in for that physician so he could get the records needed to approve Plaintiff's IOD leave. Ex. J, 27:21-28:10.

37.   That was not the only time Shirley resorted to going into a physician's office to get IOD paperwork for an injured KCKFD employee. Ex. J, 28:23-29:3.

38.   Shirley testified that he did not speak with Plaintiff's physician nor did he ask the nurse for Plaintiff's records or why Plaintiff was not on light-duty. Ex. J, 29:14-30:2.

39.   When Shirley notified Plaintiff that his IOD leave would not continue after March, he also notified Plaintiff that KCKFD had made repeated unanswered requests for documents from Plaintiff's physician. Ex. J, 77:2-78:13.

40.  As of March 15, 2013, Shirley had not received a medical authorization from Plaintiff allowing hm to obtain the records needed to approve Plaintiff's IOD leave. Ex. J, 74, 6-75:7.

41.  Shirley did not receive any updates from Plaintiff or his physician for over two months after that March 15, 2013 request. Ex. J, 77:17-79:6.

42.  On May 28, 2013 Shirley received a medical note regarding Plaintiff's work status but could not confirm what physician signed it. Ex. J, 42:6-20.

43.  This note indicated that Plaintiff had been seen in March and April, even though no updates were provided following those appointments. Ex. J, 42:6-9.

44.  After not receiving additional updates, Shirley had a letter to Plaintiff hand-delivered on July 2, 2013 requesting an update. Ex. J, 79:11-80:4.

45.  This hand-delivered note would have been sent only after attempts to reach Plaintiff by phone had failed. Ex. J, 80:5-12.

46.  Shirley then received a medical note dated July 17, 2013. Ex. J, 49:22-50:7.

47.  When Plaintiff was told by Shirley that some of his time was not IOD leave, Plaintiff testified that Shirley directed him to address his issues with Plaintiff's union. Ex. A, 79:10-20.

48.  Plaintiff went to speak to his union because whether or not he should have received IOD leave was an issue under the union contract, the MOU. Ex. A, 80:22-81:4.

49.  The multiple meetings and complaints about this issue that Plaintiff alleged in his EEOC charge were not with Shirley or Defendant, but instead with Plaintiff's union. Ex. A, 82:14-83:9.

50.  Plaintiff cannot identify any Caucasian firefighters who had similar back injuries on the job and were granted IOD while Plaintiff was not granted IOD. Ex. A, 86:3-19.

51.  Plaintiff has no personal knowledge of whether another firefighter has ever used vacation or sick leave rather than IOD leave following a work injury. Ex. A, 209:14-21.

52.  Shirley testified that KCKFD has converted IOD to sick leave in the past. Ex. J, 22:4-14.

53.  Shirley added that once an employee's leave is converted from IOD to sick leave, converting it back to IOD leave would likely have to go through the contractual grievance process. Ex. J, 23:12:19.

54.  The grievance procedure would be used because IOD leave is a contractual right under the MOU. Ex. J, 90:21-91:2.

55.  Plaintiff did not file a grievance about his IOD leave being converted to sick leave. Ex. J, 91:12-92:5.

56.  When Plaintiff first learned that he had been charged other forms of leave besides IOD for his 2013 work injury, he did not file any complaints with Defendant's Human Resources (HR). Ex. A, 86:20-87:9.

57.  HR Director Renee Ramirez is not aware of Plaintiff ever complaining to her of losing any sick time as a result of this injury. Ex. B. Deposition of Renee Ramirez, 22:12-17.

58.  Chief Jones does not recall Plaintiff making any complaints to him related to his 2013 injury or IOD leave for that injury. Ex. E, 106:7-20.

59.  Plaintiff did not file any charges with the EEOC related to his IOD leave or 2013 injury until July 19, 2017. Ex. A, 87:10-19.

**B.  Plaintiff's 2015 Station Reassignment**

60.  Plaintiff alleges that he was reassigned to a new fire station on January 16, 2015. Ex. A, 87:25-88:9.

61.  As a result, he alleges that he lost all of his chosen days off for the year. Ex. A, 88:10-15.

62.  Battalion Chief Bob Blevins testified that moving firefighters to a new station is "a very common practice." Ex. F, Deposition of Bob Blevins, 15:6-14.

63. On December 25, 2014, Plaintiff had a conflict with Firefighter Jeff Zimmerman. Ex. A, 90:23-91:6.

64. The only facts that Plaintiff testified to remembering about this Christmas Day incident is that Zimmerman challenged him to a fistfight. Ex. A, 91:7-11.

65. Plaintiff never prepared any written statement of this incident with Zimmerman. Ex. A, 94:9-23.

66. On January 12, 2015, Plaintiff's Captain noted that Harris had not completed any written statements as directed. Ex. A, 93:20-94:23; Ex. A, 98:21-99:2.

67. Plaintiff was transferred to a new station four days later. Ex. A, 98:21-99:2.

68. Plaintiff testified "I never slept in my bedroom … to stay out of his way." Ex. A, 97:5-15.

69. Plaintiff elaborated that the did not sleep in the bedroom because of concrete issues with Zimmerman, instead clarifying that he stayed out of that sleeping room "because I didn't want to have an issue. Those are different things." Ex. A, 101:15-20.

70. There had also been a prior incident between Plaintiff and Zimmerman when Plaintiff was on his phone. Ex. A, 97:5-15.

71. Plaintiff testified that this prior incident occurred when he was dropping off items in the room and Zimmerman yelled at Plaintiff for waking him up. Ex. A, 103:14-104:3.

72. Chief Jones testified that Plaintiff was moved after his incident with Zimmerman. Ex. E, 110:11-111:3.

73. Plaintiff acknowledged that firefighters were moved to new stations when they had issues with another firefighter on their shift. Ex. A, 104:21-105:2.

74. In fact, Plaintiff testified that it had happened to him before, when he was moved out of Station 17 because of problems with another firefighter. Ex. A, 104:21-105:12.

75.  After Plaintiff's transfer form Station 10 on January 16, 2015, he made no complaints to HR. Ex. A, 106:19-107:11; Ex. A, 108: 20-22.

76.  Plaintiff did not complain to Blevins about being moved shifts. Ex. F, 18:12-14.

77.  Plaintiff did not file any charges with the EEOC regarding this January 16, 2015 transfer until July 19, 2017. Ex. A, 109:12-16.

**C.    Alleged Harassment at Station 10**

78.  Plaintiff alleges that once at Station 10, he was subjected to harassment by Bob Blevins, which included yelling, cussing, and degrading comments. Ex. A, 110:13-111:4.

79.  The first issue between Plaintiff and Blevins arose after the fire apparatus went to a grocery store. Ex. A, 113:12-15.

80.  When the truck and its occupants returned to the station, Blevins gathered all the firefighters present in the kitchen. Ex. A, 114: 10-15.

81.  Plaintiff described Blevins yelling at the group as a whole because his "ass just got chewed and it rolls downhill" due to the fire apparatus being seen outside the County. Ex. A, 115:4-21.

82.  During Blevins' talk, Plaintiff told him that they had just been at Wal-Mart, which Plaintiff testified drew more profanity from Blevins. Ex. A, 115:22-116:14.

83.  Plaintiff continued that after addressing the group, Blevins pulled him and the Acting Captain Larwan McClain into an office. Ex. A, 117:9-17.

84.  Once in that office, Plaintiff described the encounter:

> 18· · · · · ·Q.· · ·What happened in there?
> 19· · · · · ·A.· · ·Once we got in the captain's office,
> 20· ·he turned to me, snapped his finger and he pointed
> 21· ·his finger in my face.· And I said, Chief, what's
> 22· ·going on?· Coincidentally at the same time my phone
> 23· ·was ringing at the same time.· I looked down and it
> 24· ·was Captain Letcher.· So I answered it and I said,
> 25· ·Chief, here, and he kind of hit it, so I put it in my

Page 118
·1· ·pocket and it was still on.
·2· · · · · · · · · And I said, Chief, why are you upset
·3· ·with me, and he said, Why would you guys say you were
·4· ·at Wal-Mart, and, such and such and such.· And before
·5· ·I could say a word Larwan said what you just said,
·6· ·sir, That's the grocery store name, Chief Blevins,
·7· ·it's Wal-Mart grocery now.· It's not Price Chopper.
·8· ·Or Apple Mart is what it used to be.
·9· · · · · · · · · And then I think he kind of felt like,
10· ·wow, because in his brain he was referencing Wal-Mart
11· ·on Roe Avenue which would be far out of the way, but
12· ·he didn't get to it as quick as you did.· But then he
13· ·looked at me and he goes, Are we good, and I said,
14· ·Yes, sir, we're good.· I just wanted to know if we
15· ·were okay going to that grocery store.
16· · · · · · · · · Then Larwan said, which I was happy,
17· ·he said, Chief, with all due respect, if you had an
18· ·issue with anywhere that truck went, you should have
19· ·just addressed me because I'm the captain of that
20· ·truck right now with Letcher gone and I asked them
21· ·where they went and got groceries and I made the
22· ·decision to go there.· So again he said, Well, okay,
23· ·I'll just talk to Letcher later, and that was pretty
24· ·much it.
25· · · · · · · · · No apologies, no, Jyan, I get it now,
Page 119
·1· ·but he was just like, Are we good, in a loud voice
·2· ·and I said, We're good, and I just walked out.

Ex. A, 117:18-119:2.

85.· While Plaintiff was at Station 10, Blevins was not Plaintiff's direct supervisor, nor was

Plaintiff in Blevins' chain of command except for one day on April 10, 2015. Ex. F, 102:18-103:1.

86.· The next incident Plaintiff recalled with Blevins occurred when he was temporarily

assigned to another station for the day. Ex. A, 119:6-120:13.

87.· At first, Plaintiff was sent to Station 3, but when he arrived there, he was told by the person

in charge to go to Station 15 instead. Ex. A, 120:3-13.

88.   Plaintiff then submitted for a mileage reimbursement for the two separate trips to different stations. Ex. A, 120:25-121:12.

89.   The next shift, Blevins approached Plaintiff with his mileage sheets and told Plaintiff he could only submit it for one trip, not both. Ex. A, 121:13-122:15.

90.   Plaintiff testified that he volunteered to re-do the mileage sheet with only one trip, and continued that:

> 16· · · · · · · · · And he said, Why did you put it in,
> 17· ·which at that time kind of piqued me because I
> 18· ·thought I just answered it and I thought, Oh, man,
> 19· ·this is going to turn into something.· Blackwell even
> 20· ·turned and looked.· And I said, Chief, I put it in
> 21· ·because I got a double move, but if I only get paid
> 22· ·for one, I'm still happy with that.· And he said, I
> 23· ·don't think that's why you did it, and I said, Okay,
> 24· ·sir.· And he said, What do you mean okay, and I said,
> 25· ·I don't know what to say.· And he said, I think you
> Page 123
> ·1· ·did it because you're trying to pull an F-ing point,
> ·2· ·and he beat the table right in front of me.
> ·3· · · · · · · · · Of course I was on my phone saying
> ·4· ·goodbye to my wife at the time.· She was on break.
> ·5· ·She heard it, so, of course, I've got her screaming
> ·6· ·in my ear, What's going on, what's going on, and I'm
> ·7· ·like, Nothing, I'll call you right back.
> ·8· · · · · · · · · Then I was like, Chief, it's like
> ·9· ·$1.75.· I really don't care.· It's no big deal to me.
> 10· ·And he's like, Yeah, okay, and so he turned and he
> 11· ·left and I just kind of put my hands on the table and
> 12· ·I looked up.

Ex. A, 122:16-123:12.

91.   After this incident, Plaintiff testified he called HR to complain on June 9, 2016. Ex. A, 124:20-125:5.

92.   Thus, prior to Plaintiff's 2016 injury, he only had those two incidents with Blevins plus one instance where he claims Blevins bumped his shoulder on purpose. Ex. A, 125:6-22.

93.   Plaintiff later described the two incidents with Blevins as "misunderstandings" rather than "confrontations." Ex. A, 125:23-126:22.

94.   Plaintiff has alleged that he felt Blevins' conduct was related to his 2013 injury. Ex. A, 127:13-25; Ex. A, 133:3-10.

95.   Plaintiff admits that Blevins was not involved in any way with his complaints surrounding the 2013 injury and 2015 transfer. Ex. A, 138:4-13.

**D.   June 27, 2016 Injury**

96.    Plaintiff alleged in his EEOC charge that he tore his rotator cuff on June 27, 2016 at work. Ex. A, 141:3-14.

97.   Plaintiff went on IOD for this injury. Ex. A, 141:15-20.

98.   On August 9, 2016, Plaintiff returned to work on light-duty status. Ex. A, 141:18-23.

99.   He remained on light-duty until his suspension pending termination. Ex. A, 143:19-22.

100. Plaintiff was on IOD leave the entirety of his absence for this injury. Ex. A, 147:13-15.

101. The MOU in effect at this time had the same IOD provisions as the one in effect during Plaintiff's 2013 injury, including authorizing communication from KCKFD to medical providers regarding IOD status. Ex. A, 145:3-9.

102. However, despite acknowledging that the MOU authorized his employer to contact medical providers regarding his status, Plaintiff alleges that the fact that Deputy Chief John Zimbelman called his doctor at all constitutes harassment. Ex. A, 145:10-19.

103. When asked if he had an issue with Zimbelman calling his doctor associated with his IOD, Plaintiff clarified that it was the frequency of contact by Zimbelman he takes issue with. Ex. A, 146:10-19.

104. Plaintiff and Zimbelman never actually spoke while Plaintiff was off for his 2016 injury. Ex. A, 146:23-147:9.

105. Zimbelman's role at this time was to collect a doctor's note every thirty days and to contact physicians to see if an injured firefighter could return to light duty. Ex. G, 26:13-20.

106. Pursuant to the MOU, it was the employee's duty to update Defendant while on IOD leave; if an employee failed to do so, KCKFD would contact the physician. Ex. G, 27:14-21.

107. Zimbelman testified that he had difficulty getting Plaintiff to sign his IOD forms because Plaintiff did not return KCKFD's phone calls. Ex. G, 30:7-31:12.

108. Typically, when an employee does not return a call within a few days, Zimbelman testified that someone would go to their house to deliver forms in person. Ex. G, 30:7-31:12.

109. Zimbelman was well-acquainted with Plaintiff's physician and had frequent contact with that office because many firefighters treated there for IOD injuries. Ex. G, 108:15-109:15.

110. Zimbelman testified that contacting physicians for employees on IOD "was done the same way on every single employee." Ex. G, 108:15-109:15.

111. Plaintiff returned to work on light duty on August 9, 2016. Ex. A, 147:16-148:1.

112. Plaintiff's light duty work was at KCKFD headquarters, and he described it as sitting in a reception area, answering a phone, logging paperwork, and other clerical tasks. Ex. A, 151:4-22.

113. This was a common light duty assignment. Ex. A, 152:13-16.

114. While working this light-duty position, Plaintiff alleges that Blevins pounded his fist on a table and yelled at Plaintiff. Ex. A, 152:22-153:2.

115. The fist-pounding occurred when Blevins would walk by Plaintiff's desk area and hit the ledge in front of Plaintiff. Ex. A, 153:3-10.

116. The yelling referred to the following incident as described by Plaintiff:

11· · · · · ·Q.· · ·Anything else you're referring to
12· ·there?
13· · · · · ·A.· · ·When you said yelled and shouted at
14· ·me, while I was delivering mail one day and I put the
15· ·mail in the mail slot and as I walked by he said, Hi,
16· ·and I actually said, How are you doing, sir?· And
17· ·when I got to the stairs he yelled, What did you just
18· ·say, and I turned around and I said, How are you
19· ·doing, sir?· And he said, Are you sure that's what
20· ·you said, and I said, Yes, sir, and he said, That
21· ·better be what you said, and I said okay.
22· · · · · ·Q.· · ·Anything else you were referring to
23· ·there?
24· · · · · ·A.· · ·That was to the extent of it, but it
25· ·was in a very aggressive manner like before.

Ex. A, 153:11-25.

117. Blevins was not aware of any complaints brought by Plaintiff, whether it was for a work

injury or moving stations, or of any underlying facts for Plaintiff's work injuries or double dipping.

Ex. F, 18:12-16.

118. Plaintiff testified that he still experiences pain and weakness in his left shoulder and that

his shoulder injury makes it difficult to sleep. Ex. A, 150:2-7;.

**E.   Plaintiff's Meetings With Officials of Defendant**

119. Plaintiff complained by phone to HR on June 9, 2016. Ex. A, 127:4-7.

120. In this call to HR Manager Shakeva Christian, Plaintiff complained about Blevins and

Zimbelman, but not about any racial issues or losing sick time. Ex. H, Deposition of Shakeva

Christian, 14:23-15:7.

121. A meeting was scheduled initially for June 10, 2016 but was moved once by Defendant

and once by Plaintiff. Ex. A, 128:1-20.

122. Because this complaint coincided with Plaintiff being investigated for double-dipping, an

in-person meeting between Plaintiff and HR was delayed. Ex. B, 173:2-18.

123. When a meeting was scheduled, Plaintiff cancelled it in a phone message and did not attempt to reschedule. Ex. H, 15:25-16:20.

124. Connor never told HR not to investigate Plaintiff's complaints. Ex. D, 67:12-14.

125. On June 30, 2016, Plaintiff had a meeting with County Administrator Doug Bach, which was set up and attended by Reverend Jimmy Banks. Ex. A, 154:10-23.

126. Reverend Banks set up this meeting at Plaintiff's request. Ex. A, 154:24-155:2.

127. Although the meeting with Banks, Bach and the Plaintiff occurred three weeks after Plaintiff initially contacted HR, Plaintiff started reaching out to Banks to set up this meeting "almost simultaneously" with his complaint to HR. Ex. A, 156:10-21.

128. Plaintiff's EEOC Charge alleges that he asked Banks to arrange the meeting because Plaintiff was concerned that his complaint to HR was not being taken seriously. Ex. A, 154:10-20; Ex. A, 156:22-158:1.

129. The subjects of Plaintiff's meeting with Banks and Bach were his IOD leave, sick leave, and moving stations. Ex. A, 159:15-160:11.

130. Plaintiff testifies that he told Banks and Bach that he felt he was being discriminated against due to his race. Ex. A, 160:12-161:24.

131. Blevins testified that he never knew of any complaints made against him by Plaintiff. Ex. F, 18:1-14.

**F.   Investigation Into Plaintiff's Second Employment With Parks and Recreation and Double Dipping**

132. In 2013 and 2014, Plaintiff was an in instructor for the Parks and Recreation summer program through the UG, and he was promoted to lead instructor for the summer of 2015. Ex. K, Deposition of Shelly Burnett, 6:14-18.

133. In 2013 and 2014, Plaintiff's instructor role required him to be at the summer program from 8:00 a.m. to 5:00 p.m. daily. Ex. K, 6:19-7:3.

134. When promoted for the summer of 2015, Plaintiff's hours were 7:45 a.m. to at least 5:15 p.m. Ex. K, 8:19-9:2.

135. Testifying as a corporate representative, program coordinator Shelly Burnett testified Plaintiff was expected to record the actual hours he worked. Ex. K, Deposition of Shelly Burnett 12:22-25.

136. In October 2015, the Kansas Department of Labor contacted UG's Parks and Recreation regarding an unemployment claim filed by a summer program subcontractor. Ex. B, 24:1-18; Ex. B, 90:6-25.

137. As a result of that inquiry by the Department of Labor, Defendant's HR reviewed Parks and Recreation's summer program employee roster and found other UG employees working in that program. Ex. B, 25:19-27:5.

138. Plaintiff was one such UG employee found on the Parks and Recreation summer program roster. Ex. B, 27:20-28:4.

139. The subsequent investigation into Plaintiff was performed by Defendant's HR, not KCKFD. Ex. B, 231:15-232:3.

140. Ramirez and Shakeva Christian were concerned that UG employees working the summer program while simultaneously claiming to work their other jobs for the UG. Ex. B, 28:15-29-9.

141. After requesting information from KCKFD about Plaintiff's schedule, Ramirez discovered that there were some days Plaintiff was recorded as working both at KCKFD and Parks and Recreation during the same times. Ex. B, 30:18-31:1.

142. Ramirez determined that of the summer program employees that were already UG employees, only Plaintiff was working for the summer program while simultaneously being on the clock for his primary job with the UG as a Firefighter. Ex. B, 32:10-18.

143. As a result, Ramirez discovered "the same patterns in 2013 and 2014" as in 2015: Plaintiff logging time at Parks and Recreation while also working for KCKFD. Ex. B, 38:7-13.

144. As part of this Report, Ramirez determined that on July 15, 2015 Plaintiff called in sick to the Fire Department but worked at Parks and Recreation from 8:00 a.m. to 5:00 p.m. Ex. B, 108:14-24.

145. Ramirez continued that by calling in sick, Plaintiff should not have been working anywhere else. Ex. B, 109:12-17.

146. The MOU provides that sick leave is intended only to protect employees for loss of pay due to a bona fide illness. Ex. B, 239:4-11.

147. Ramirez determined that Plaintiff had called in sick to KCKFD despite not having a bona fide illness, which violates the MOU. Ex. B, 238:20-239:18.

148. On July 15, 2016 a meeting was held between Ramirez, Connor, Plaintiff, union representative Bob Wing, and KCKFD Deputy Chiefs John Peterson and Zimbleman. Ex. B, 125:3-12.

149. Plaintiff explained to Connor and Ramirez that there were times he was not at Parks and Recreation but his supervisors told him to fill out his time sheets regardless because he occasionally stayed late without recording it on other occasions. Ex. B, 129:22-130:8; Ex. D, 30:16-31:2.

150. Connor testified that Plaintiff did not mention trading time during this meeting:

> 1· · · · · ·Q.· · ·In the meeting that you had with
> ·2· ·Mr. Harris in July of 2016, do you ever remember him

·3· ·mentioning trading time?
·4· · · · · ·A.· · ·No.
·5· · · · · ·Q.· · ·You don't remember or he did not?
·6· · · · · ·A.· · ·He did not.
·7· · · · · ·Q.· · ·Do you remember anyone else mentioning
·8· ·trading time at that point?
·9· · · · · ·A.· · ·No.

Ex. D, 43:1-9.

151. Ramirez testified that she does not recall Plaintiff talking about trading time during that meeting. Ex. B, 131:18-20.

152. Connor met with Parks and Recreation employees Pam Smith, Shelly Burnett, and Jeremy Rogers "pretty quickly" after meeting with Plaintiff. Ex. D, 25:5-15.

153. Connor testified that when meeting with Burnett, she "vehemently denied" Plaintiff's claim that he was directed to falsify his time records by marking himself present when he was not actually present at Parks and Rec. Ex. D, 26:7-27:2.

154. Smith similarly denied Plaintiff's claims to Connor. Ex. D, 27:6-9.

155. On April 21, 2016, Ramirez sent a memorandum to Connor summarizing the entire Department of Labor investigation and recommending Plaintiff's termination. Ex. B, 50:8-17; Ex. O, Ramirez Deposition Ex. 4.

156. After meeting with Plaintiff and the Parks and Recreation employees, Connor recommended that Plaintiff should be terminated. Ex. D, 34:25-35:1; Ex. P, Connor Deposition Ex. 62.

157. Connor detailed similar double dipping in 2013 and 2014, but recommended termination solely due to the 2015 double dipping because there was enough evidence based on that summer alone to justify termination. Ex. D, 40:3-12.

158. Once Connor had recommended suspension pending termination to Bach, Bach supported that outcome and recommended termination. Ex. C, 77:16-78:19.

159. When Bach reviewed Connor's findings, he "could not see how we could have somebody like that working for us that as just blatantly stealing time from us." Ex. C, 71:15-22.

160. Accordingly, Connor forwarded his recommendation to Chief Jones, informing the Chief that Connor and the office of the Administrator supported the decision to terminate Plaintiff. Ex. D, 36:24-37:2.

161. Chief Jones described Plaintiff's actions as "pretty unique … based on this fraudulent activity," remarking that he cannot recall a similar situation. Ex. E, 161:1-16.

## G.   Plaintiff's Suspension and Termination

162. Plaintiff was suspended pending termination on September 28, 2016. Ex. B, 140:15-21; Ex. Q, Ramirez Deposition Ex. 20.

163. After receiving Connor's recommendation, Jones met with Plaintiff in Jones' office to inform him of his suspension pending termination. Ex. E, 155:18-20.

164. At that meeting, Plaintiff was represented by his union, and Jones laid out the issues. Ex. E, 156:23-157:9.

165. During his meeting with Chief Jones, Plaintiff declined to add anything to the conversation after being confronted with the facts underlying his suspension pending termination. Ex. E, 156:23-157:9.

166. On Plaintiff's behalf, his union grieved his termination through the entire grievance process. An arbitrator upheld his termination. Ex. A, 182:5-15.

167. The neutral arbitrator issued his decision sustaining Plaintiff's termination on May 18, 2018. The decision provides in pertinent part as follows,

" [D]ocuments relating to the Grievant were sought, including the Fire Department daily roster, the log kept by Fire Department Captains, the daily list of Fire Fighters trading time, and the Summer Youth Program report of staff hours. These documents revealed that the Grievant was paid by the Summer Youth Program for 9.5 hours on June 9, 12, 15, 18, and July 6, 2015, at the same time that he was paid for working the very same hours by the Fire Department. The records also revealed that the Grievant was paid for 9 hours of work by the Summer Youth Program on July 15, 2015.

Following the assembling of this information Human Resources proceeded to check records for the Summer Youth Program for 2014 and 2013. The Grievant worked in the program both years at the Joseph Amayo Community Center, but in each instance he was an instructor rather than a supervisor. In 2014 Human Resources found double payments - by the Fire Department and the Summer Youth Program - for the dates of June 10, 13, 19, 25, and July 1 and 7, 2014. Double payment dates in 2013 occurred on June 3, 6, 12, 18, 21, 24, 27 and July 9, 2013. All of the 2013 dates involved instances where the Grievant was listed as off sick by the Fire Department while being paid for working in the Summer Youth Program. The records supporting this included sickness or injury reports filed by the Grievant.

.   .   .

The evidence presented by the Unified Government established without question that there were multiple occasions on which the Grievant [Plaintiff] was paid for time as a Kansas City, Kansas Fire Fighter as well as for time as an instructor or supervisor in the Unified Government's Summer Youth Program. In and of itself this would not violate any ethical or policy requirement of the Unified Government if, for example, the Grievant had traded time, was on paid vacation, unpaid leave, or otherwise not working for both Departments at the same time. However, the dates identified and proven by the Unified Government involved instances when the Grievant was paid for working as a Kansas City, Kansas Fire Fighter or on paid sick leave, while at the same time being paid for working the identical hours at the Summer Youth Program.

The double payments were proven by time records and canceled checks. The paid time off for sick leave was proven by shift records and sickness or injury reports. Moreover, the Grievant did not contest that these double payments were in fact made. Based on the totality of evidence I find that the Unified Government established double payments on all of the occasions it identified in 2013, 2014 and 2015.

Putting aside for the time being the instances in which the Grievant was paid sick leave time while also receiving payment for work at the Summer Youth Program, it is self-evident that no employee can legitimately receive payment for working as a Kansas City Kansas Fire Fighter while at the same time receiving payment for working the exact same hours elsewhere. However, there is conflict in the testimony as to the reasons the Grievant gave for the double payment.

Assistant County Administrator Joe Connor interviewed the Grievant after the double payment dates had been discovered and reported to him. His memorandum to Fire Chief Jones on this issue, dated September 21, 2016, specifically stated that the Grievant told him that he had been instructed by Ms. Burnett and Ms. Smith to fill out timesheets for the Summer Youth Program that included claims for hours that he did not work in order to make up for extra time that he put into the Program. Mr. Connor confirmed at the hearing that the Grievant made that statement.

The implication of such a claim would be that the Grievant was in fact working as a Fire Fighter and being paid for that time while claiming payment for hours he was not actually working at the Summer Youth Program. This would be inconsistent with the Grievant's obligation to honestly report and receive payment only for time actually worked. It would also be inconsistent with the responsibilities of Ms. Burnett and Ms. Smith who, it should be noted, specifically denied ever giving the claimed instructions to the Grievant.

However, at the hearing the Grievant denied ever stating to Mr. Connor that he had been instructed to claim payment for hours worked at the Summer Youth Program which he did not actually work. This testimony stands in stark contrast to Mr. Connor's September 21, 2016 memorandum and arbitration hearing testimony which asserted that the statement had been made. When questioned at the arbitration hearing about the conflict all that the Grievant could offer was that Mr. Connor did not understand the Fire Department's time trading system which the Grievant claimed explained the apparent double payment on the occasions identified by Unified Government.

The Kansas City Kansas, Fire Department's time trading system allows Fire Fighters to cover for each other for either a full or partial shift. Thus, Fire Fighter A could work 8 hours for Fire Fighter B who then on a subsequent occasion would work 8 hours for Fire Fighter A. If a full shift was traded each Fire Fighter would work 24 hours for the other Fire Fighter. There was nothing in Mr. Connor's testimony suggesting that he could not or did not understand this.

If the double payment hours that the Unified Government identified involved hours that the Grievant had traded with another Fire Fighter, nothing improper would have occurred, and the Unified Government did not argue to the contrary. However, none of the records for the days in question support the Grievant's claim that he had traded time with another Fire Fighter and therefore was being properly paid for his work time in the Summer Youth Program.

Fire Department trading timesheets, which are prepared each day, list the names of the Fire Fighters who have traded time as well as whether the time traded was a full shift of 24 hours or a partial shift. In the latter case the specific hours traded are listed. On the double payment days identified by the Unified Government

the Grievant's name does not appear as one of the Fire Fighters who traded time. It is not credible to believe that all of the claimed omissions arose as a result of mistakes or for any other reason.

At the hearing the Grievant did not challenge the specific instances when he received sick pay from the Fire Department and payment for overlapping hours by the Summer Youth Program. On the days in question the shift sheet for the shift that the Grievant would have worked had him coded 011 which is the code for off sick and the Summer Youth Program had him listed as having worked on the same day. The records also included sickness/accident reports and cancelled Summer Youth Program checks. The conclusion that there was double payment on days that he reported to the Fire Department that he was sick is inescapable.

There are two relevant provisions of the labor contract which specifically address the issue of sick leave. § 8.6(f)(1)(a) states that sick leave is only to be used for the purpose of "provid[ing] an employee with protection against a loss of pay due to a bona fide illness." This is supplemented by § 8.6(f)(1)(j) which prohibits employees on sick leave from "being gainfully employed by an employer other than UG or being self-employed." The Unified Government argued that the latter provision was intended to bar employees on sick leave from working for compensation elsewhere despite the fact that as written it would seemingly allow employees on sick leave to work for the Unified Government in another capacity. No doubt the Unified Government did not contemplate employees on sick leave working the same hours for other Unified Government divisions and therefore the language does not clearly cover this possibility. Nevertheless, how § 8.6(f)(1)(j) should be interpreted need not be resolved in this proceeding and can be addressed by the parties in future negotiations. This is due to the fact that I find that the Grievant receiving sick pay from the Fire Department while actively working or receiving pay from the Summer Youth Program is a violation of § 8.6(f)(1)(a) of the labor agreement.

The clear purpose of Fire Department sick pay under the labor agreement is to provide protection against the loss of income if a Fire Fighter is injured or ill, If a Fire Fighter is ill, cannot perform his duties for the Fire Department, and receives sick pay, it is inconsistent for him or her to work as an instructor or supervisor in the Summer Youth Program. It is also impermissible for him or her to receive payment from the Summer Youth Program when no work has been performed. Thus, for example, on July 15, 2015 the Grievant's off-duty illness report noted that his absence was due to flu like symptoms and the type of treatment identified was over-the-counter medications and rest. This is inconsistent with either working for the Summer Youth Program or, since the Grievant received sick pay, being paid at all by the Program for the same time.

A careful review of the evidence establishes that the Grievant received double pay for the same hours by the Unified Government Fire Department and Summer Youth Program. The evidence does not support the claim that the Grievant

traded hours and thus properly worked for and received pay from the Summer Youth Program. Under the circumstances, any claim that the Fire Department's shift trading records applicable to the Grievant erroneously omitted his trades is not credible, and the number of instances where the Grievant reported double hours and received double payments could not be overlooked. The Grievant was also not justified in receiving sick pay from the Fire Department while at the same time receiving compensation from the Summer Youth Program, whether or not it was for work actually performed. These are the violations that the Unified Government properly found, and it reached the judgment that termination was the appropriate penalty.

.   .   .

In the instant case the Unified Government was presented with conclusive evidence that the Grievant had reported double hours and received double payment from the Unified Government for the same hours of work and had also received sick pay for hours that he was paid for working in the Summer Youth Program. The Grievant denied that he told Mr. Connor that he was instructed to submit time records for hours he did not work by Parks & Recreation Department personnel, and at the hearing claimed that the double payment was permissible due to the fact that he had traded shifts. However, the Grievant could offer no explanation why Mr. Connor would have fabricated his testimony.

The available evidence did not support the Grievant's trading shifts claim, and he did not address the double payment on occasions when he called in sick. He misused the Department's sick leave benefit by violating the restriction contained in § 8.6(f)(1)(a) of the labor agreement. Despite the Grievant's good work record, the seriousness of these violations led the Chief of the Fire Department to impose the penalty of termination. There are no sufficient grounds that would justify this Arbitrator in reversing that judgment.

AWARD

The Unified Government had just cause to terminate the Grievant. The grievance is hereby denied."

Ex. N, IAFF802-817.

168. During the grievance process, Plaintiff was suspended without pay pending termination.

Ex. E, 158:23-159:2.

169. After the Arbitrator's Award was issued, Plaintiff's employment was terminated on May 22, 2018. Ex. R, Letter from Shirley to Plaintiff.

170. However, Plaintiff is not aware of any reason for his termination other than what Chief

Jones told him:

> 21· · · · · ·Q.· · ·Are you aware of any facts that you
> 22· ·were not suspended pending termination for the reason
> 23· ·that the Unified Government gave to you in that
> 24· ·letter by John Paul Jones?
> 25· · · · · ·A.· · ·No, sir.
> Page 180
> ·1· · · · · ·Q.· · ·Were you ever told by anyone that you
> ·2· ·were suspended pending termination for any reason
> ·3· ·other than the reason that Chief Jones provided to
> ·4· ·you in that letter?
> ·5· · · · · ·A.· · ·No, sir.

Ex. A, 179:21-180:5.

171. Plaintiff admits that the records show he was both working for KCKFD and for Parks and

Recreation at the same time. Ex. A, 178:9-12.

172. Plaintiff could not testify to any specific racial comments made by Blevins, Jones, Shirley,

or Zimbelman. Ex. A, 164:24-166-23.

173. Plaintiff is not aware of any other firefighter that double-dipped by marking themselves

present at both the KCKFD and another department of the UG. Ex. A, 178:2-8.

174. As a corporate representative for Defendant, Bach testified that he is not aware of any other

individual that engaged in the conduct that Plaintiff was accused of engaging in. Ex. I, Rule

30(b)(6) Deposition of Dough Bach, 10:20-25.

175. Since Plaintiff's termination, he has done some odd jobs for a friend. Ex. A, 184:6-185:22.

176. Plaintiff allowed his EMT certification to lapse. Ex. A, 185:23-25.

177. Plaintiff has not attempted to find work as a firefighter since his termination Ex. A, 1-6.

178. Plaintiff blames his decision to look for another job on his termination and on his "physical

disability." Ex. A, 186:7-10.

179. However, Plaintiff has applied for other jobs as a driver, in security, and clerical positions. Ex. A, 186:17-187:8.

**H. Plaintiff's Supervisors and Defendant's Policies on Harassment**

180. Station 10 is located near the University of Kansas Medical Center, on the eastern edge of Wyandotte County off Rainbow Boulevard. Ex. A, 110:1-6; Ex. F, 86:4-7.

181. In 2015 and 2016, Blevins was a battalion chief over the west district, which covered Wyandotte County west of Interstate 635 and north of K-32. Ex. F, 83:19-84:3; Ex. F, 85:6-10.

182. Blevins testified that the Stations under his command in the west district were: 2, 4, 6, 8, 18, 19, and 20, and that Stations 3, 10, and 17 were outside his command area. Ex. F, 85:22-86:3.

183. While at Station 10, the only date that Plaintiff would have been in Blevins' chain of command would have been April 10, 2015. Ex. F, 88:19-89:7.

184. This one shift was the day that Blevins and Plaintiff discussed the Wal-Mart incident discussed in Section II.C. Ex. F, 90:14-19.

185. Ramirez testified that the UG has an Equal Opportunity Policy and a Human Resources Guide for the UG that is designed to prevent discrimination. Ex B., 150:16-8; Ex. B, 151:12-24.

186. These policies target discrimination, harassment, and retaliation in the workplace based on many areas, including race and disability. Ex. B, 152:15-154:17.

187. The UG also provides training on discrimination, harassment, and retaliation Ex. B, 155:12-15.

188. UG Employees are required to undergo this training on a regular basis, every three or five years depending on the topic. Ex. B, 156:13-25.

189. The UG's Harassment in the Workplace Guide "encourages employees to report harassment *before* it becomes severe or pervasive." Ex. M, Ramirez Deposition Exhibit 25, p. 3.

### III.   ISSUES PRESENTED

1. Whether the Kansas City, Kansas Fire Department can be sued?

2. Did Plaintiff timely exhaust his administrative remedies?

3. Whether Defendant should prevail on Plaintiff's Title VII discrimination claim?

   a. Whether Plaintiff has stated a *prima facia* case of racial discrimination?

   b. Whether Defendant has a nondiscriminatory reason for the employment actions?

   c. Whether the *Ellerth/Faragher* defense applies

4. Whether Defendant should prevail on Plaintiff's Title VII Retaliation claim?

5. Whether Defendant should prevail on Plaintiff's ADA Discrimination claim?

   a. Whether Plaintiff is disabled under the meaning of the ADA?

   b. Whether Plaintiff can establish a *prima facie* case of disability discrimination?

   c. Whether Defendant has a nondiscriminatory reason for the employment actions?

6. Whether Defendant should prevail on Plaintiff's ADA Retaliation claim?

7. Whether Defendant can be liable for punitive damages?

### IV.   ARGUMENTS AND AUTHORITIES

### A.   Summary Judgment Standard

"The very purpose of summary judgment is to determine whether trial is necessary." *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the Declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); accord *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538-39 (10th Cir. 1993).  "The moving party bears the burden to show the absence of a genuine issue of material

fact." *Bennet v. Henderson*, 15 F.Supp.2d 1097, 1103 (D. Kan. 1998).  Once the moving party has satisfied its burden, "the burden shifts to the nonmoving party who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.'"  Id. (quoting *Anderson*, 477 U.S. at 256).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  Id.  Here, there is no significant probative evidence tending to support Plaintiff's claims in this case, and summary judgment should therefore be entered in favor of Defendant.

**B.  The Kansas City, Kansas Fire Department is Not a Governmental Entity Subject to Suit.**

Subunits of city governments, such as police departments or fire departments, are not governmental entities subject to suit. *Whayne v. State of Kan.*, 980, F.Supp. 387, 391 (D. Kan. 1997). The District of Kansas had previously noted that the Kansas City, Kansas Fire Department is not subject to being sued. *Becerra v. Unifed Gov't of Wyandotte County/Kansas City, Kansas*, 272 F.Supp.2d 1223, 1233 (D. Kan. 2003). Accordingly, the KCKFD should be dismissed as a party to this suit and any claims against it should be resolved against Plaintiff as a matter of law.

**C.  Exhaustion of Administrative Remedies**

Plaintiff filed his first EEOC charge on July 19, 2017. Fact ¶2. The 300-day window extends back from that date to September 22, 2016. The only employment action that occurred after September 22, 2016 was Plaintiff being suspended pending termination on September 28, 2019 and terminated on May 22, 2018. Fact ¶162, 169. Thus, none of Plaintiff's claims under the Americans with Disabilities Act (ADA) and none of Plaintiff's claims for harassment under Title VII were exhausted.

Title 42 U.S.C. §2000e-5(e)(1) and §2000e(f)(3) require that for allegations under Title VII and the ADA, a charge of discrimination be filed within three hundred days after the alleged unlawful employment practice occurred. *Lincoln v. BNSF Railway Co.*, 900 F.3d 1166, 1184-85 (10th Cir. 2018). Following the Tenth Circuit's decision in *Lincoln*, a plaintiff's failure to exhaust administrative remedies by filing an EEOC charge is no longer a jurisdictional bar. However, the failure to exhaust administrative remedies is still an affirmative defense. *Id.* Importantly, each incident of discriminatory or retaliatory treatment must be exhausted. *Lincoln*, 900 F.3d at 1181. However, while *Lincoln* means that failure to exhaust is no longer a bar to a court's jurisdiction to hear a claim, as an affirmative defense it means that the court can dismiss claims that were not exhausted. *Brown v. Keystone Learning Servs.*, 804 Fed.Appx. 873, 877, 882 (10th Cir. 2020). Here, Plaintiff has complained of either (1) discrete acts that fall outside the 300-day window or (2) harassment that took place entirely outside the 300-day window.

Both of Plaintiffs' EEOC charges allege that the discrimination was a continuing action. Fact ¶2. Current Tenth Circuit case law recognizes a continuing violation only where "the conduct as a whole can be considered as a single course of conduct." *Hamer v. City of Trinidad*, 924 F.3d 1093, 1098 (10th Cir. 2019) (quoting *Sierra Club v. Okla. Cas & Elec. Co.,* 816 F.3d 666, 672 (10th Cir. 2016)). Thus, a plaintiff's claim must be for injuries resulting from "a series of separate acts that collectively constitute one unlawful act," rather than "conduct that is a discrete unlawful act." *Id.* However, for the continuing violation doctrine to apply, one of the wrongful acts contributing to the collective conduct must occur within the 300-day filing period. *Id.* If a plaintiff satisfies that requirement, a court may consider the entire time period alleged, even outside the 300-day window. *Id.* One "important caveat" to this doctrine is that it requires "continual unlawful acts, not continual ill effects from the original violation." *Id.* (quoting *Mata v. Anderson*, 635 F.3d

1250, 1253 (10th Cir. 2011)). Here, Plaintiff's allegations are not continuing violations, and fall outside the 300-day window.

First, Plaintiff's claims regarding IOD leave for his 2013 injury did not continue past September 22, 2016. Plaintiff's allegations as to his IOD leave being converted to sick leave pertain to only the calendar year 2013 because plaintiff returned to work that year. Plaintiff was off work for his 2013 injury only during the 2013 calendar year. Fact ¶5. When Plaintiff sustained another work injury in 2016, he received IOD the entire time he was off and thus the approval of his IOD did not continue into that second injury over three years later. Fact ¶100. Thus, there was no continuation of issues with Plaintiff's leave beyond the end of 2013.

Second, Plaintiff's claims regarding his station transfer in 2015 did not continue past September 22, 2016. This was a discrete action. Plaintiff alleges that this move caused him to lose his chosen days off for the year. Fact ¶61. However, the alleged loss of vacation days is an *effect* of the allegedly unlawful action, and a continuing violation looks only at the acts, not their effects. *Hamer*, 924 F.3d at 1098. Further, even if the loss of chosen vacation days could qualify as a continuing violation, it would be constrained to the year 2015, which falls outside the 300-day window.

Third, Plaintiff's alleged harassment by Blevins at his new station consists of three incidents and is therefore not a continuing violation. These incidents were the confrontation after the Wal-Mart trip, the confrontation about Plaintiff's reimbursement forms, and Blevins bumping his shoulder. Fact ¶¶79-90. Plaintiff admitted that these were the only three incidents that occurred until he was working light duty following his 2016 injury. Fact ¶92. Because all those occurred before Plaintiff's June 27, 2016 injury, they fall outside the 300-day window.

Fourth, Plaintiff's alleged harassment by Zimbelman while on IOD leave for his June 27,

2016 injury would have stopped on August 9, 2016 when he returned to work. Fact ¶98. Thus, even if that harassment could be a continuing violation, it ceased when Plaintiff returned to work, which occurred before September 22, 2016. Plaintiff has not alleged that Zimbelman continued to harass him after Plaintiff returned to light duty on August 9, 2016.

Accordingly, the only alleged unlawful employment action that occurred within 300 days of Plaintiff's EEOC charge was his suspension pending termination and subsequent termination. Although failure to exhaust administrative remedies no longer deprives this court of subject-matter jurisdiction over those claims, it is nonetheless still an affirmative defense. *Brown*, 804 Fed. Appx. at 877, 882. This court can and should dismiss any claim for which Plaintiff's administrative remedies were not exhausted.

### D.  Title VII Discrimination

Plaintiff has alleged race discrimination under Title VII due to harassment and adverse job actions of denial of IOD leave for his 2013 injury, moving him to a new station in 2015, and terminating his employment in 2016. Pretrial Order, ECF Doc. 135, p. 14.

Plaintiff's Amended Petition includes a count of a hostile work environment under Title VII. ECF Doc. 95, ¶¶98-102. The Pretrial Order discusses harassment as a part of his claim for discrimination under Title VII. ECF Doc. 135, pp. 14-15. The Tenth Circuit has held that claims not included in the Pretrial Order are waived. *Cortez v. Wal-Mart Stores, Inc.*, 460 F.3d 1268, 1276-77 (10th Cir. 2006). Thus, any harassment alleged by Plaintiff should be analyzed as discriminatory conduct rather than as a hostile work environment, as that claim is waived.

"To prevail on a Title VII discrimination claim, the plaintiff bears the ultimate burden of proving intentional discrimination by the employer." *Singh v. Cordle*, 936 F.3d 1022, 1037 (10th Cir. 2019). "To survive summary judgment on a Title VII claim of discrimination based on race,

color, religion, sex, or national origin, a plaintiff must present either direct evidence of discrimination or indirect evidence that satisfies the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019). If there is no direct evidence of discrimination, the *McDonnell Douglas* framework is a three-step process:

> Under the *McDonnell Douglas* framework, a plaintiff must first "raise a genuine issue of material fact on each element of the prima facie case, as modified to relate to differing factual situations." The burden then "shifts to the employer to offer a legitimate nondiscriminatory reason for its employment decision." If the employer does so, "the burden then reverts to the plaintiff to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e., unworthy of belief."

*Bekkem*, 915 F.3d at 1267. To establish a *prima facie* case of Title VII discrimination, a plaintiff must establish that: "(1) [he] is a member of a protected class, (2) [he] suffered an adverse employment action, (3) [he] qualified for the position at issue, and (4) [he] was treated less favorably than others not in the protected class." *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir., 2012).

1. Plaintiff has not established a *prima facie* case of Title VII Discrimination

Here, Plaintiff has not demonstrated any direct evidence of racial discrimination. In fact, Plaintiff was unable to identify any racial comments by KCKPD officials and knows of no reasons for his termination other than those provided by Chief Jones. Fact ¶¶170, 172. Due to the lack of direct evidence, the Court should apply the *McDonnell Douglas* framework. For the purposes of summary judgment only, Defendant will assume that Plaintiff has established the first and third elements of a *prima facie* case. However, Plaintiff cannot provide evidence that the alleged harassment was an adverse employment action or that that he was treated less favorably than individuals outside his class.

First, Plaintiff cannot establish that any harassment constituted an adverse employment action. Plaintiff has alleged harassment by Shirley, Blevins, and Zimbelman. While harassment can be sufficiently severe to constitute an adverse employment action, the alleged harassment here does not rise to that level. *Tapia v. City of Albuquerque*, 170 Fed. Appx. 529, 533 (10th Cir. 2006). A plaintiff's "mere subjective belief" that he is being harassed is insufficient to survive summary judgment. *Id.* at 534. In *Tapia*, the Tenth Circuit found a lack of adverse employment actions from alleged harassment where no change in the plaintiff's employment status occurred, such as his job, pay, and benefits. *Id.* Here, Plaintiff does not allege that Shirley and Zimbelman harassed him personally: Plaintiff alleges that they contacted his physician too often. Fact ¶¶24, 26-28, 102-03. However, Plaintiff described his interactions with Shirley following the 2013 injury as "decent conversations" and admitted that he never actually interacted with Zimbelman while on IOD leave for his 2016 injury. Fact ¶25, 104. Further, Shirley and Zimbelman were seeking medical documentation to keep Plaintiff on paid leave while injured. Fact ¶¶ 31-46, 105-109. In other words, Shirley and Zimbelman were trying to prevent Plaintiff's refusal to comply with contractual provisions for his leave from depriving him of his IOD leave. Plaintiff's feelings about Shirley and Zimbelman contacting his physicians is a mere subjective belief.

As for the alleged harassment by Blevins, Plaintiff has not, and cannot, establish an adverse employment action that occurred due to that harassment. Instead, Plaintiff has a subjective belief that he was harassed, which is insufficient to survive summary judgment, and which resulted in no adverse employment action. Additionally, Plaintiff has testified that he feels Blevins discriminated against him due to his work injury, not his race. Fact ¶94.

Second, Plaintiff has not supplied evidence that employees outside his protected class were treated more favorably than him. Plaintiff cannot identify any Caucasian firefighters failed to

comply with IOD leave requirements and were granted leave when Plaintiff's was denied. Fact ¶50. Plaintiff cannot provide facts showing that his 2015 station transfer was the result of being treated less favorably than others not in a protected class. In fact, Plaintiff admitted that firefighters were routinely moved to a new station if they had an issue with another firefighter, and that it had happened to him before. Fact ¶73-74.

Plaintiff has no evidence that Blevins treated him any differently than Blevins treated individuals not in a protected class. Plaintiff has no evidence that Shirely and Zimbelman treated him any differently than individuals not in a protected class. Lastly, Plaintiff cannot present evidence of other employees that double-dipped and were paid by the UG twice for the same times and were treated differently than him. Fact ¶173.

    2.   <u>Defendant can demonstrate non-discriminatory reasons for its employment decisions</u>

If the Court finds that Plaintiff has established a *prima facie* case of Title VII discrimination, Defendant has the burden of demonstrating non-discriminatory reasons for the employment decisions about which Plaintiff now complains.

First, the portion of Plaintiff's IOD leave following his 2013 injury that was denied was the result of Plaintiff's inability or refusal to provide Defendant the proper medical documentation to justify the leave despite repeated attempts by Defendant to obtain it. Plaintiff acknowledged that the MOU that governs IOD leave required him to check in with Defendant every thirty days, and Deputy Chiefs Shirley and Andrade both testified to the same requirement. Fact ¶¶14-18. If those medical updates are not provided, IOD leave can be denied. Fact ¶22. Plaintiff failed to comply with Defendant's IOD leave procedures, which were a product of the MOU bargained for by Plaintiff's union. Fact ¶14, 32-46, 54. Shirley, the Deputy Chief at the time, tried several times to contact Plaintiff and obtain proper paperwork, and went so far as going to Plaintiff's physician to

obtain the paperwork. Fact ¶¶33-35. Pursuant to the MOU, Defendant can contact the physician of a firefighter on IOD leave. Fact ¶20. The date that Plaintiff's IOD leave stopped was converted to sick leave, Defendant had not received a medical authorization from Plaintiff and had not received sufficient documentation from Plaintiff. Fact ¶¶33, 39. Accordingly, Plaintiff's IOD leave was not converted to sick leave due to his race, it was converted to sick leave due to Plaintiff's inability and failure to comply with the contractual provisions governing this fully-paid leave requiring regular thirty day reports from the employee. Fact ¶167. Shirley testified that denial of IOD for failure to submit reports has been done before. Fact ¶69. Plaintiff cannot identify any Caucasian firefighters who were granted IOD in the absence of timely thirty-day IOD reporting. Fact ¶50.

Second, Plaintiff was moved to a new station in January 2015 because of his altercations with another firefighter. Fact ¶72. Plaintiff's testimony establishes that he and almost had a fist fight on Christmas Day 2014.  Fact ¶¶63, 69-71. This was the second time Plaintiff had been moved in his career due to problems with a coworker. Fact ¶74. Thus, his station transfer was not an instance of discrimination, but rather a decision by the KCKFD made after an altercation with a co-worker who worked in the same Firehouse with Plaintiff. Fact ¶72. Such transfers were common at the KCKFD. Fact ¶62.

Third, Plaintiff was suspended pending termination, and ultimately terminated, after Defendant discovered that he was being paid wages by two of its departments for the same hours worked. Fact ¶167-69.  To establish a prima facie case of Title VII discrimination discharge case, a plaintiff must show that: "'(1) he belongs to a protected class; (2) he was qualified for his job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge.'" *Singh*, 936 F.3d at 1037 (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1229 (10th Cir. 2000)). For the purposes of summary judgment, Defendant will assume the

Plaintiff can state a *prima facie* case of Title VII discrimination for his termination.

However, there is a clear nondiscriminatory reason for Plaintiff's termination. While still employed as a firefighter for the KCKFD, Plaintiff also worked for the UG's Parks and Recreation summer program. Fact ¶132-33. When summer program hours were examined for a Kansas Department of Labor investigation, Defendant determined that Plaintiff was recording himself as present on the same day for both the summer program and the KCKFD. Fact ¶141. Plaintiff was working for both departments concurrently in the summers of 2013, 2014, and 2015. Fact ¶¶143, 155. The neutral arbitrator who examined Plaintiff's misconduct found that Plaintiff double-dipped on five occasions in 2015, six occasions in 2016 and that he worked at Parks while calling in sick to the Fire Department on one occasion in 2015 and eight occasions in 2013. Fact ¶166. While other UG employees also worked for the summer program, only Plaintiff double-dipped by marking himself present in multiple places at once. Fact ¶¶137, 141-42. Because he was able to work a full shift for the summer program, Plaintiff called in sick despite not having a bona fide illness, which violates the MOU. Fact ¶¶146-47. Plaintiff has no evidence of any other reasons for his termination other than those provided by then-Fire Chief Jones. Fact ¶170. In fact, Plaintiff admitted that the records show he was working for KCKPD and the summer program at the same time. Fact ¶171. Plaintiff's termination was not pretextual: it was because he falsified records and stole time, double-dipping to be paid by the UG twice for the same hours. Fact ¶167. The lack of pretext is firmly established by the fact that the neutral third-party arbitrator who examined plaintiff's termination found that the evidence conclusively established his misconduct sufficient to warrant his termination. Fact ¶167.

As for any alleged harassment by Blevins, Plaintiff has admitted that he believes it was due to his 2013 injury rather than due to race. Fact ¶94. Thus, any alleged harassment by Blevins was

not racially motivated.

      3.   The *Ellerth-Faragher* defense applies

If the Court finds that Plaintiff was not harassed by a supervisor, Defendant is only liable if it was negligent in controlling working situations. If the Court finds that Plaintiff was harassed by a supervisor (and that he has not abandoned his claims of harassment under Title VII), Defendant is entitled to the defenses provided by *Ellerth/Faragher*. Under this standard, an employer's liability for harassment hinges on whether the alleged harasser was a supervisor or a coworker. If the harasser was Plaintiff's coworker, the employer is liable only if it was negligent in controlling working conditions. *Vance v. Ball State Univ.*, 570 U.S. 421, 429 (2013). If the harasser is a supervisor and the harassment causes a tangible employment action to occur, the employer can be held strictly liable. *Id.* If the harasser is a supervisor and no tangible employment action occurs as a result, an employer can mitigate or avoid liability by showing (1) that it exercised reasonable care to prevent and promptly correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that were provided." *Id.* at 430. The facts here show that Plaintiff was not harassed by a supervisor; if he was harassed by a supervisor no tangible employment action resulted from it; and that Defendant is entitled to the *Ellerth/Faragher* defense.

      *i.*   *Whether Plaintiff's alleged harassers were his supervisors*

The initial question under *Ellerth/Faragher* is whether the alleged harasser was Plaintiff's supervisor. This question is almost always a question of law, and the United States Supreme Court has found that it will typically be decided on summary judgment. *Vance*, 570 U.S. at 441. Importantly to this case, the "ability to direct another employee's tasks is simply not sufficient" in determining whether the alleged harasser was a supervisor. *Id.* at 439. Rather, supervisory capacity

requires that the supervisor can make tangible employment action, which the United States Supreme Court has defined as, to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance.* 570 U.S. at 431. The Court in *Vance* also noted that a "supervisor has been empowered by the company *as a distinct class* of agent to make economic decisions affecting other employees under his or her control." *Id.* at 440 (emphasis original).

First, Blevins was only in Plaintiff's chain of command on one day in 2015 and 2016: April 10, 2015. Fact ¶183-84. Otherwise, throughout 2015 and 2016, Blevins was in command of the western district while Plaintiff's station, Station 10, was in the eastern district. Fact ¶¶180-81. Thus, there is only one day where Blevins was even in a position above Plaintiff in the chain of command. Notably, this means that any alleged harassment by Blevins in 2016 was that of a co-worker, because Blevins was not in any position directly above Plaintiff. However, even on the sole day in 2015 where Blevins was in Plaintiff's chain of command – the Wal-Mart incident – Blevins did not have the authority or power to take a tangible employment action against Plaintiff. There is simply no evidence that Blevins could fire Plaintiff, fail to promote Plaintiff, reassign Plaintiff to significantly different responsibilities, or effect a significant change in Plaintiff's benefits. Thus, at no time was Blevins Plaintiff's supervisor.

As for Shirley and Zimbelman both were Deputy Chiefs at the time of the alleged harassment and therefore in Plaintiff's chain of command. However, Plaintiff has not suggested any facts that they could fire Plaintiff, fail to promote Plaintiff, reassign Plaintiff to significantly different responsibilities, or effect a significant change in Plaintiff's benefits.

Thus, if the court finds that the alleged harassment by Blevins, Shirley, or Zimbelman rises

to the level of Title VII discrimination, that harassment was by a co-worker, not a supervisor, and Defendant is only liable if it was negligent in controlling working conditions.

> ii.    *No tangible employment actions occurred due to harassment by a supervisor*

Of the alleged harassment by supervisors, no tangible employment actions occurred. "A tangible employment decision requires an official act of the enterprise, a company act." *Ellerth*, 524 U.S. at 761-62. "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 761. Here, the only tangible employment action under *Ellerth* would be Plaintiff's termination. His transfer to Station 10 did not include any "significantly different responsibilities." *See id.* However, Plaintiff has not alleged that he was suspended pending termination because he was harassed. Even if the Court does find that a supervisor harassed Plaintiff, which Defendant denies, the lack of a tangible employment decision opens up the *Ellerth/Faragher* defense to Defendant.

> iii.   *Defendant exercised reasonable care to prevent harassment and Plaintiff unreasonably failed to take advantage of preventive or corrective opportunities*

Defendant can avoid liability by showing: "(1) that it exercised reasonable care to prevent and promptly correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that were provided." *Vance,* 570 U.S. at 430.

On the first element of this defense, "an employer 'acts reasonably as a matter of law to prevent harassment if it adopted valid [anti-]harassment policies and distributed those policies to employees via employee handbooks, even if it either provided no [anti-]harassment training or provided training only to managers.'" *Stapp v. Curry County Board of County Comm'rs.*, 672

Fed.Appx 841, 849 (10th Cir. 2016) (brackets original) (quoting *Debord v. Mercy Health Sys. Of Kansas, Inc.*, 737 F.3d 642, 653 (10th Cir. 2013)). Here, Defendant has anti-harassment policies that are distributed to employees and requires employees to addend regular trainings on those topics. Fact ¶¶153-86. Thus, Defendant has acted reasonably as a matter of law.

The first element also requires an employer to show that it acted reasonably promptly when "given proper notice" of the allegations "as required under its complaint procedures." *Helm v. Kansas*, 656 F.3d 1277, 1290 (10th Cir. 2011). Defendant's policy encourages employees to report harassment before it becomes severe or pervasive. Fact ¶189. Here, Plaintiff waited over a year to make a complaint to HR. Blevins allegedly harassed Plaintiff in April 2015 and did not complain to HR until June 9, 2016. Fact ¶¶ 123, 91.

The second element asks whether the complainant unreasonably failed to take advantage of preventative or corrective actions. "As for the correction requirement, an employer satisfies its burden 'by showing that the victimized employee unreasonably delayed in reporting [or never reported] incidents of [prohibited] harassment.'" *Stapp*, 672 Fed.Appx. at 849-50 (brackets original) (quoting *Helm*, 656 F.3d at 1291). The District of Kansas has noted that delays of under seven months are still unreasonable under this element. *Ferguson v. Associated Wholesale Grocers, Inc.*, 469 F.Supp.2d 961, 970 (D. Kan. 2007). Here, Plaintiff waited far longer than that. As stated in the preceding paragraph, Defendant has shown that Plaintiff unreasonably delayed in reporting alleged harassment to HR by waiting over a year to complain about Blevins.

If any alleged harasser is found to by Plaintiff's supervisor, Defendant has established that the uncontroverted facts in this case make it eligible to the *Ellerth/Faragher* defense and that it has met the requirements for that defense.

### E.  Title VII Retaliation

Claims for Title VII retaliation follow the same *McDonnell Douglas* framework as a claim for discrimination under Title VII. *Bekkem*, 915 F.3d at 1267. To state a prima facie case for Title VII retaliation under the first step of *McDonnell Douglas*, a plaintiff must show three things: "(1) that she engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Id.* (quoting *Khalik v. United Air Lines,* 671 F.3d 1188. 1193 (10th Cir. 2012)). For a retaliation claim under Title VII, an action is materially adverse if it would have dissuaded a reasonable worker form making or supporting a charge of discrimination. *Jones v. Wichita State Univ.*, 528 F.Supp.2d 1182, 1193 (D. Kan. 2007).

Plaintiff's Amended Complaint alleges that his protected opposition to discrimination was reporting racial harassment to HR and the Mayor of Kansas City, Kansas. ECF Doc. 95, ¶115-116. Notably, Plaintiff has admitted that he did not complain to either HR or the Mayor regarding his 2013 injury and leave therefor or his station transfer and any alleged loss of sick leave. Fact ¶¶ 56, 75. Thus, Plaintiff cannot assert any retaliation based on complaints for his 2013 injury or 2015 station transfer. Additionally, the first complaint Plaintiff made to HR was by phone on June 9, 2020. Fact ¶119. Accordingly, no alleged action taken against Plaintiff before that date can constitute Title VII discrimination because Plaintiff had not engaged in protected opposition to the discrimination yet; an employment action cannot be caused by a complaint not yet made.

The only allegedly retaliatory actions Plaintiff's claims could address, then, would be part of Blevins' harassment[2] and his termination. As for Blevins' alleged harassment, Plaintiff

---

[2] However, if Plaintiff contends that Blevins' alleged harassment while Plaintiff was on light duty in 2016 is retaliation, then that harassment would be separate from any prior alleged harassment following Plaintiff's 2015 transfer. As such, not all of Blevins' conduct could be a continuing action. Thus, either all of Blevins' alleged harassment is related and therefore not retaliatory, or some of it is retaliatory, and any harassment prior to June 9,

described his 2016 incidents with Blevins as "misunderstandings." Fact ¶93. Thus, Plaintiff's own admission indicates that the second showing for a *prima facie* case is lacking. Further, his "misunderstandings" with Blevins, even those after June 9, 2016, do not rise to the level of conduct required by the Tenth Circuit to constitute "materially adverse."

There is also no causal connection between any protected activity and Blevins' alleged harassment because Blevins did not know of any such protected activity. For a claim of retaliation to meet the causal connection prong, the alleged retaliator must know that the employee was engaging in protected opposition. *Peterson v. Utah Dept. of Corrections*, 301 F.3d 1182, 1188 (10th Cir. 2002). Blevins did not know about Plaintiff's complaints. Fact ¶131. As such, he could not have been retaliating against protected activity about which he had no knowledge. Blevins knew nothing of any complaints by Plaintiff regarding his transfer and Plaintiff admitted that Blevins was not involved in any complaints about the 2013 injury. Fact ¶76. Importantly, Plaintiff also testified that he feels Blevins' alleged harassment in 2015 after the station transfer was related to his 2013 injury. Fact ¶24. As such, any complaints made about Blevins were not related to any complaints about racial discrimination under Title VII and there is no causal connection. *See Beck v. Figeac Aero North American, Inc.*, 382 F.Supp.3d 1170, 1177 (D. Kan. 2019) (finding that complaint to HR was a protected opposition to discrimination because the complainant thought she was complaining about conduct prohibited by Title VII). Further, this demonstrates that Plaintiff himself has conceded the lack of a causal relationship between his 2015 interactions with Blevins and any Title VII protected activity. As for any alleged action by Blevins after Plaintiff complained to HR, Blevins was unaware of any complaints made by Plaintiff or any other investigation into Plaintiff. Fact ¶76, 118, 131. As such, there is no causal connection.

---

2016 falls squarely outside the 300-day window prior to Plaintiff's EEOC claim.

The only other employment action that occurred after Plaintiff's first HR complaints was his suspension pending termination and ultimate termination following the grievance process. On this issue, the causal connection is lacking. Plaintiff was fired because it was discovered that he was double-dipping by earning wages twice from the UG during the same time periods, not because of any complaints he may have made. Defendant incorporates its argument, *supra,* Section IV.C as to the reasoning for Plaintiff's termination.

### F.  ADA Discrimination

1.  <u>Plaintiff is not a "qualified individual."</u>

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADAAA defines a "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." *Id.* at § 12102(1). For the purposes of subsection (1)(3) and perceived disability, the ADAAA provides:

> (A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.
> (B) Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.

*Id.* at § 12102(3). Under this definition, for a plaintiff alleging disability discrimination to show that his employer regarded him as having an impairment, "the plaintiff must show that (1) he has an actual or perceived impairment, (2) that impairment is neither transitory nor minor, and (3) the

employer was aware of and therefore perceived the impairment at the time of the alleged discriminatory action." *Adair v. City of Muskogee*, 823 F.3d 1297, 1306 (10th Cir. 2016).

Plaintiff's 2013 work injury was transitory or minor. First, Plaintiff was taken off work from January 21, 2013 until August 22, 2013, just one month longer than the statutory cutoff. Second, an impairment is minor where a plaintiff makes a quick and total recovery from an acute injury. *EEOC v. UPS Ground Freight, Inc.*, 443 F.Supp3d 1270, 1286 (D. Kan. 2020). Here, Plaintiff sustained an acute injury to his back and left leg. Fact ¶3. He did not require surgery, instead doing stretching exercises, icing, heating, and taking ibuprofen. Fact ¶4. In *Paraham v. Atriums Mgmt. Co., Inc.*, Judge Murguia noted that the plaintiff's back injury was not transitory where he was forced to quit his prior job as a mover, took time off due to back pain years after the injury, and often spoke of back pain. No. 16-2539, 2018 WL 691000 at *5-*6 (D. Kan. Feb. 2, 2018). Here, there is no evidence of Plaintiff missing work for his back after his initial leave. Further, he testified that he was able to perform his "very strenuous" job duties following his 2013 injury up to his second work injury in 2016. Fact ¶7-8. Thus, Plaintiff's 2013 injury falls far short of those long-lasting and constantly-felt effects.

Similarly, Plaintiff's 2016 injury was also transitory and minor. First, Plaintiff was off work from June 27, 2016 to August 9, 2016. Fact ¶¶96, 98. Thus, pursuant to § 12102(3)(B), the shoulder injury was transitory. Even if Plaintiff's light duty work from August 9, 2016 until his suspension pending termination does not stop the six-month clock under § 12102(3)(B), Plaintiff has no objective evidence that the duration of his impairment was over six months.

Both Plaintiff's 2013 and 2016 work injuries were transitory and minor. As such, he cannot satisfy even the ADAAA's low threshold of a perceived disability.

2. Plaintiff cannot establish a *prima facie* case of disability discrimination.

Because Plaintiff has no direct evidence of discrimination, the analytical framework first articulated in *McDonnell Douglas* applies to Plaintiff's ADA discriminatory treatment claim. *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005) (citations omitted). Under the first step, plaintiffs must establish a *prima facie* case of ADA discrimination, which requires showing that "the plaintiff (1) is a disabled person as defined by the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) suffered discrimination by an employer or prospective employer because of that disability." *Fryer v. Coil Tubing Servs., LLC.*, 415 Fed.Appx. 37, 43 (10th Cir. 2008).

The Tenth Circuit has stated that to satisfy the ADA's definition of disabled under the first prong of a prima facie case, "a plaintiff must (1) have a recognized impairment, (2) identify one or more appropriate major life activities, and (3) show the impairment substantially limits one or more of those activities." *Allen v. Southcrest Hospital*, 455 Fed. Appx. 827, 831 (10th Cir. 2011).

While the ADA's definition of impairment discusses major life activities, the Act itself does not define that term. However, the Tenth Circuit has borrowed EEOC regulations adopt a definition provided in the Rehabilitation Act Regulations, defining the term to mean "'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" *Bolton v. Scrivner, Inc.*, 36 F.3d 939, 942 (10th Cir. 1994) (quoting 29 C.F.R. § 1630.2(i)). To establish an impairment of the ability to work specifically, an individual must "demonstrate that she was substantially limited in performing a class of jobs or broad range of jobs in various classes as compared to most people with comparable training, skills, and abilities." *Allen v. Southcrest Hospital*, 455 Fed. Appx. 827, 835 (10th Cir. 2011). Where a plaintiff cannot establish a substantial limitation "in performing a class of jobs or a broad range of jobs in various classes as compared to most people with comparable training, skills, and abilities," that

plaintiff cannot meet their burden on summary judgment to establish a *prima facie* case of disability discrimination. *Id.*

Here, Plaintiff cannot demonstrate a substantial limitation as to working because he cannot demonstrate a substantial limitation in performing a class or broad range of jobs. Specifically, Plaintiff testified that he was able to perform his "very strenuous" job duties following his 2013 injury up to his second work injury in 2016. Fact ¶7-8. While Plaintiff alleged that he has trouble sleeping, he testified that this is related to his 2016 shoulder injury, not his 2013 back injury. Fact. ¶118. Plaintiff's Amended Complaint alleges that his 2013 back injury has substantially limited the following major life activities: "sitting, standing, exercise, sleep, lifting, pulling and loss of sensitivity in his left leg." ECF 95, ¶76. Plaintiff did not testify to any of those limitations. Accordingly, he cannot demonstrate any facts that would support a substantial limitation of major life activities due to his 2013 injury.

Following Plaintiff's 2016 injury, he did not return to full duty before his suspension pending termination. Fact ¶99. Since his termination, Plaintiff has not looked for work as a firefighter, blaming his lack of a job search on the fact that he was terminated and his "disability." Fact ¶¶177-79. However, despite testifying that his disability is the reason he is not working, Plaintiff has no evidence that his disability is continuing today and is substantially limiting him from working in any class of jobs. In fact, Plaintiff testified that he has performed some odd-jobs for a friend, and has applied for some non-firefighter jobs: driver, security officer, and clerical positions. Fact ¶¶175. Thus, Plaintiff's application for jobs in multiple areas, from office jobs to security jobs to driving jobs demonstrates that he does not consider his work injury to substantially limit him from working in multiple classes of jobs. As for other substantially limited major life activities, Plaintiff testified that it is harder to rotate his arm over his head and he does not sleep

well. Fact ¶118. Ultimately, his own testimony does not support his claim that his shoulder injury is the cause of an impairment to a major life activity.

Because Plaintiff is not substantially limited in any major life activities from either his 2013 or 2016 injuries, he cannot state a *prima facie* case for ADA discrimination.

3.   <u>There are legitimate, nondiscriminatory reasons for the alleged employment actions.</u>

Even if Plaintiff can state a *prima facie* claim for ADA discrimination, there are legitimate, nondiscriminatory reasons for each of the alleged employment actions.

First, Plaintiff's IOD leave following his 2013 injury has been discussed *supra* in Section IV.C.2 and incorporates that argument here. Second, Plaintiff's station transfer was due to conflict with a coworker, not any alleged disability, as discussed *supra* in Section IV.C.2. Lastly, the reasoning behind Plaintiff's termination is his double-dipping, as discussed *supra* in Section IV.C.2. Defendant incorporates those argument here.

Additionally, as discussed *supra*, in Section IV.C.1, the alleged harassment by Shirley and Zimbelman was in fact an effort to keep Plaintiff on his paid IOD leave, not discriminate against him because of his injury. This alleged harassment, then, was an effort to document and substantiate Plaintiff's injury, not discrimination because of it.

## G.  ADA Retaliation

"The ADA's retaliation statute provides that '[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.'" *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1186 (10th Cir. 2016). Whereas an ADA discrimination claim requires a plaintiff to show he is a "qualified individual with a disability," and ADA retaliation claim requires a showing

that a plaintiff "had a reasonable, good-faith belief that he was disabled." *Id.* Accordingly, an ADA retaliation claim does not require a plaintiff to show that they suffer from an actual disability. *Id.* Without direct evidence of retaliation, the *McDonnel Douglas* framework is used. *Id.*

### 1. Plaintiff cannot state a *prima facie* case of ADA retaliation

To establish a prima facie case of ADA retaliation, a plaintiff must prove that: "(1) he 'engaged in a protected activity'; (2) he was 'subjected to [an] adverse employment action subsequent to or contemporaneous with the protected activity'; and (3) there was 'a causal connection between the protected activity and the adverse employment action.'" *Id.* (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999)).

In the context of an ADA harassment claim, the first prong – engaging in a protected activity – can be satisfied if a plaintiff shows the act of requesting an accommodation. *Id.* at 1187. The "request for accommodation is adequate if it is 'sufficiently direct and specific, giving notice that [the employee] needs a special accommodation.'" *Id.* (quoting *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 23 (1st Cir. 2004)). Filing an EEOC charge constitutes a protected activity. *Anderson*, 181 F.3d at 1178. Requests for reassignment to an open position can constitute a protected activity. *Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1194 (10th Cir. 2007). Here, Plaintiff's alleged protected activity was opposing and complaining about the discrimination to which he was subjected. Pretrial Order, ECF Doc. 135, p. 15. However, "the mere discussion of an ADA-protected condition does not automatically convert the conversation into protected activity under the ADA." *Grear v. Miller & Newberg, Inc.*, No. 15-7458-JAR, 2016 WL 4095429 at *9 (D. Kan., Aug. 2, 2016). In *Grear*, this Court required evidence of specifically allegations of ADA discrimination or a request for accommodation, holding that a plaintiff that simply discusses the challenges of a medical condition is insufficient to constitute protected activity in an ADA

retaliation claim. *Id.*

Plaintiff did not request or require any accommodations after his 2013 work injury, nor did he request a transfer to another position because of an inability to perform his current position. Fact ¶¶8-10. Plaintiff did not complain to HR after his 2013 injury. Fact ¶56-57. Plaintiff did not complain to Chief Jones. Fact ¶58. Plaintiff spoke to Shirley about his IOD leave following the 2013 injury, but there is no testimony that he alleged any ADA discrimination or requested an accommodation. Fact ¶47. The only person to whom Plaintiff complained after his 2013 injury was his union. Fact ¶49. However, Plaintiff did not file a grievance. Fact ¶55. Thus, Plaintiff did not engage in any protected activity related to his 2013 injury.

Plaintiff's second injury occurred on June 27, 2016. Fact ¶96. Plaintiff returned to light duty on August 9, 2016. Fact ¶98. However, Plaintiff's complaint to HR was made on June 9, 2016, before this injury. Fact ¶119. Thus, Plaintiff's complaints to HR could not constitute protected activity regarding an injury that had not occurred yet. In his meeting with County Administrator Doug Bach and Reverend Jimmy Banks, on June 30, 2016, Plaintiff did not complain about anything related to his 2016 injury. Fact ¶129-30. In his meeting with Mayor Mark Holland and Reverend Banks on July 7, 2016, Plaintiff does not allege that he complained about his 2016 injury. Amended Complaint, ECF Doc. 95, ¶43. Accordingly, there is no evidence that, prior to filing an EEOC charge, Plaintiff engaged in any protected activity relative to his 2016 injury, either by requesting an accommodation or complaining about any discrimination as a result of that injury.

Plaintiff has failed to establish any facts that he engaged in any protected activity related to either work injury.

The second prong of a *prima facie* case in an ADA retaliation claim requires that a plaintiff

show they were subjected to an adverse employment action subsequent to or contemporaneous with the protected activity – the complaint about discrimination. There is no "set rule regarding what constitutes an 'adverse employment action'" in the Tenth Circuit; the determination is made on a case-by-case basis. *Anderson*, 181 F.3d at 1178. Even at summary judgment, the alleged harassment cannot be based merely on a plaintiff's unsupported assertions expressed through deposition testimony. *Tapia v. City of Albuquerque*, 170Fed.Appx 529 (10th Cir. 2006) (holding that where employee asserted harassment but had no corroborating testimony by coworkers and the allegedly-harassing supervisors denied the harassment, the employee's unsupported assertions were insufficient at summary judgment to sustain a finding of adverse employment action and, therefore, a finding of harassment.).

Here, the only adverse employment action that could possibly meet this prong is Plaintiff's termination. His station transfer in 2015 occurred over a year before his June 9, 2016 complaint to HR. Fact ¶119. Similarly, any alleged harassment by Shirley and Zimbelman occurred before that date. Additionally, Plaintiff has not established any facts to show that his claims of harassment against Shirley, Zimbelman, and Blevins resulted in an "adverse employment action." As the Tenth Circuit found in *Tapia*, even on summary judgment an unsupported claim of harassment is insufficient to constitute a finding of an adverse employment action.

The third prong of an ADA retaliation claim requires a causal connection between the protected activity – complaining about discrimination – and the adverse employment action – being forced to use sick leave instead of IOD leave. To establish a causal connection, a plaintiff "must present evidence of circumstances that justify an inference of retaliatory motive." *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014). "The Supreme Court has likened this burden to a showing of 'but-for causation.'" *Id.* (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338,

360 (2013)). "The evidence of but-for causation must be based on more than mere speculation, conjecture, or surmise." *Id.* (internal quotation marks omitted). An employer "need not suspend previously planned adverse employment actions upon encountering an employee's protected activity. *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1185 (10th Cir. 2016) (quoting *Clark City School Dist. v. Breeden*, 532 U.S. 268, 272 (2001)).

Here, the causation element is lacking as to Plaintiff's termination. Defendant became aware of Plaintiff's double-dipping when the Kansas Department of Labor initiated an investigation into the summer program in October 2015. Fact ¶¶136-38. By the time Plaintiff contacted HR to make a complaint about the facts alleged in this case, he was already being investigated for this activity. In fact, the reason for the delay in Plaintiff meeting with HR in person was that he was already being investigated when he complained. Fact ¶122. As stated in *Foster*, Defendant did not need to suspend its previously planned adverse employment action due to Plaintiff's complaint to HR. The fact that Plaintiff was being investigated prior to his complaints also demonstrates that his complaint was not the "but-for" cause of his suspension pending termination. *See, Ward, supra.*

> 2.   Defendant has legitimate, nondiscriminatory reasons for Plaintiff's termination

Defendant's non-discriminatory reasons for Plaintiff's termination have been discussed, *supra*, in Section IV.C.2 and Defendant incorporates them here by reference.

## V.   DEFENDANT CANNOT BE LIABLE FOR PUNITIVE DAMAGES

As a governmental entity, the Unified Government of Wyandotte County/Kansas City, Kansas cannot be liable for punitive damages on a Title VII claim. *Conchola v. Kansas City,* No. CIV.A.98–2155–GTV, 1999 WL 183931 at *1 (D. Kan., March 31, 1999). In *Conchola*, the District of Kansas found that in a suit against the Kansas City, Kansas Police Department, the

plaintiff could not recover punitive damages for a Title VII claim. *Id.* Here, too, Plaintiff cannot collect punitive damages against Defendant.

## VI.   CONCLUSION

For all the reasons stated above, Defendant is entitled to summary judgment on all claims and against Plaintiff.

Respectfully submitted,

McANANY, VAN CLEAVE & PHILLIPS, P.A.
10 E. Cambridge Circle Drive, Suite 300
Kansas City, Kansas 66103
Phone: (913) 371-3838
Fax: (913) 371-4722
rdenk@mvplaw.com
slow@mvplaw.com

 /s/ Spencer A. Low
Ryan B. Denk #18868
Spencer A. Low #27690

*Attorneys for Defendant Unified Government of
Wyandotte County/Kansas City, Kansas*

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that on the 2nd day of September, 2020, the above and foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to the following:

Alexander L. Edelman
Sarah Liesen
Edelman, Liesen & Myers, LLP
4051 Broadway, Suite 4
Kansas City, MO 64111
aedelman@elmlawkc.com
sliesen@elmlawkc.com

*Attorneys for Plaintiff*

                                                    /s/ Spencer A. Low