# EXHIBIT

# J

*JYAN HARRIS vs*

*CITY OF KANSAS CITY, KANSAS FIRE DEPARTMENT, et al.*

*DEPOSITION OF KEVIN SHIRLEY*

*July 15, 2020*



mcr@metropolitanreporters.com
www.metropolitanreporters.com
913.317.8800   800.748.7511

OUT-OF-TOWN DEPOSITIONS?
WE'VE GOT YOU COVERED!



WWW.DEPOSPAN.COM

Case 2:18-cv-02084-JAR   Document 139-11   Filed 09/02/20   Page 3 of 14

JYAN HARRIS vs                                               DEPOSITION OF KEVIN SHIRLEY
CITY OF KANSAS CITY, KANSAS FIRE DEPARTMENT, et al.                    July 15, 2020

Page 9

1  Q. Okay. And how do you know him?
2  A. From working at the fire department.
3  Q. Do you recall what position you were
4  in when you first met him?
5  A. Oh, I'm sorry, I was a battalion chief
6  at the time before.
7  Q. Was that the job you had directly
8  before your final position as deputy chief?
9  A. Right. I was a battalion chief and
10  then I was selected to be a deputy chief.
11  Q. And how long were you a battalion
12  chief for?
13  A. I'm sorry, I can't tell you for sure.
14  I'm just guessing, I don't have any records, I don't
15  want to tell you something that's not correct.
16  Q. Okay.
17  A. I would say -- okay, I would say I was
18  a battalion chief at least 2 to 3 years.
19  Q. Okay. And how often did you interact
20  with Jyan Harris.
21  A. Seldom. Yeah, I would have only seen
22  him occasionally, but I knew who he was, he knew who
23  I was.
24  Q. Okay. Do you recall Jyan Harris at
25  some point in time being injured on the job?

Page 10

1  A. Yes, I do.
2  Q. What do you recall about that?
3  A. It was reported to me that Jyan had
4  been struck by a vehicle. I believe he had been
5  directing traffic or was on the edge of the road, and
6  that's what I remember happening.
7  Q. Okay. And how did that come to your
8  attention?
9  A. As a deputy chief, I reviewed the what
10  we call "IOD packets." When someone was injured on
11  the job, there was a packet that was filled out
12  stating what went on, requesting medical records,
13  telling the employee what is expected of them, what
14  they should do.
15  Q. Okay. And IOD, you said that, does
16  that mean injury on duty?
17  A. Correct.
18  Q. Okay. And do you remember doing that
19  for -- do you remember Jyan Harris' packet coming to
20  you for review?
21  A. Not specifically. But I'm sure it
22  did, you know. It was one of those things that I
23  would do in the morning, go to the shift commanders,
24  check for paperwork for injuries and so forth.
25  Because I remember, I don't think he was still in the

Page 11

1  hospital when I got that packet, I don't -- I can't
2  remember what his -- what happened to him for sure,
3  other than he had been struck by the vehicle.
4  Q. Okay. Do you remember whether
5  Mr. Harris' injury or injury-on-duty leave was
6  approved.
7  A. Well, I remember the packet was filled
8  out and so yes. I don't have total recall, but if he
9  was injured on duty, yeah, he was covered.
10  Q. And how long was he covered? How long
11  would he have been covered for?
12  A. Well, he had one year to return to
13  work. You know, as long as you're complying with the
14  process.
15  Q. And what do you mean by that?
16  A. I mean as long as the medical reports
17  or submitted correctly, as long as the doctor report
18  says, hey, this guy can't work, he's still
19  recovering, he's doing physical therapy, whatever
20  those things are, that's how long at the utmost he
21  would have had, one year to come back to work.
22  Q. Okay. And so it's one year -- is it
23  up to one year, but only until the doctor releases
24  someone to come back to work?
25  A. The doctor has to release them to come

Page 12

1  back to work, that is correct.
2  Q. And so would they receive leave until
3  the doctor released them to come back to work, as
4  long as it wasn't more than a year?
5  A. Sorry, I'm not sure I understand what
6  that -- would they -- go ahead.
7  Q. And so I guess my question is, if
8  someone's injured -- if they are injured on the
9  job --
10  A. Uh-huh.
11  Q. -- do they receive IOD leave until
12  they are released from their doctor?
13  A. That is correct.
14  Q. As long as it's not more than a year?
15  A. Right.
16  Q. Okay. And what governs this?
17  A. It's in the contract.
18  Q. Okay.
19  A. The union contract.
20  Q. I want to actually look at that. I'm
21  just going to share my screen. All right.
22  Mr. Shirley, can you see what I've
23  pulled up on my screen?
24  A. I can.
25  Q. Okay. And this is previously marked

JYAN HARRIS vs                                                    DEPOSITION OF KEVIN SHIRLEY
CITY OF KANSAS CITY, KANSAS FIRE DEPARTMENT, et al.                       July 15, 2020

Page 17
1    A.   Uh-huh.
2    Q.   -- at least from what we can read?
3    A.   Right.
4    Q.   It's dated 1/22/2013.  Is this the
5  injury report that you generally reviewed when there
6  was an injury on duty?
7    A.   That is correct.  It's part of a
8  packet of info.
9    Q.   Okay, part of the packet.  And it
10 looks like as we discussed, while directing traffic,
11 Jyan Harris was struck by a car?
12   A.   Correct.
13   Q.   Okay.  And then I want to show you
14 what, let's see, what I will mark as Exhibit 95, P
15 134.
16        (Shirley Exhibit 95 was marked for
17 identification.)
18 BY MS. LIESEN:
19   Q.   Do you recognize this document?
20   A.   I'm not seeing anything.  I'm seeing
21 something that says "select all images with
22 chimneys."
23   Q.   Let's see.  Do you see it now?
24   A.   It says "Sarah has started" -- okay.
25 This is the attending physician's report.

Page 18
1    Q.   Okay.  And it looks like it's dated
2  September 23rd, if you go to the bottom.  And it's
3  executed September 25, 2013, and signed, I guess,
4  September 23, 2013.  And it looks like it's got Jyan
5  Harris' name at the top.  And in the middle it says
6  "Date patient may return to light duty with
7  restrictions," and then it says, "Can go back full
8  duty."
9         Do you see that?
10   A.   Yes.  "Date patient may return."
11   Q.   Okay.  And is it your recollection
12 that Jyan Harris was returned to work from that
13 injury around September 23rd, 2013, by his doctor?
14   A.   That's what this states, yes.
15   Q.   Okay.  And so was Jyan Harris eligible
16 for leave, injury-on-duty leave, from 1/22/13, the
17 date of the injury, until 9/23/13?
18   A.   Was he eligible?  The doctor would
19 have to submit those reports.  If all the reports
20 that he sent every 30 days, you know, kept him off,
21 then he was off on IOD.
22   Q.   Okay.  So, if he was kept off from
23 1/22/13 to 9/23/13 by his doctor for the injury,
24 would he be eligible to be receiving IOD?
25   A.   As long as the reports were submitted,

Page 19
1  yes.
2    Q.   Okay.  Tell me what you mean by that.
3    A.   I mean, as I said, every 30 days a
4  report should have been submitted stating, you know,
5  the nature of his injuries, if he could work, if he
6  could perform light duty and so forth.
7         "So forth" is a bad term, but.
8         We would be looking at the doctor's
9  report saying he could work or he could not work or
10 he could work light duty.  That's what we would be
11 looking for.
12        So, I don't know.  It's got all these
13 reports listed here, treatment being provided and so
14 forth, but I don't know if all the reports were
15 completed in a timely manner.
16   Q.   Okay.  And what if the reports were
17 not completed in a timely manner?
18   A.   Then we would have requested from Jyan
19 to get those reports submitted.
20   Q.   Okay.  And if the reports were not
21 submitted in a -- and so you would request from Jyan,
22 and how would you do that?
23   A.   Well, I mean, it could go -- we would
24 definitely want it documented when we did it.  But,
25 oftentimes, we could often call and say, hey, Jyan,

Page 20
1  have you got these reports, has your doctor got the
2  reports, we need them.
3         Then it would go, you know, into
4  written communications and so forth.
5         Sometimes it's just the doctor has it
6  sitting on his desk and hasn't turned it in.  But I
7  don't know, so.  That's kind of where I would -- go
8  ahead.
9    Q.   Okay.
10   A.   No, I was --
11   Q.   And if the doctor didn't timely submit
12 the reports, could that affect the injury-on-duty
13 leave?
14   A.   Yes, it could.
15   Q.   In what way?
16   A.   Well, at this point then, the employee
17 is no longer in compliance with the injury leave
18 documents.  And, at that point, we don't know if he's
19 off on his own, if the doctor's keeping him off, we
20 just don't know.
21        So the City is still paying him to be
22 off, you know, so we need to have it from the doctor
23 what's going on.
24   Q.   Would that be grounds to deny
25 someone's injury-on-duty leave?

Case 2:18-cv-02084-JAR   Document 139-11   Filed 09/02/20   Page 5 of 14

JYAN HARRIS vs                                                DEPOSITION OF KEVIN SHIRLEY
CITY OF KANSAS CITY, KANSAS FIRE DEPARTMENT, et al.                    July 15, 2020

Page 21

1  A. Certainly.
2  Q. Okay. And how do you know that?
3  A. I'm sorry?
4  Q. How do you know that?
5  A. How do I know it could be denied?
6  Q. Based upon the reports at issue that
7  we just --
8  A. Yeah. If the reports from the
9  employee are not completed in a timely manner, then
10 that moves into, you know, what is going on. You
11 can't just be off just because you want to, you have
12 to have a doctor's note. And we do our best to get
13 that.
14 Q. But you said that it could be grounds
15 to deny injury-on-duty leave, how do you know that?
16 A. Because it had been done before. I
17 can't remember who or anything else, but.
18 Q. Was that allowed per the contract?
19 A. I do not know that.
20 Q. And how do you know it had been done
21 before?
22 A. How do I know it's been done before?
23 As I was working with Robert Rocha, he tried to train
24 me on what could happen when these things aren't
25 filled in correctly, and so I believe that's where I

Page 22

1  learned that.
2  Q. And do you know for sure?
3  A. 100 percent, no. It's too far back.
4  Q. Had you ever denied someone's
5  injury-on-duty leave based upon their -- based upon
6  not receiving those reports in a timely fashion?
7  A. Sorry, I'm trying to think of an
8  example and none of them are coming up. But I know
9  we -- I know we converted IOD to sick leave, I know
10 that that's been done. Especially if we get a report
11 that wouldn't coincide with their original injury.
12         No, I mean, you're asking me some
13 specifics that I don't have knowledge of. I can't
14 recall it.
15 Q. Well, and so I'm not asking for
16 specifics. I'm just asking if you recall whether
17 you've ever denied injury-on-duty leave based upon
18 not receiving these reports in a timely fashion.
19 A. I don't have recollection, 100 percent
20 recollection of that. I don't know that I've done
21 that or I could have done it, I just don't know. I
22 would have to see some examples.
23 Q. Do you know whether -- sorry.
24         Do you know whether it's something you
25 frequently did?

Page 23

1  A. No. These type of things would be
2  very infrequent.
3  Q. And what types of things are very
4  infrequent?
5  A. Switching somebody from IOD to sick
6  leave or from sick leave to IOD.
7  Q. Okay.
8  A. It could go both ways for the
9  employee.
10 Q. Okay. What if someone is out of
11 compliance with the reports and then they are -- if
12 they're switched from IOD to sick leave --
13 A. Uh-huh.
14 Q. -- and then they get back in
15 compliance with the reports, can they be put back on
16 sick leave -- or back on IOD?
17 A. You know, I don't know that for sure.
18 I just don't. I would imagine that would go through
19 a grievance process, I don't know.
20 Q. Okay. Let me show you what's been
21 previously marked as Exhibit 65. I think there's two
22 documents here. Hold on.
23         Okay. So Exhibit 65, do you recognize
24 this document?
25 A. I do recognize it, yes.

Page 24

1  Q. What is this?
2  A. This is notification of a request for
3  injury leave stating we haven't got the forms. And
4  that you could do physical therapy but could not do
5  light duty. Yeah.
6         So, yeah, I mean, basically at this
7  point we're saying, hey, you can do physical therapy,
8  but you could not do light duty. This had been
9  reviewed and your request for injury leave for
10 January 22nd is approved. Any absences after
11 March 15th will be applied to your sick leave, so.
12 Q. Okay. And so this communication is
13 dated May 14, 2013, and it looks like it's to Jyan
14 Harris from yourself; is that right?
15 A. Correct.
16 Q. Okay. And it looks like at the bottom
17 you're saying essentially that Jyan Harris' sick
18 leave will be approved from January 22nd, 2013, the
19 date of the injury, until March 15, 2013; is that
20 right?
21 A. No. I think you meant -- you said
22 "sick leave," but you meant injury leave.
23 Q. I'm sorry, injury leave.
24 A. Submitting your request for injury
25 leave is approve.

Case 2:18-cv-02084-JAR   Document 139-11   Filed 09/02/20   Page 6 of 14

JYAN HARRIS vs                                               DEPOSITION OF KEVIN SHIRLEY
CITY OF KANSAS CITY, KANSAS FIRE DEPARTMENT, et al.                        July 15, 2020

Page 25
1   Q.   Okay. I apologize. Let me rephrase
2  that, I apologize, thank you.
3        Okay. So his request for injury leave
4  from January 22nd, 2013, the date of his injury, was
5  approved from that date until March 15, 2013; is that
6  right?
7   A.   That is correct.
8   Q.   Okay. And a few minutes ago, we
9  looked at Jyan Harris being released September 23,
10 2013, to full duty. Why was his injury-on-duty leave
11 only approved through March 15th?
12  A.   The only reason I can think of right
13 there with this information is because he was okay to
14 do physical therapy but could not do light duty.
15  Q.   Okay.
16  A.   So we would definitely comply with any
17 physical therapy, things he needed to do, doing light
18 duty, answering the phone, whatever it was. So
19 that's kind of where we were.
20  Q.   So it says he could not do light duty
21 and he wasn't released by his doctor until
22 September 23rd, 2013, and so why would physical
23 therapy impact whether or not he would receive his
24 IOD leave?
25  A.   Evidently, if you could do the

Page 26
1  physical therapy, we were wondering why he couldn't
2  come and do light duty.
3   Q.   Okay.
4   A.   And you mentioned the 9/23, that was
5  from the original doctor's statement that he couldn't
6  come back from January 1st to September? Is that
7  correct?
8   Q.   We can go back and look at that
9  document.
10  A.   Yeah.
11  Q.   Let me pull that up so that we see
12 that. Okay, we're looking back at P 134.
13       So this is dated September 23, 2013,
14 and it says, "The patient may return to full duty on
15 September 25, 2013."
16  A.   And this was -- I'm trying to
17 look -- okay, so the doctor is reporting on
18 September 23rd that he could return to next shift or
19 whatever, the next day that he was scheduled to work,
20 September 25th.
21  Q.   Yes. And so my question is then, if
22 he was off and not released by the doctor all the way
23 until September 23, 2013, why was his IOD only
24 approved to March 15, 2013?
25  A.   The only thing I can think of is that,

Page 27
1  again, the paperwork, monthly reports, were not
2  submitted in a timely manner as requested, and so we
3  had no information to go on.
4   Q.   And so in that instance, what would
5  you do? If you didn't receive the reports on time,
6  we touched on this, but what would you do?
7   A.   Right. Well, first, like I said, I
8  would try to call him to find out if there was some
9  reason that he's not submitting it. And then we
10 would go with the hand delivery after that.
11       In other words, I tried to get him to
12 get the paperwork in, if he was having trouble that
13 we could assist him with, then we could help him.
14  Q.   Okay. And then it says, "Repeated
15 requests by the Fire Department to your attending
16 physician for medical records have gone unanswered."
17       Do you recall anything about that?
18  A.   Yes, I know. I tried several times
19 sending mail, faxes, so forth, to try to get those
20 records so we could make a decision.
21  Q.   Did you ever go to Jyan Harris'
22 doctor's office?
23  A.   Yes.
24  Q.   Okay, tell me about that.
25  A.   I went down to I think it was on

Page 28
1  Washington Avenue or boulevard, I can't remember
2  which, went into the office, requested from the
3  receptionist or nurse that we really needed to get
4  some paperwork from Jyan and we needed it as quickly
5  as possible.
6        And I remember her saying something to
7  the effect that the doctor was out of the country or
8  something. And I said, well, who would fill in for
9  him and how do we get records that we need. And that
10 was it.
11  Q.   And what was the response to that
12 question?
13  A.   As I remember, there wasn't really a
14 response. They didn't tell me that you can contact
15 Dr. So-and-so to get reports, they didn't say
16 anything like that. They just said he's out of the
17 country. I think they said out of country. It's
18 been so long ago, they could have said out of town.
19  Q.   And do you recall them saying anything
20 about how long that was, the out of town or out of
21 country?
22  A.   No, I do not. No, I do not.
23  Q.   Had you ever gone to a doctor's office
24 before for any other employee on injury-on-duty
25 leave?

Case 2:18-cv-02084-JAR   Document 139-11   Filed 09/02/20   Page 7 of 14

JYAN HARRIS vs                                                    DEPOSITION OF KEVIN SHIRLEY
CITY OF KANSAS CITY, KANSAS FIRE DEPARTMENT, et al.                           July 15, 2020

Page 29

1   A.   Dr. Johnson maybe. He was a -- yeah.
2  That would be the only other one I ever went to I can
3  remember offhand. I can't remember who it was for.
4   Q.   Do you remember who that was for?
5   A.   I'm sorry, I don't recall.
6   Q.   Okay. And do you remember why?
7   A.   No, not at all. I just know I tried
8  to do the best I could to get the records when
9  needed. And if I could assist the employee by doing
10 that, then I would have gladly gone and done it.
11  Q.   Do you know whether -- did you go with
12 anyone else to Jyan's doctor's office?
13  A.   I do not know that.
14  Q.   Did you ever ask Jyan's doctor why he
15 wasn't on light duty?
16  A.   No. I don't think I ever had any
17 contact with him, with the doctor. I don't think.
18  Q.   Did you ever ask the nurse why he
19 wasn't on light duty?
20  A.   I don't recall that.
21  Q.   Do you recall ever asking the nurse to
22 see Jyan's chart?
23  A.   Well, I wouldn't have said that. I
24 would have requested medical records that would have
25 been given to us by the doctor. I don't know if I

Page 30

1  requested it to the nurse, to the office manager. I
2  know it was sent down by there fax and by mail.
3   Q.   I think Mr. Denk sent you some
4  documents. I don't know if you have the ability to
5  hold them up, I just want you to look at the
6  injury-on-duty leave section from Page 4 through 6.
7  I can leave it up on mine.
8   A.   That would be helpful if you left it.
9  I didn't get any documents.
10  Q.   You can look at the screen or you can
11 look at it -- okay. Just tell me, I want to make
12 sure you have his -- I asked you earlier where it
13 said the injury-on-duty leave could be denied if
14 documents weren't properly filled out by a doctor,
15 timely filled out by a doctor.
16      And so I want -- and you weren't sure.
17 So I want you to look through the contract and let me
18 know if you see that anywhere in the contract.
19      So just take your time and tell me,
20 you know, when you want me to scroll.
21  A.   Okay. Okay, if you can scroll down
22 just a little bit.
23  Q.   Tell me when to stop.
24  A.   Keep going. Keep going. Keep going.
25 There. Oh, you went too far now. Can you just go

Page 31

1  back up, sorry, to Page 4?
2   Q.   The top of Page 4?
3   A.   There you go, right there.
4       If you'll scroll up to F. Okay.
5  Right there. Okay. Okay. Right there.
6   Q.   I'm sorry.
7   A.   It flipped up on you just a little
8  bit. If you can go back just to F there. Keep going
9  just a little bit more. Thank you.
10      I'm still flipping. Okay.
11      Okay. You can go on up to J. Okay.
12      Okay. And so your question being
13 again?
14  Q.   Where in the contract does it say that
15 injury-on-duty leave can be denied for failure to
16 timely receive 30-day reports?
17  A.   If you'll go up to G. Keep going just
18 a little bit. Okay.
19      Okay, and I need you to go up just a
20 little bit more, ma'am, so I have all of G on my
21 screen. A little bit more. Okay.
22      It says in G then at the bottom
23 sentence after saying, hey, we need this, this and
24 this from, you, we can't be getting -- if you can't
25 get it, an employee shall not be entitled to receive

Page 32

1  injury leave benefits unless he complies with this
2  section.
3   Q.   Okay. And so that section, if you
4  look at G, relates to the initial report, it appears
5  the initial report of the injury. It says, "An
6  employee injured on duty must report, if reasonably
7  able, in writing, such injury forthwith to his
8  immediate supervisor."
9   A.   Correct.
10  Q.   "The injury shall be recorded in the
11 fire company's log book as to the date, time,
12 location and type of injury. The employee shall then
13 be required to forthwith report to a physician
14 authorized by the healthcare plan of which the
15 firefighter is a member for examination and/or
16 treatment. If such physician is not available then
17 the firefighter shall be required to report to a
18 hospital emergency facility for examination and/or
19 treatment. The injured employee shall return a
20 written verification to the department that he has
21 been so examined and/or treated. An employee shall
22 not be entitled to receive injury leave benefits
23 unless he complies with this section."
24      Now, it looks like we do have that
25 initial report signed by a physician, P 123; is that

Case 2:18-cv-02084-JAR   Document 139-11   Filed 09/02/20   Page 8 of 14

JYAN HARRIS vs                                              DEPOSITION OF KEVIN SHIRLEY
CITY OF KANSAS CITY, KANSAS FIRE DEPARTMENT, et al.                   July 15, 2020

Page 41

1    (Shirley Exhibit 96 was marked for
2  identification.)
3  BY MS. LIESEN:
4      Q.   Have you ever seen this document
5  before?
6      A.   You're breaking up a little bit, but I
7  think you asked have I seen this document before.
8      Q.   Yes.
9      A.   Okay.  Yes, I've seen a document like
10 that before, yes.
11     Q.   Okay.  And do you know what this is?
12     A.   Do I know what it is?
13     Q.   Yes.
14     A.   It's the Statement of Attending
15 Physician.
16     Q.   Okay.  And it looks like and it says
17 "Jyan Harris" at the top, it has an address.  And it
18 shows the injury, and then it says "not released" and
19 then it's dated May 28th and it says 31 here.
20          But do you know if this was a report
21 from May 28, 2013?
22     A.   No, I don't know that.  I would accept
23 that that's right, but it says 5/28/13, so.
24     Q.   At the top it -- uh-huh.  At the top
25 it says 5/28; is that right?

Page 42

1      A.   Or 5/25.
2      Q.   Okay.  Either -- does that appear to
3  be 5/28 when I zoom in a little bit?
4      A.   I wouldn't swear to it.
5           There it is, yes.  Now I can see it.
6      Q.   Okay.  Yeah, sorry, 5/28.  It looks
7  like so the dates and times the patient was seen,
8  5/28, 4/24, 3/11 and 3/15.  Is that what that says?
9      A.   Yes.
10     Q.   Okay.  And would you believe that that
11 would be -- that after an injury on January 22nd,
12 2013, that these dates would also be in 2013, the
13 following dates?
14     A.   I believe that could be true.
15     Q.   Okay.  And so it looks like your
16 letter is dated May 14, 2013, and then this report
17 may have been received on May 28th, it appears to be
18 May 28, 2013.
19     A.   I don't -- I mean, I don't even know
20 who this doctor is.  I don't know what that is.
21     Q.   Okay.  At the bottom it says
22 "Signature of Physician," right?
23     A.   Right.  But I can't trace that down.
24     Q.   I'm sorry?
25     A.   I don't know who that is.  I

Page 43

1  don't -- it's not legible.  And I certainly would
2  have accepted it from the doctor, but I would have
3  liked to have known the doctor that was treating him
4  if that was that doctor's signature.
5      Q.   Okay.
6      A.   I'm not calling -- I'm not
7  calling -- oh, go ahead.
8      Q.   No, go ahead.
9      A.   Sorry, you're breaking up, sorry.
10     Q.   Can you hear me?
11     A.   Yes.
12     Q.   I guess, would you have accepted this
13 statement from a doctor?
14     A.   Well -- let's leave it up at the top
15 for a second.  Let me look at this real quick.
16          It needs to go down a little bit more,
17 I can't see the top of the form.
18          Okay, so it's on duty, there's no
19 date.
20          MR. DENK:  Can you zoom back in,
21 Sarah?
22     A.   Date and time of inception of illness,
23 that's not it.  Name of physicians.
24          If you can scroll down a little bit
25 passed the death in the family.

Page 44

1          And then it says, "Patient Jyan Harris
2  was seen," yes, he was seen on those dates.  Nothing
3  in February.  Treatment, narcotic, referral to
4  specialist, imaging, okay, minimum 90 days.  Not
5  released.  Pain with sitting and standing, walking.
6  To date he could not be released to full duty.
7          Would I have accepted this?  Is that
8  what you're asking me?
9      Q.   Yes.
10     A.   I would have accepted this if I could
11 figure out who this doctor is, yes, I would have
12 accepted this.
13     Q.   Okay.  And so, again, it looks like
14 your letter was dated May 14, 2013.  If you received
15 this on May 28, 2013, would you have converted Jyan
16 Harris back to on-duty leave?
17     A.   There seems to be a month missing
18 there, so.
19     Q.   And what do you mean by that?
20     A.   Well, the first report is 3/15.  This
21 is the date the patient is seen on 3/15, so he wasn't
22 seen during February at all.  Which he should have
23 been, just so we know.
24     Q.   Okay.  Let me go back to the
25 injury-on-duty leave report right here.  Let's see.

JYAN HARRIS vs                                                     DEPOSITION OF KEVIN SHIRLEY
CITY OF KANSAS CITY, KANSAS FIRE DEPARTMENT, et al.                July 15, 2020

Page 49

1   Q.   What do you mean by that?
2   A.   I mean, I don't believe that I was
3   ever told that, hey, you know, I want you to convert
4   mine back, I've got all the papers signed, here's all
5   the documents and reports. I don't think that every
6   occurred.
7   Q.   So you're saying he never asked you to
8   convert it back to injury-on-duty leave?
9   A.   No. What I'm saying is I've never
10  received all the documents necessary for me to do
11  that at that time, and that's just what I recall. I
12  don't -- you know.
13  Q.   And did you ever receive the documents
14  necessary to do that?
15  A.   To my knowledge, no.
16  Q.   Let me share with the witness what's
17  been marked as Bates No. 131 to 132. I'd like to
18  mark this as Exhibit No. 97.
19       (Shirley Exhibit 97 was marked for
20  identification.)
21  BY MS. LIESEN:
22  Q.   Okay. I'd like to ask you,
23  Mr. Shirley, if you recognize this document?
24  A.   Yeah, I recognize it as a sick injury
25  form.

Page 50

1   Q.   Okay. It looks like it's dated
2   7/17/2013. It's got Jyan Harris' name at the top.
3   A.   Uh-huh.
4   Q.   And then it's got a doctor's name and
5   it's signed, executed.
6        Is this a 30-day report?
7   A.   It appears to be, yes.
8   Q.   Okay. Is this report in compliance
9   with what's required for a 30-day report?
10  A.   Signature. Received and notarized.
11  Yeah, it appears to be.
12  Q.   Okay. At this point in time, did you
13  ever convert Jyan Harris back to injury-on-duty
14  leave?
15  A.   I don't have any knowledge of that. I
16  can't remember that.
17  Q.   Okay. And does this refresh your
18  recollection about whether you did receive documents
19  that were in compliance with the 30-day report?
20  A.   All of this --
21       MR. DENK: Hold on, let me object. I
22  object as vague and ambiguous as to time.
23       Go ahead, Kevin.
24  A.   Again, this was submitted on 7/17, I
25  don't have knowledge of all the reports being in at

Page 51

1   this point just from looking at this.
2   BY MS. LIESEN:
3   Q.   Okay. And what I asked you earlier
4   was whether you ever received -- what I asked you was
5   about the documents and if you ever received
6   documents. I guess you made the statement to the
7   effect that you don't recall whether you ever
8   received documents that were in compliance with the
9   30-day report.
10       And so what I'm asking is, does this
11  appear to be a document in compliance with the 30-day
12  report requirements?
13       MR. DENK: Same objection as to vague
14  and ambiguous.
15  A.   Again, can you scroll up please just a
16  little bit?
17       Okay Jyan Harris, 7/17, and then some
18  date -- what is that next date? Is that 15 5 28 4.
19  BY MS. LIESEN:
20  Q.   5/28 and 4/24 --
21  A.   There it is, okay. So 4/24, 5/28, no
22  June. Is this good for one month? I would say yes,
23  if I just got this.
24  Q.   Okay. And so, at this point in time,
25  would Jyan Harris be entitled to be on injury-on-duty

Page 52

1   leave?
2   A.   I don't know that.
3   Q.   And why not?
4   A.   Because I don't -- there's not a
5   history here showing me -- this appears to
6   be -- that's not the doctor that I remembered.
7   Didn't it start with a G or something like that that
8   was the initial treating physician that he had been
9   going to?
10  Q.   Does it have to be the same doctor?
11  A.   Absolutely not. But there has to be
12  some kind of, you know, form submitted that show how
13  all this happened from --
14  Q.   Okay.
15  A.   -- January all the way to here. There
16  should be one every 30 days to say, hey, here's
17  what's going on and it's all signed and it's
18  documented and consent for release of information.
19  Q.   And so would you have accepted this as
20  a 30-day report of Jyan Harris' injury?
21  A.   I believe so, yes. I believe I would
22  have accepted that one.
23  Q.   Thank you. And did you ever -- do you
24  recall having a conversation with anyone about Jyan
25  Harris being in compliance in July of 2013?

Case 2:18-cv-02084-JAR   Document 139-11   Filed 09/02/20   Page 10 of 14

JYAN HARRIS vs                                              DEPOSITION OF KEVIN SHIRLEY
CITY OF KANSAS CITY, KANSAS FIRE DEPARTMENT, et al.                    July 15, 2020

Page 65

1  interactions with Mr. Harris?
2      A.   This was after, right?  2015?
3      Q.   Yeah.
4      A.   Yeah.
5      Q.   If you don't know, then don't --
6      A.   Okay.
7      Q.   I can't testify for you.
8      A.   Okay.
9      Q.   You have to --
10     A.   I don't see where it has the date on
11 here.
12     Q.   Right here?  Can you see my hand?
13     A.   No.
14     Q.   Let me zoom a little bit more.  Do you
15 see it there?
16     A.   No.
17         MS. LIESEN:  I don't see it either.
18 We're on Page 19.
19         MR. DENK:  Huh, I'm on Page 1.
20         THE WITNESS:  There.  You're getting
21 somewhere now, it's just really big.
22         MR. DENK:  Okay, so I have to do it
23 over on my side screen then.  Okay.  I get it.
24 BY MR. DENK:
25     Q.   All right, do you see it now?

Page 66

1      A.   Half of it.
2      Q.   Do you see the date?
3      A.   No, it's got -- there we go,
4  2015-2017.
5      Q.   Okay.  So this would have been the
6  contract that was in place during your interactions
7  with Mr. Harris in 2013?
8      A.   No.
9      Q.   And you retired what year?
10     A.   2014.
11     Q.   Okay.  So you would have retired
12 before this 2015 through 2017 contract came into
13 place; is that correct?
14     A.   Correct.
15     Q.   Do you know whether any of the IOD
16 provisions in the 2015 through 2017 contract changed
17 from the contract that was in place in 2013?
18     A.   I do not.
19     Q.   All right.  Let me go down to the IOD
20 provisions that you were looking at.  And can you see
21 Subsection E there?  Or do I need to scroll?
22     A.   I've got E.
23     Q.   Okay.  And so you went over this
24 section with Ms. Liesen, and it says, "An employee on
25 injury leave shall be required to periodically (at

Page 67

1  least every 30 days)," and then they have to meet the
2  requirements that we've gone over several times; is
3  that correct?
4      A.   That is correct.
5      Q.   Ms. Liesen pointed out that there was
6  not similar language, as is required from the initial
7  report of injury in Subsection F, that if the
8  employee -- or pardon me -- G, that an employee shall
9  not be entitled to receive injury leave benefits
10 unless he complies with this section.
11         Do you recall that testimony?
12     A.   Yes.
13     Q.   Okay.  Let me ask you, the language in
14 Subsection E that says an employee on injury leave
15 shall complete the 30-day reports, did you understand
16 that to be a requirement to continue to receive
17 injury leave after your initial report?
18     A.   That is correct.
19     Q.   And how long were you in the capacity
20 of deputy chief when you managed injury leave?
21     A.   I don't recall the exact dates.
22     Q.   Well, I'm just looking for approximate
23 time.  How many years?
24     A.   I would say deputy chief approximately
25 2007, I could be off, to 2014.

Page 68

1      Q.   Okay.  So, during the course of
2  7 years, was it, thinking back, was it your
3  understanding that the employees were required to
4  complete the 30-day reports in order to continue to
5  receive injury-on-duty leave?
6      A.   Yes.
7      Q.   And was that your practice when you
8  were in that position for 7 years?
9      A.   Yes.
10     Q.   And that language in Subsection E,
11 does it require that the employee is the one who is
12 required to submit that report?
13     A.   The employee is required, yes.
14     Q.   Okay.  And so it's not actually the
15 physician who submits it, it's the employee's
16 obligation, correct?
17     A.   Correct.
18     Q.   So, going back to Mr. Harris'
19 situation.
20         First off, let's look at, okay, do you
21 see -- and I don't --
22         MR. DENK:  Sarah, everything you sent
23 over wasn't marked as a deposition exhibit.
24         MS. LIESEN:  Yeah, I hadn't marked
25 them yet.

JYAN HARRIS vs                                                          DEPOSITION OF KEVIN SHIRLEY
CITY OF KANSAS CITY, KANSAS FIRE DEPARTMENT, et al.                           July 15, 2020

Page 69

1    MR. DENK:  Okay.
2  BY MR. DENK:
3    Q.  So just I'll just refer to this by
4  Bates stamp number, which is P000162, which is a
5  correspondence to Dr. Anil V. Gosalia dated March 5,
6  2013.  Do you see that?
7    MS. LIESEN:  Ryan, could you make it a
8  little bit bigger?
9    MR. DENK:  Sure.  Yeah, that's a good
10 idea.
11   MS. LIESEN:  Sorry.  And are we
12 marking this as Exhibit 98 then?  Because I don't
13 think we marked this one yet.
14   MR. DENK:  That's fine.  We'll
15 virtually mark this Exhibit 98.
16   (Shirley Exhibit 98 was marked for
17 identification.)
18 BY MR. DENK:
19   Q.  Can you see that, Mr. Shirley?
20   A.  Yeah.  Yes, I can.
21   Q.  Okay.  And this is a correspondence to
22 Dr. Gosalia at 1610 Washington Boulevard; is that
23 correct?
24   A.  That is correct.
25   Q.  And was it your understanding when you

Page 70

1  wrote this correspondence that Dr. Gosalia was
2  Mr. Harris' treating physician?
3    A.  Yes.
4    Q.  Do you recall whether it was
5  Dr. Gosalia that did the original injury
6  certification for Firefighter Harris?
7    A.  I do not.
8    Q.  Okay.  It says in the second sentence,
9  "Firefighter Harris has indicated that you are his
10 primary care physician and that he has been seen and
11 evaluated by you."
12   Do you see that?
13   A.  Yes.
14   Q.  Then in the next sentence says,
15 "Firefighter Harris has submitted a Fire Department
16 'Statement of Attending Physician' that indicates he
17 was seen in your office on 1/25/13 at approximately
18 2:00 PM."
19   Do you see that?
20   A.  Yes.
21   Q.  Do you recall that that is the initial
22 report of injury that we looked at earlier, from the
23 date?  I can show it to you if you'd like.
24   A.  I'm trying to think of when his injury
25 actually occurred.  Not to make it difficult, but

Page 71

1  1/25, did his original injury occur on the 21st?
2    Q.  I'll go ahead and share that with you.
3    A.  Yeah, please.
4    Q.  All right, can you see that?
5    A.  Not yet.
6    MS. LIESEN:  Your screen isn't shared.
7    MR. DENK:  Yeah.
8  BY MR. DENK:
9    Q.  How about now?
10   A.  I can see it now and it says 1/22 is
11 when it happened.
12   Q.  Okay.  So this was the ER doc.
13 Wouldn't be Dr. Gosalia, correct?
14   A.  This is the ER doctors.
15   Q.  Okay.
16   A.  Which they usually -- yeah, it's the
17 ER doctor.
18   Q.  All right, so Employee/Physician Sick
19 or Injury Report?  Do you see that, which is
20 Exhibit 12, it would be EMP 127 through 128?
21   A.  Yes, I do see it.
22   Q.  Okay.  And do you see Dr. Gosalia at
23 18th And Washington Boulevard?  Do you see that?
24   A.  I know I see a signature.  I can't
25 read it.

Page 72

1    Q.  Well, that's okay.  Let me go back to
2  -- let's go back to what we've marked as Exhibit 98
3  and just ask you this question:  It looks from the
4  body of this letter like you've had some
5  communication from Jyan Harris, would you agree, that
6  Dr. Gosalia was his treating physician?
7    A.  Yes.
8    Q.  Okay.  And you, accordingly, sent a
9  correspondence dated March 5, 2013, requesting
10 further documentation relating to Mr. Harris' injury,
11 correct?
12   A.  That is correct.
13   Q.  Was this as part of an attempt to get
14 that additional information that you needed to verify
15 Mr. Harris' continued injury-on-duty status?
16   A.  Correct.
17   Q.  Let me ask this question, if the
18 contract required that it is the employee's
19 responsibility to submit the Statement of Attending
20 Physician every 30 days, was it typical for you to
21 write a correspondence, such as this, to the
22 attending physician, or at least the reported
23 attending physician, to attempt to get the
24 documentation necessary to verify IOD status?
25   A.  Yes.

Case 2:18-cv-02084-JAR   Document 139-11   Filed 09/02/20   Page 12 of 14

JYAN HARRIS vs                                                    DEPOSITION OF KEVIN SHIRLEY
CITY OF KANSAS CITY, KANSAS FIRE DEPARTMENT, et al.                       July 15, 2020

Page 73
1  Q.  Okay. And so just so I understand
2  your process, you get the Statement of Attending
3  Physician and that includes authorization for release
4  of medical records; is that correct?
5  A.  Yes.
6  Q.  And so then would this correspondence
7  go out at that point to try to get verification of
8  the IOD status?
9  A.  Correct.
10  Q.  Okay. And so this is Dr. Gosalia --
11  or addressed to Dr. Gosalia at 1610 Washington
12  Boulevard; is that correct?
13  A.  That is correct.
14  Q.  Is that consistent with your memory as
15  to the doctor's office where you went to attempt to
16  get medical records?
17  A.  Yes. That is where I went.
18  Q.  Okay. And you were unsuccessful at
19  that time in getting medical records; is that
20  correct?
21  A.  Yes.
22  Q.  They told you Dr. Gosalia was
23  wherever, traveling out of the country, wherever he
24  or she may be; is that correct?
25  A.  That is correct.

Page 74
1  Q.  Okay. So then the next correspondence
2  from you -- to your best recollection -- well, let me
3  pull up this next correspondence.
4      Can you see that?
5  A.  I do.
6  Q.  P 126. So, this would be a Statement
7  of Attending Physician from Jyan Harris dated 3/15 of
8  2013; is that correct?
9  A.  Yes.
10  Q.  And it says, Name of physician,
11  Dr. Gosalia, Dr. Lee, correct?
12  A.  Yes.
13  Q.  This part at the bottom -- well, first
14  off, can you see -- do you know whose signature that
15  is, signature of physician?
16  A.  I do not have any idea.
17  Q.  Okay. And then for this form to be
18  complete, is the consent for release of medical or
19  confidential information required to be filled out
20  and notarized, as we have seen in other forms?
21  A.  Yes. It should have been filled out.
22  Q.  Is the purpose of that so that you can
23  get medical records to in fact verify that the
24  employee's IOD status is appropriate?
25  A.  Correct.

Page 75
1  Q.  And so on 3/15 of '13, you don't have
2  that, correct?
3  A.  Right. According to this document, I
4  do not have that.
5  Q.  Okay. So is this -- this is an
6  incomplete form; is that true?
7  A.  Yes.
8      MR. DENK: Sarah, do you have the
9  Exhibit 65? It's not on your email. You were
10  sharing your screen on that earlier.
11      MS. LIESEN: If you stop sharing your
12  screen, I can pull it up.
13      MR. DENK: Okay.
14      MS. LIESEN: Okay. Is this where you
15  want to be?
16      MR. DENK: Yeah.
17      MS. LIESEN: Or do you want to be on
18  the second page?
19      MR. DENK: I think it's only one page,
20  right?
21  BY MR. DENK:
22  Q.  So, Exhibit 65, Mr. Shirley --
23      MS. LIESEN: Yeah, there's two pages.
24      MR. DENK: Okay. What's the second
25  page?

Page 76
1      MS. LIESEN: Two pages is what I'm
2  saying, one is May and one is July.
3      MR. DENK: Okay. So, yeah, let's look
4  at Page 1, which is May 14, 2013.
5  BY MR. DENK:
6  Q.  This is the correspondence you went
7  over earlier with Ms. Liesen. Do you recall going
8  over that?
9  A.  Yes.
10  Q.  Okay. And so in that second paragraph
11  there, it references -- and this is to Mr. Harris
12  dated May 14th of '13, correct?
13  A.  Yes.
14  Q.  Via hand delivery. Do you recall
15  whether you went to his home to hand deliver it?
16  A.  I do not. This could have been
17  delivered by a battalion chief or operations chief.
18  I'd like to go back through and see who delivered it.
19  But I don't have information for that anymore.
20  Q.  All right. So let's go to the second
21  paragraph. It says the last -- second paragraph,
22  second sentence, "The last Statement of Attending
23  Physician report dated 3/15/13 indicated you could do
24  physical therapy but could not do light duty."
25      Do you see that?

JYAN HARRIS vs
CITY OF KANSAS CITY, KANSAS FIRE DEPARTMENT, et al.

DEPOSITION OF KEVIN SHIRLEY
July 15, 2020

Page 77

1  A.  Yes.
2  Q.  Then the sentence before that says,
3  "Repeated requests by the Fire Department to your
4  attending physician for relevant medical records have
5  gone unanswered."
6      Do you also see that?
7  A.  Yes.
8  Q.  So, let me ask, we looked at the
9  May -- pardon me -- March 5, 2013, correspondence to
10 Dr. Gosalia requesting medical records, correct?
11 A.  Correct.
12 Q.  And then at some point in time, you
13 have a memory of physically going to that office on
14 Washington Boulevard and trying to get the records,
15 correct?
16 A.  Yes.
17 Q.  To your best recollection, would it
18 have been in between that May 5th -- or pardon
19 me -- March 5, 2013, through May 14, 2013, time
20 frame?
21 A.  I cannot specifically recall that.
22 Q.  Okay.  The sentence in the second
23 paragraph that says, "Repeated requests by the Fire
24 Department to your attending physician for relevant
25 medical records have gone unanswered."

Page 78

1      Do you see that?
2  A.  Yes.
3  Q.  So, we saw one request for medical
4  records in your correspondence dated May 5, 2013,
5  correct?
6  A.  Correct.
7  Q.  We don't have any other written
8  requests for medical records.  Does that lead you to
9  believe there were other means of communication to
10 obtain those medical records, whether in-person, by
11 phone or other means?
12 A.  Correct.  There would have been a fax
13 probably also included in that, besides phone calls.
14 Q.  Okay.  And from March 5, 2013, until
15 May 14, 2013, so March, April, May, so 2-1/2 months
16 goes by, we still don't have medical records
17 verifying Jyan Harris' IOD status; is that fair?
18 A.  That's fair.
19 Q.  Okay.  And so it's at that point in
20 time that you indicate that Mr. Harris' IOD status as
21 of March 15, 2013, in essence, will be applied to his
22 sick leave rather than paid IOD, correct?
23 A.  Correct.
24 Q.  So, the March 15, 2013, statement, as
25 we just detailed, was incomplete in that it didn't

Page 79

1  have a consent for release of medical records, right?
2  A.  Correct.
3  Q.  All right.  So, and you haven't seen
4  any documentation that he submitted an updated form
5  in April or May or corrected form in March, have you?
6  A.  I do not.
7  Q.  Okay.
8      MR. DENK:  So then, Sarah, can you pan
9  down to the second correspondence in the Exhibit 65?
10 BY MR. DENK:
11 Q.  So July 2, 2013, again, a second
12 correspondence to Mr. Harris via hand delivery,
13 correct?
14 A.  Correct.
15 Q.  To the best of your recollection,
16 would a written correspondence by hand delivery have
17 been your first means of communication with
18 Mr. Harris about attempting to obtain compliance with
19 the IOD requirements?
20 A.  I do not recall that, that being my
21 first attempt.
22 Q.  Okay.  You testified earlier that what
23 would happen was that you would attempt to reach out
24 to firefighters by phone communication, and then you
25 would subsequently document any needed documentation.

Page 80

1      Is that your best recollection as to
2  the process that you followed when you handled these
3  matters?
4  A.  Correct.  I would have attempted that.
5  Q.  All right.  So would this -- I know
6  you say you don't have an affirmative memory, but if
7  you were following your regular practice, would these
8  two written correspondence to Mr. Harris by hand
9  delivery in May and July of 2013 have occurred after
10 you attempted to reach Mr. Harris by phone
11 communication?
12 A.  That's correct.
13 Q.  So, as of July 2, 2013, to the best of
14 your recollection based upon what's enclosed or
15 what's in this correspondence, did you receive any
16 updated employee 30-day IOD report forms from Jyan
17 Harris from that May 14, 2013, time frame until this
18 July 2, 2013, time frame?
19 A.  I do not recall.
20 Q.  All right.  And then Ms. Liesen did
21 show you that there was a report in July that you
22 testified you would accept as IOD.  And I can pull it
23 up.  It's July, okay.
24     MS. LIESEN:  Do you want me to stop
25 sharing?

Case 2:18-cv-02084-JAR   Document 139-11   Filed 09/02/20   Page 14 of 14

JYAN HARRIS vs                                                    DEPOSITION OF KEVIN SHIRLEY
CITY OF KANSAS CITY, KANSAS FIRE DEPARTMENT, et al.                        July 15, 2020

Page 89

1  down, I know Mr. Denk asked you if there had been
2  changes between that, and I showed you the one in
3  effect after this one.  So, I just want to make sure,
4  I'd like you to look and let me know if you see any
5  differences in this contract that would change any of
6  your answers versus the last contract we looked at.
7  Does that make sense?
8      A.   Yeah, I understand what you're saying,
9  to see if there's anything --
10     Q.   Okay, yeah, if there's any differences
11 that would change any of your answers from before
12 when we were referencing the 2015 contract.
13          Can you take a look at it and let me
14 know that?
15     A.   I think I can do that.
16     Q.   And just let me know when you'd like
17 me to scroll.
18     A.   Keep going.  Keep going.  A little bit
19 further.  There.  Right down to B please.
20     Q.   Sorry.
21     A.   There you go.  I'll look at that real
22 quick.
23          Okay, scroll up.  I'm on F.
24          Okay.  Go ahead and scroll up.  Scroll
25 down just a little bit.

Page 90

1           There is nothing glaring that shows me
2  there's something different.  I would have to --
3      Q.   Okay.  Would anything that you read in
4  the 2011-2013 contract, Exhibit 99, change your
5  answers in relation to what we were talking about
6  with the 2015-2017 contract?
7      A.   I don't believe so.  I believe I was
8  still -- this is what I would act on, the 30-day
9  reports.
10     Q.   Okay.  And the language seems to be
11 similar or substantially -- substantially the same or
12 the same as the language in the 2015 to 2017 contract
13 related to injury-on-duty leave; is that correct?
14     A.   I believe that to be true.
15          MS. LIESEN:  I don't have any other
16 questions.
17          MR. DENK:  I do have just a couple
18 follow-up.
19              EXAMINATION
20 BY MR. DENK:
21     Q.   So IOD benefits, they're contractual,
22 correct?
23     A.   Correct.
24     Q.   And the contract is between the IAFF
25 Local 64 and the Kansas City, Kansas, Fire

Page 91

1  Department/Unified Government, correct?
2      A.   That is correct.
3      Q.   And during your tenure both as deputy
4  chief and then your 6 to 7 months as chief, I'm
5  assuming you had some involvement in grievance
6  processing; is that correct?
7      A.   That is correct.
8      Q.   So, you're familiar with how
9  grievances would be filed and the various due process
10 steps that go along with that; is that correct?
11     A.   I do remember them.
12     Q.   Okay.  Let me ask this question, do
13 you recall -- well, strike that.
14          Who is it that files grievances for
15 contract violations?
16     A.   Who is it that files the grievance?
17     Q.   Yeah.
18     A.   The employee or the representative
19 files that.
20     Q.   Okay.  In this instance, do you recall
21 that any grievance was ever filed?  And by
22 "grievance," I'm referring to a formal written
23 statement of grievance, was ever filed relating to
24 Jyan Harris' denial of IOD?
25     A.   I do not recall that, that ever being

Page 92

1  done.  It was filed with --
2      Q.   Do you recall -- I'm sorry, I didn't
3  mean to cut you off.  Go ahead.
4      A.   I do not recall a grievance being
5  filed by Jyan Harris.
6      Q.   As the deputy chief who was writing
7  the denial letters based upon past practice in the
8  department, if a grievance had been filed, is it your
9  understanding that you would have had some
10 involvement in that grievance process?
11     A.   I would have.
12     Q.   Okay.  And, as you sit here today, you
13 have no memory of ever participating in that; is that
14 fair?
15     A.   That's fair.
16     Q.   Per the contract, is there a time
17 frame within which the union or the employee has to
18 file a grievance to pursue a contract violation?
19     A.   There are time limits, I don't recall
20 them.
21     Q.   Okay.  And if Jyan Harris or his union
22 felt agrieved by your decision to deny him IOD pay,
23 they had a contractual remedy through the grievance
24 procedure; is that correct?
25     A.   That's correct.

