## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**JYAN HARRIS,**

    **Plaintiff,**

    **v.**                                       **Case No. 18-2084-JAR**

**CITY OF KANSAS CITY, KANSAS FIRE DEPARTMENT,** et al.,

    **Defendants.**

## MEMORANDUM AND ORDER

Plaintiff Jyan Harris brings this action alleging discrimination and retaliation under the Americans with Disabilities Act ("ADA") and Title VII of the Civil Rights Act of 1964. Before the Court is Defendants City of Kansas City, Kansas Fire Department and Unified Government of Wyandotte County/Kansas City, Kansas's Motion for Summary Judgment (Doc. 138). The motion is fully briefed and the Court is prepared to rule. To the extent the motion seeks judgment in favor of the Kansas City, Kansas Fire Department and on Plaintiff's claim for punitive damages, it is moot because those claims were omitted from the Pretrial Order. As described more fully below, the Court grants in part and denies in part the remainder of Defendants' motion for summary judgment. The Court grants the motion on Plaintiff's ADA claims and on his Title VII claims based on harassment and denial of his Injury On Duty leave. The Court denies the motion on the Title VII claims based on suspension without pay and termination.

## I.      Standard

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[1] In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2]  "There is no genuine [dispute] of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[3]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  A dispute of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[5]

The moving party initially must show the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law.[6]  Once the movant has met the initial burden of showing the absence of a genuine dispute of material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[7]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[8]  Rather, the nonmoving party

---

[1] Fed. R. Civ. P. 56(a).

[2] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010) (citing *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1210 (10th Cir. 2008)).

[3] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)).

[4] *Wright ex rel. Tr. Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5] *Adler*, 144 F.3d at 670 (citing *Anderson*, 477 U.S. at 248).

[6] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7] *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[8] *Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[9]  In setting forth these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[10]  A nonmovant "cannot create a genuine issue of material fact with unsupported, conclusory allegations."[11]  A genuine issue of material facts must be supported by "more than a mere scintilla of evidence."[12]  Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[13]

## II.     Factual Background

### A.     Evidentiary Rulings

Before reciting the uncontroverted facts in this matter, the Court must rule on three evidentiary issues that require extended analysis: (1) Defendant's objection to Mark Holland's deposition testimony; (2) Defendant's argument that evidence surrounding Plaintiff's unexhausted ADA and Title VII claims may not be considered as background evidence in support of his remaining Title VII claims; and (3) Plaintiff's objection to the admissibility of the arbitration decision issued as part of the collective bargaining grievance process.

Summary judgment evidence need not be "submitted 'in a form that would be admissible

---

[9] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 670–71).

[10] *Adler*, 144 F.3d at 671.

[11] *Tapia v. City of Albuquerque*, 170 F. App'x 529, 533 (10th Cir. 2006) (citing *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004)).

[12] *Black v. Baker Oil Tools, Inc.*, 107 F.3d 1457, 1460 (10th Cir. 1997).

[13] *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

at trial.'"[14]  But "the content or substance of the evidence must be admissible."[15]  Under Fed. R.

Civ. P. 56(c)(2), a party may object on this basis—that the material "cannot be presented in a

form that would be admissible in evidence."  Indeed, as the advisory committee notes to the 2010

Federal Rule amendments explain: "The burden is on the proponent to show that the material is

admissible as presented or to explain the admissible form that is anticipated."[16]  "The

requirement is that the party submitting the evidence show that it will be possible to put the

information, the substance or content of the evidence, into an admissible form."[17]

### 1.  Holland's Deposition

In opposing summary judgment, Plaintiff heavily relies on the deposition testimony of

former Kansas City, Kansas Mayor Mark Holland.  Defendant objects that much of his testimony

is inadmissible hearsay because it is based on statements made to him by others, or because he

lacks personal knowledge.  The Court allowed Plaintiff to file a surreply to the motion for

summary judgment to address this discrete issue since it was raised for the first time in reply.

Most of Defendant's objections to Plaintiff's statements of fact that rely on the Holland

deposition state that because Holland lacks personal knowledge of discrimination in the Fire

Department, his testimony on that issue is inadmissible hearsay.  But this argument conflates

hearsay, foundation, and the rule governing lay opinion testimony.  The Court addresses personal

knowledge and lay opinion first, and then addresses the remaining hearsay objections.

---

[14] *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016) (quoting *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006)).

[15] *Id.* (quoting *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006)).

[16] Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment.

[17] *Brown*, 835 F.3d at 1232 (quoting 11 James Wm. Moore et al., Moore's Federal Practice—Civil § 56.91 (3d ed. 2015)); *see O'Connor v. Williams*, 640 F. App'x 747, 750 (10th Cir. 2016).

### a.    Foundation and Lay Opinion

Under Fed. R. Evid. 602, Holland "may testify to a matter only if evidence is introduced sufficient to support a finding that [he] has personal knowledge of the matter."  Holland's own testimony can provide evidence of personal knowledge.[18]  Moreover, lay opinion testimony is governed by Fed. R. Evid. 701, and is "limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."[19]

Defendant argues that Holland was a member of the Board of County Commissioners before becoming mayor, and in neither capacity was responsible for the day-to-day supervision of the police and fire departments.  He did not have access to personnel records, records relating to disciplinary investigations, or records relating to complaints of discrimination.  Defendant argues that Holland's personal knowledge was therefore limited to what individual employees told him, rather than records relating to official complaints.  In support of its foundation objection, Defendant points to Holland's testimony that because he lacked access to records to investigate discriminatory discipline in the police and fire departments, he asked the legislative auditor to investigate his concerns.[20]

Plaintiff suggests that Holland's deposition testimony is not subject to the personal knowledge standard set forth in Rule 56(c)(4), which applies to affidavits and declarations, but not depositions.  While this is true, it is still Plaintiff's burden to demonstrate that the content of his evidence will be admissible at trial, which means that he must establish a foundation for the

---

[18] *See* Fed. R. Evid. 602.

[19] Fed. R. Evid. 701.

[20] *See* Doc. 153-4 at 65:4–68:17, 137:10–138:16.

witness's testimony.  According to Holland's testimony, his opinion that there was a pattern of discriminatory discipline in the police and fire departments came after several reports to him by employees, including by Plaintiff.  Holland admitted that he lacks access to personnel records, which is why he testified about his efforts to submit the issue of discriminatory discipline to a legislative auditor.  And he testified that he spoke with Doug Bach, the County Administrator, in his capacity as both commissioner and mayor about some of Bach's investigations into employee complaints when they impacted public safety.

To the extent Holland testified that he received reports of discrimination and took certain steps in response to them, such as requesting a legislative audit, these statements are certainly within his personal knowledge.  But Holland's statements that otherwise lack foundation are inadmissible.  Plaintiff is entitled to elicit testimony from Holland at trial about the fact that he received these reports of discrimination and explore why they led Holland to take steps to further investigate what he suspected to be widespread problems in the department.  Defendant is entitled to explore the limits of Holland's personal knowledge and whether or not the legislative audit in fact occurred.  The Court will disregard testimony that clearly falls outside of these parameters.  For example, Holland's opinion that Former Fire Chief John Paul Jones was "actively discriminating against minorities and women" lacks foundation.  Also, Holland's testimony about the circumstances surrounding Chief Jones' retirement is inadmissible because he could not say how he learned that information.  In contrast, his testimony about time trading that is largely based on a 2016 legislative auditor report is admissible because he established during his testimony that he based his opinion and statements on the report, and the underlying report is in evidence.

### b.    Hearsay

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."[21]  The proponent of the summary judgment evidence must make some showing that the substance of the evidence would be admissible at trial by either demonstrating that an exception to the hearsay rule applies, or that the declarant would testify to the document's contents.[22]  Defendant objects that Holland's statements about widespread discrimination in the police and fire departments, and about discriminatory statements by Chief Jones, are hearsay.  Plaintiff responds that many of the statements are not offered to prove the truth of the matter asserted and the rest fall under the hearsay exclusion for party opponent statements.

### i.    Statements Made by Employees

First, Defendant objects to Holland's testimony about complaints of discrimination made to him by Plaintiff and other employees.  This evidence is admissible on summary judgment to the extent Plaintiff and the other employees can testify at trial about their own statements—Plaintiff can easily eliminate the hearsay problem by calling them directly to testify at trial.  The evidence is also admissible to the extent it is not offered to prove the truth of the matter asserted, but instead to demonstrate Holland's state of mind and the steps he took as Mayor to determine whether there was a pattern of discrimination in the Fire Department.

The employee statements may also be admissible as statements by a party opponent. This exclusion to the hearsay rule applies if the "statement is offered against the opposing party" and was either "made by the party in an individual or representative capacity," "made by a

---

[21] *United States v. Lovato*, 950 F.3d 1337, 1341 (10th Cir. 2020) (quoting *United States v. Collins*, 575 F.3d 1069, 1073 (10th Cir. 2009)).

[22] *See Brown*, 835 F.3d at 1232–33.

person whom the party authorized to make a statement on the subject," or "made by the party's agent or employee on a matter within the scope of that relationship and while it existed."[23] Holland testified about complaints of discriminatory conduct made to him by employees when they were employed by Defendant.  Plaintiff submits evidence that complaints of discrimination were authorized by UG Equal Opportunity policies providing that employees should report concerns of discrimination or harassment to any level of management, orally or in writing.[24] Because these statements were made by persons who were authorized to make them under the UG policies, they are admissible under Rule 801(d)(2)(C).

### ii.    Statements by Chief Jones

Defendant argues that Holland's testimony about racist comments by former Chief Jones are also hearsay.  Holland identifies three specific comments by Chief Jones during his testimony.  Holland testified that Chief Jones made two statements directly to him: (1) that "the reason there's no blacks on the fire department is because they are afraid of fire,"[25] and (2) "You know, they just won't apply.  I can't get them to apply.  They just won't apply for the job," while throwing up his hands.[26]

The first statement is not offered for the truth of the matter asserted, but instead to illustrate Chief Jones' beliefs and Defendant's general lack of concern that Chief Jones held such beliefs.  The second statement is admissible to the extent it is not offered for the truth of the matter asserted, but instead to show that Chief Jones believed he could not get minorities to apply to be firefighters despite other evidence suggesting he did not make a concerted effort to

---

[23] Fed. R. Evid. 801(d)(2)(A), (C), (D).

[24] *See* Docs. 166-1, 166-2.

[25] Doc. 153-4 at 30:1–16, 50:12–16, 141:2–14.

[26] *Id.* at 141:15–142:12.

seek out a diverse applicant pool.  The second statement may also be admissible as a party-opponent statement under Rule 801(d)(2)(D) because it was made by Chief Jones when he was still the Fire Chief.  Under Tenth Circuit "controlling precedent, an employee's statements are not attributable to her employer as a party-opponent admission in an employment dispute unless the employee was 'involved in the decisionmaking process affecting the employment action' at issue."[27]  There is ample evidence in the summary judgment record that Jones, as the Fire Chief, was the final decisionmaker in this case; thus, this hearsay exclusion would apply to his statement.

The third statement Holland testified about was a comment by Chief Jones relayed to Holland by another firefighter about the anatomy program required for EMT training: "And an African-American firefighter told me that John Paul Jones said, well, one of the things about the anatomy is they don't like the sight of blood so they can't get through the training.  Black people.  Black people don't like the sight of blood."[28]  Defendant argues that this statement is double hearsay, but the Court disagrees.  Although the statement contains two layers of declarants—the firefighter's statement to Holland and Jones' statement to the firefighter, neither layer is offered for the truth of the matter asserted.

## 2. Dismissed Claims as Background Evidence

In his summary judgment response, Plaintiff acknowledges that he did not timely exhaust his ADA claims or his Title VII discrimination claims based on harassment, the denial of his Injury on Duty ("IOD") leave, and station transfers.  Yet, Plaintiff argues that evidence of the unexhausted Title VII claims may still be used as background evidence for his surviving Title

---

[27] *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1202 (10th Cir. 2015) (quoting *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1208–09 (10th Cir. 2010)).

[28] Doc. 153-4 at 144:12–17.

VII claims based on suspension without pay and termination.  Defendant replies that evidence of Plaintiff's unexhausted claims is inadmissible because it is not of the same nature as his administratively exhausted claims.

The Supreme Court in *National Railroad Passenger Corp. v. Morgan* rejected application of the "continuing violation" doctrine for discrete acts of discrimination and retaliation.[29] However, this precedent does not "bar an employee from using prior acts as background evidence in support of a timely claim."[30]  Defendant argues that unexhausted claims may only be used as background evidence for exhausted claims that are of the same character, citing Tenth Circuit caselaw, including the recent decision in *Sanderson v. Wyoming Highway Patrol*.[31]

In *Sanderson*, a hostile work environment case, the court explained that given the "unique nature of a hostile work environment claim . . . courts can consider events which on their own would be barred by the statute of limitations, as long as one act that contributes to the hostile work environment claim occurred within the filing period."[32]  Similarly, other Tenth Circuit cases discuss how certain unexhausted claims may be considered as background evidence under *Martinez* in support of administratively exhausted discrete acts of discrimination and retaliation.[33]  The caselaw requires that the proffered background evidence support the inference

---

[29] 536 U.S. 101, 114 (2002).

[30] *Martinez v. Potter*, 347 F.3d 1208, 1211 (2003) (alteration omitted) (quoting *Morgan*, 536 U.S. at 113).

[31] 976 F.3d 1164 (10th Cir. 2020).

[32] *Id.* at 1175.

[33] *See, e.g.*, *Sunderman v. Westar Energy Inc.*, 307 F. App'x 224, 229 (10th Cir. 2009) ("[T]he court should have considered the prior retaliation alleged by plaintiff as background evidence when considering plaintiff's claim that he was terminated in retaliation for filing his complaint with the KHRC.  This is especially true here since: (1) plaintiff generally referred to the prior acts of retaliation in his 'Factual Contentions' in the Pretrial Order; and (2) the prior acts of retaliation are the predicate wrongs in the complaint that plaintiff filed with the KHRC." (citations omitted)); *Pitre v. W. Elec. Co.*, 843 F.2d 1262, 1267 (10th Cir. 1988) (explaining when considering disparate treatment claim that "[p]articularly when a company's decision-making process has not changed, evidence of prior discrimination 'might in some circumstances support the inference that such discrimination continued.'" (quoting *Bazemore v. Friday*, 478 U.S. 385, 310 (1986))).

of discrimination or retaliation required on the plaintiff's claims.[34]  Here, the Court will consider

the unexhausted Title VII claims as background evidence only to the extent such evidence is in

fact probative of the discriminatory or retaliatory animus required on Plaintiff's exhausted claims

based on his suspension without pay and termination.  These claims all require the Court to

consider whether Plaintiff's discipline for double dipping was a pretext for discrimination or

retaliation.  Only evidence that is relevant to these issues will be considered.

### 3.    Arbitration Decision

It is uncontroverted that Plaintiff's union grieved his termination and a neutral arbitrator

upheld the termination, finding it was made for "just cause."  Defendant submits the arbitrator's

decision as evidence in support of summary judgment.[35]  Plaintiff objects to Defendant's reliance

on the arbitrator's decision, arguing that it is inadmissible hearsay and that its prejudicial impact

outweighs its probative value under Fed. R. Evid. 403.

The Court overrules Plaintiff's objection to the extent he argues that the arbitrator's

decision is per se inadmissible as hearsay or under Rule 403.  The Supreme Court precedent

cited by Plaintiff holds that where a collective bargaining agreement does not cover statutory

claims, an arbitrator cannot decide questions of statutory rights.[36]  In contrast, where the

arbitration provisions in the collective bargaining agreement expressly cover statutory claims, the

terms of the arbitration agreement control.[37]  Defendant does not argue that the collective

bargaining agreement covered Plaintiff's Title VII claims in this case, and concedes there is no

---

[34] *See, e.g.*, *Sunderman*, 307 F. App'x at 229–30 (finding district court erred by not considering prior acts of discrimination as background evidence, but no reversible error because that evidence would not have changed the outcome).

[35] *See* Doc. 139-15.

[36] *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 53–54 (1974).

[37] *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 260–64 (2009).

waiver or res judicata on the basis of the arbitrator's decision.  Nonetheless, Defendant asserts

without analysis that several issues decided by the arbitrator should be given preclusive effect,

including that Plaintiff was not trading time on the dates that the UG asserts he was double

dipping.  But *Gardner-Denver* makes clear that the Court is not bound by the arbitrator's

decision here and that it should not be given preclusive effect.[38]  Defendant's attempt to thread

the needle by arguing that issue preclusion applies even if claim preclusion does not is

unavailing.

Even though the arbitrator's decision does not have preclusive effect, Defendant offers it

as evidence in support of its summary judgment motion.  In *Gardner-Denver*, the Court held that

an arbitrator's decision is admissible as evidence in a separate Title VII action and may be

"accorded such weight as the court deems appropriate."[39]  In a footnote, the Court explained:

> We adopt no standards as to the weight to be accorded an arbitral
> decision, since this must be determined in the court's discretion
> with regard to the facts and circumstances of each case.  Relevant
> factors include the existence of provisions in the collective-
> bargaining agreement that conform substantially with Title VII, the
> degree of procedural fairness in the arbitral forum, adequacy of the
> record with respect to the issue of discrimination, and the special
> competence of particular arbitrators.  Where an arbitral
> determination gives full consideration to an employee's Title VII
> rights, a court may properly accord it great weight.  This is
> especially true where the issue is solely one of fact, specifically
> addressed by the parties and decided by the arbitrator on the basis
> of an adequate record.  But courts should ever the mindful that
> Congress, in enacting Title VII, thought it necessary to provide a
> judicial forum for the ultimate resolution of discriminatory

---

[38] *See Mathews v. Denver Newspaper Agency*, No. 09-1233, 2011 WL 2040396, at *8 (10th Cir. May 17, 2011) (explaining that because the plaintiff's arbitration agreement did not cover statutory claims "no preclusive effect should be accorded to the arbitral decision."); *see also Ortega v. San Juan Coal Co*., No. 12-CV-0501 MV/RHS, 2013 WL 12116377, at *14 (D.N.M. Oct. 3, 2013) (finding *Gardner-Denver* applies equally to bar application of issue preclusion).

[39] *Gardner-Denver Co.*, 415 U.S. at 60.

employment claims.  It is the duty of courts to assure the full availability of this forum.[40]

In order to accord the arbitral decision great weight, the Court must consider the *Gardner-Denver* factors, which requires a case-specific analysis.[41]  Yet, the collective bargaining agreement is not in evidence, so the Court cannot determine whether its provisions conform substantially with Title VII.  Likewise, the Court cannot determine on this record the degree of procedural fairness in the arbitral forum, or the special competence of the arbitrator.  Although the arbitral record appears to be adequate, this is the only factor for which there is any support at this stage of the proceedings.  In contrast, there is no indication in the lengthy arbitral decision that the Union asserted Plaintiff's claims of race discrimination or retaliation, much less fully advocated for Plaintiff's statutory rights under Title VII during the arbitral proceeding.  It is undisputed that his Title VII counsel was not allowed to participate at the hearing.  And there is no indication that the arbitrator considered whether the reason for the UG's adverse employment decisions—double dipping—was a pretext for discrimination or retaliation on the basis of race.  Therefore, while the Court finds that the arbitral decision is admissible, it must construe the facts in the light most favorable to the Plaintiff on summary judgment, and therefore does not accord the arbitral decision "great weight" in deciding Plaintiff's Title VII claims.

## B.    Uncontroverted Facts

Having resolved these evidentiary objections, the Court recites the following material facts, which are either uncontroverted, stipulated, or viewed in the light most favorable to Plaintiff.[42]

---

[40] *Id.* at 60 n.21.

[41] *Mathews*, 2011 WL 2040396, at *13.

[42] The Court does not consider facts presented by the parties that the record does not support or that are not relevant to the legal issues presented.  Nor does the Court consider legal arguments included in the parties'

### *The Unified Government and KCK Fire Department*

Defendant Unified Government of Wyandotte County/Kansas City, Kansas ("UG") is a consolidated city and county government and is a municipal corporation organized and existing under the laws of the State of Kansas.  The City of Kansas City, Kansas Fire Department ("KCKFD") is a department within the UG.  Plaintiff is African-American.  He was first employed by the UG in 1997 in Pretrial Services; he was employed as a firefighter beginning in May of 2004.  He worked for the UG for approximately nineteen years.

When Plaintiff worked for Pretrial Services, he documented visits to offenders under his supervision when in fact he had not made those visits.  Plaintiff was suspended for fifteen days for dishonesty, falsification of UG records, violation of appropriate department or division rules, and inefficiency or negligence in the performance of his duties.

John Paul Jones worked for the UG for approximately thirty-one years, working through the ranks of the KCKFD until he eventually became Fire Chief.  He was the Fire Chief for over ten years and held that position when Plaintiff worked as a firefighter.  Chief Jones made racist comments during his tenure, including telling former Mayor Mark Holland that "there's no blacks on the fire department . . . because they are afraid of fire."[43]  Holland reported this statement to Doug Bach, the County Administrator, and asked him to fire Chief Jones.  Chief Jones also told a firefighter, when discussing the anatomy program required for EMT training: "one of the things about the anatomy is they don't like the sight of blood so they can't get through the training.  Black people.  Black people don't like the sight of blood."[44]  Chief Jones

---

statements of fact.  The Court has omitted the many facts included by the parties that are only relevant to the unexhausted ADA and Title VII claims, except when needed to provide context to the surviving claims, or as background evidence as described above.

[43] Doc. 153-4 at 30:6–9.

[44] *Id.* at 144:12–17.

entered into an agreement with the UG in December 2017 that provided he would announce his retirement and transfer to a Special Advisor position and remain a sworn fireman until the effective date of his retirement on June 21, 2018.

During his tenure as mayor, Holland was concerned that the KCKFD was not sufficiently diverse given that African-Americans comprise 25% of the city's population.  He testified that during his first year in office, the KCKFD's graduating class had no minorities.  He was concerned about diversity in the KCKFD and believed it was a result of nepotism and racism. He believed lack of diversity in the Fire Department was due to the failure to recruit firefighters from the Wyandotte County public schools; instead, KCKFD only recruited from Bishop Ward High School, Chief Jones' alma mater.  Holland identified several family members of people "high up in the organization" that joined the KCKFD.  When Holland spoke to Chief Jones about the issue, he said repeatedly: "You know, they just won't apply.  I can't get them to apply.  They just won't apply for the job," while throwing up his hands.[45]

Holland testified that "as mayor, I had a number of people come into my office asking for help with discrimination, both women and minorities, and I heard their cases.  [Plaintiff] was one of them.  He was in my office a couple of times sharing his concerns about discrimination."[46] Plaintiff told Holland that other black firefighters talked about a "good old boy system" in the KCKFD, and how misconduct by black firefighters is targeted with investigations whereas misconduct by white firefighters, especially those with family in the department, get "pull[ed] . . . aside and talk it out."[47]

---

[45] *Id.* at 141:15–142:12.

[46] *Id.* at 13:2–7.

[47] *Id.* at 22:2–5.

In addition to Plaintiff, Terry (LNU), who was the head of the Black Firefighter's Association, Paul Jones, and (FNU) Richardson reported race discrimination in the KCKFD to Holland.  Jones told Holland that he was written up for the same conduct as White employees who were not written up.  Terry told Holland that he did not want to recruit young Black men into the department because of the "toxic culture and the black firefighters are held to a different standard and are more under threat of being written up than others."[48]

Based on these reports, Holland sought further investigation about whether there was a pattern of discrimination in the Fire Department.  He asked the Department of Justice ("DOJ") to review hiring and other practices in the Fire Department.  The DOJ agreed to review the department and the UG subsequently adopted a resolution with multiple recommendations about how to improve hiring and recruiting.  The DOJ did not take any enforcement action as a result of this process, nor did the UG enter into a consent decree.  The changes instituted by the UG as a result of the process were voluntary.  Holland also asked the legislative auditor to look into his concerns about discriminatory discipline in the UG, but this report never happened.

Other UG officials testified about issues with race and discipline at the KCKFD.  J. Renee Ramirez, the UG's Director of Human Resources ("HR"), testified that there were issues and admitted that there was unequal discipline for some firefighters.  Bach also testified that he was aware of accusations of disparate discipline by the UG on the basis of race.

### *Material Complaints by Plaintiff Prior to 2016*

Plaintiff suffered a back injury while on duty in 2013.  He subsequently complained about issues involving his Injury on Duty ("IOD") leave, and about receiving repeated station and shift reassignments.

---

[48] *Id.* at 153-4 at 58:21–24.

On September 21, 2015, Bach contacted HR and requested "year of employment and a list of any personnel activity of Firefighter Jyan Harris. I am not looking for anything special, just need to be aware if there is anything. I need info by the end of the day Tuesday."[49]  HR responded by email, providing an overview of Plaintiff's personnel file. Bach forwarded the information to Joe Connor, the Assistant County Administrator, stating, "I need to move forward with the investigation of personnel practices regarding this employee. Do you have thoughts on how to proceed."[50]  Connor replied:

> I think that Fire Admin. should be able to give their side of the story but not sure how without raising the anxiety of not only the chief s office but other FD employees as well. They cling to their Code of Conduct which does not encourage complaining outside of the Fire Department. My only suggestion is to lay out the complaints and request a written response from the Chief for our use only.[51]

On December 14, 2015, Bach advised Chief Jones by email that an outside inquiry had been made into "the previous grievance process relating to Firefighter Jyan Harris in regard to his transfer/removal from our HazMat unit and loss of sick time."[52]  Bach wrote that he was pulling records from HR about these actions and asked for him to advise if there was "anything extraordinary regarding his situation" that he should be aware of.[53]  He did not share with Chief Jones that the outside inquiry had come from Reverend Jimmy Banks, Plaintiff's family friend and pastor. Bach's notes about his meeting with Banks are lost and Bach does not recall the

---

[49] Doc. 156-28.

[50] *Id.*

[51] *Id.*

[52] Doc. 156-6.

[53] *Id.*

specifics about Plaintiff's complaint.  However, when asked during his deposition if race was a

topic at the meeting, Bach responded that it was "possible."[54]

### Plaintiff's Park and Recreation Employment

In addition to his work as a firefighter, Plaintiff worked as an instructor for the UG's

Parks and Recreation summer program in 2013 and 2014; he was promoted to lead instructor in

2015 at the Eisenhower Community Center ("Eisenhower").  Plaintiff's instructor role required

him to be at the summer program from 8:00 a.m. to 5:00 p.m. daily, in charge of managing

between 45 and 50 kids.  As a lead instructor for the summer of 2015, Plaintiff's hours were at

the latest 7:45 a.m. to 5:00 p.m., sometimes staying later until the last child was picked up.

Plaintiff missed overtime opportunities as a firefighter in order to work in the Parks and

Recreation Department.  The Parks and Recreation Program Coordinator, Shelly Burnett, never

received a complaint or report that Plaintiff was not present for the entirety of all his shifts.  She

told Ramirez that Harris was a reliable worker and present every day.  Burnett only visited

Plaintiff's worksite once per week for about ten minutes to collect time sheets.

In October 2015, the Kansas Department of Labor ("KDOL") contacted the UG's Parks

and Recreation Department regarding an unemployment claim filed by a summer program

subcontractor.  As a result of that inquiry by the KDOL, HR reviewed Parks and Recreation's

summer program employee roster and found that some UG employees worked in that program in

addition to other UG jobs.  Plaintiff was one of the UG employees HR identified on the Parks

and Recreation summer program roster.  The subsequent investigation into Plaintiff's summer

hours was performed by HR, not KCKFD.

---

[54] Doc. 161-2 at 27:14–18.

Under the Memorandum of Agreement for 2015–2017 ("MOA") between the UG and the International Association of Firefighters Local No. 64, "[e]mployees on approved sick leave are prohibited from being gainfully employed by an employer other than UG or being self-employed."[55]  The MOA also provides that paid sick leave "may only be used for the purpose for which it was intended, that being to provide an employee with protection against a loss of pay due to a bona fide illness."[56]  It states that "[t]he authority to discipline employees is vested exclusively in the Chief."[57]

After requesting and receiving information from KCKFD, including payroll records, about Plaintiff's 2015 summer schedule, Ramirez discovered that there were some days and times for which Plaintiff was recorded as working both at KCKFD and the Parks and Recreation Department.  Ramirez determined that of the summer program employees that were already UG employees, "everyone was either not working or they were off, with the exception of Mr. Harris."[58]  Ramirez next reviewed Plaintiff's hours in 2013 and 2014 and found "the same patterns . . . where he was working at the Fire Department, but had logged some time in at Parks and Recreation."[59]  Ramirez testified that on the dates in question, Plaintiff must have been working at the KCKFD:

> Q.     And so did you look in to which place he was during those days in question?
> A.     Based on the records that I had, I could place him at the Fire Department.
> Q.     And based on the records you had, could you also place him at Parks and Rec?
> A.     No.

---

[55] Doc. 157-17 at 14.

[56] *Id.* at 12.

[57] *Id.* at 23.

[58] Doc. 139-3 at 32:15–16.

[59] *Id.* at 38:10–13.

> Q.     Why not?
> A.     Because Shelly Burnett wasn't
> physically there at that location that he was at.
> Q.     And so who did Jyan Harris work with
> for Parks and Rec?  Who did he work with on a daily
> basis?
> A.     I don't know.
> Q.     Did you look in to that?
> A.     No.
> Q.     And you didn't ask any of those
> individuals he would have worked with?
> A.     No.
> Q.     Why not?
> A.     I don't know.[60]

Ramirez and Connor both spoke to Burnett and Pam Smith, another Parks and Recreation

supervisor, but they did not ask any other Parks and Recreation employees about Plaintiff's

attendance, nor did they consider whether Plaintiff was time trading at the KCKFD on the dates

in question.

Parks and Recreation used sign-in sheets, on which each employee would sign in when

they arrived and sign out when they left, documenting their hours worked.  In 2015, as the lead

instructor at the Eisenhower location, Harris was responsible for processing separate "time

sheets," for the other employees, which comprised writing down what time they arrived and left,

and getting their signatures.  Burnett picked up the time sheets from Harris every Wednesday.  In

contrast, the sign-in sheets were left at the respective community centers and bundled together at

the end of each summer with other documents such as the registration forms.

When Burnett was asked to produce the sign-in sheets as part of Ramirez's investigation,

she sent the time sheets she picked up each week from the recreation center.  Burnett could not

find the sign-in sheets for the Eisenhower facility, so she contacted Smith, who was a full-time

---

[60] Doc. 153-1 at 47:17–48:12.

recreation specialist and Burnett's "right-hand person."  Smith maintained the Eisenhower files.

Smith told Burnett that Plaintiff had thrown away the sign-in sheets for the 2015 summer

because he did not think that the Parks and Recreation Department filed them.  Burnett turned

over the 2014 time sheets to Ramirez during the investigation.

As part of a report she prepared following her investigation, Ramirez determined that on

five separate dates in 2015, Plaintiff was on duty with the KCKFD and submitted time sheets

showing he was also working for the Parks and Recreation Department: June 9, June 12, June 15,

June 18, and July 6.  Ramirez also determined that on July 15, 2015, Plaintiff called in sick to the

Fire Department but worked at Parks and Recreation from 8:00 a.m. to 5:00 p.m.  Ramirez's

report stated that "calling in sick for the Fire Department and working for another employer

other than Unified Government is a violation of the IAFF Memorandum of Understanding."[61]  It

was customary to talk to an employee during an investigation like this one before making a

determination about discipline, but Ramirez did not speak to Plaintiff about her findings before

she issued her report.

On April 21, 2016, Ramirez sent a memorandum to Connor summarizing the KDOL

investigation and recommending discipline for Plaintiff, "up to and including termination."[62]

Connor relayed what Ramirez discovered to Chief Jones over the phone.  When asked to recall

Chief Jones' response to this information, Connor testified that "I think it certainly caught his

attention.  I certainly think that he was interested in how to move that forward.  And, again, I just

recall talking strategy, what are we going to do with this information now that we have it."[63]

---

[61] *Id.* at 108:19–22.

[62] Doc. 139-16 at 7.

[63] Doc. 153-8 at 18:23–19:2.

***Plaintiff's Race Discrimination Complaint***

On June 9, 2016, Plaintiff contacted Shakeva Christian, who worked under Ramirez in HR.  Christian recalled that Plaintiff was upset about "being treated differently" and that he asked to meet and discuss.[64]  Christian did not recall at her deposition the specific issues Plaintiff complained about during the phone call, but thought that he mentioned harassment by Bob Blevins and a complaint about John Zimbelman.  Plaintiff testified that he complained about harassing treatment by Blevins due to Plaintiff's injury and requests for sick leave and vacation time after that injury.  Christian scheduled a meeting with him, but Ramirez asked her to cancel it because Connor wanted her to wait until after they met with Plaintiff about the results of their KDOL investigation.  Connor told Ramirez, "let's get through this meeting first and then you can talk about whatever he wants to talk about after that."[65]  On July 13, 2016, Ramirez sent a message to Connor: "Shakeva is available Friday at 9.  I have scheduled Jyan's meeting with HR for next week, July 22nd at 10am on the newest issue he is bringing to us."[66]

They rescheduled the meeting, but Plaintiff cancelled and the meeting was never rescheduled.  Connor admitted that failing to investigate Plaintiff's complaints would not be in accordance with UG policy, which provides that "[a]ll complaints of harassment will be promptly, thoroughly, and impartially investigated," and that "the Director of Human Resources, upon receiving . . . an oral or written complaint, allegation, or notice of harassment, shall immediately open, and subsequently maintain a file on the matter."[67]  The policy also requires that a complaint should be expeditiously investigated, including taking statements from the

---

[64] Doc. 153-7 at 11:24–25.

[65] Doc. 153-8 at 67:21–23.

[66] Doc. 156-30.

[67] Doc. 139-14 at 2, 5.

complainant and, if necessary, the accused party.  Ramirez testified that she did not have a reason why Plaintiff's 2016 complaint was not investigated other than that Plaintiff was suspended pending termination before the investigation could happen.

### Summer 2016 Meetings with Plaintiff

On June 30, 2016, Plaintiff met with Bach and Banks, who brokered the meeting. Plaintiff initiated the meeting through Banks because he did not feel that his June 9, 2016 complaint to HR was being taken seriously.  At the meeting, Plaintiff addressed other complaints he had made dating back to 2013 involving his injury, his physical time, comp time, sick time, and station transfers.  He also addressed a harassment issue he was having with Blevins.  He indicated that he "felt like the way the fire department was failing to adequately address my situation and the harassment by Chief Blevins was because of race."[68]  Bach recalls that around this time, Plaintiff also complained about race discrimination by Chief Jones—Bach could not recall the specific complaints when he testified at his deposition, only that they concerned "fair treatment, equitable treatment."[69]  Bach spoke to Chief Jones about these allegations but does not recall the content of the conversation.

Plaintiff emailed Holland on June 24, 2016, asking to meet and discuss his "problems with the fire department. . . .  Yes I am African American and I definitely know it has played a major roll [sic] in my situation."[70]  Holland's office set up a meeting with Plaintiff for July 7, 2016.  Plaintiff told Holland that he was disciplined for conduct that "everybody else is doing,

---

[68] Doc. 153-9 at 160:16–18.

[69] Doc. 153-3 at 49:21–50:9, 51:13–20.

[70] Doc. 156-31 at 2.

that the other guys get away with."[71]  Holland recalled that Plaintiff told him he was "being bullied around his—around his injury and his sick time and that he wasn't being fairly treated."[72]

On July 15, 2016, Ramirez, Connor, and KCKFD Deputy Chiefs John Peterson and John Zimbelman met with Plaintiff and confronted him about the discrepancies between his hours at the two UG departments.  Plaintiff's union representative, Bob Wing, also attended the meeting. Neither Connor nor Ramirez recall Plaintiff mentioning that he was trading time as an explanation.  Connor remembers Harris saying, "I can explain this."[73]  He and Ramirez recalled Plaintiff telling them that his supervisors at Parks and Recreation told him to fill out his time sheets even if he wasn't there because he often stayed late.  Wing recalled Plaintiff explaining that he could submit time sheets for Parks and Recreation that averaged his hours out, e.g., if he worked ten hours one day and six hours another, he could submit time sheets for two eight-hour days.  During his deposition, Wing initially testified that he recalled Plaintiff stating in the meeting that he had been time trading on the dates in question.  But after he was shown a memorandum Connor prepared on September 21, 2016, Wing testified that Plaintiff did not discuss time trading.  Connor prepared a written summary of the July 15, 2016 meeting, which he sent to Zimbelman and Peterson on August 4, 2016 for comment.  The summary recounts his own recollection of Plaintiff's explanation; it does not mention time trading.

Plaintiff was caught off guard at the July 15 meeting; he did not have time to review the documents presented to him and look back to determine how to explain the discrepancies on those dates from the prior year.  This meeting was the first time Plaintiff was informed about the double dipping allegations against him.  At the meeting, Plaintiff did not dispute that on the five

---

[71] Doc. 153-4 at 22:21–22.

[72] *Id.* at 139:15–17.

[73] Doc. 153-8 at 35:21–24.

dates in question in 2015 when he collected regular time pay from the KCKFD, Plaintiff was on duty as a firefighter but received pay from Parks and Recreation.  Nor did he deny that he called in sick to the Fire Department on July 15, 2015, in order to work at Parks and Recreation.

Immediately following the meeting, as they walked outside together, Plaintiff told Wing about an incident prior to the meeting with Deputy Chief Blevins where Blevins "got somewhat violent and pounded his fist on the table and screamed at him.  I don't specifically know what that was all about."[74]  Wing believed Plaintiff because he was emotional when telling him about the incident.  Plaintiff told him that he had not "turn[ed] that in," but that he had told his captain. Wing told him that he needed to report that sort of conduct, and felt that the "ship had sailed" since he had not filed a complaint.[75]  Wing told Chief Jones about the incident and that he should look into it.

Pretty quickly after this meeting, Connor met with Smith, Burnett, and Jeremy Rogers, who were Plaintiff's supervisors in the Parks and Recreation Department.  They "vehemently denied" instructing Plaintiff to put hours on his time sheets that he did not in fact work, but again expressed that he was always a "faithful employee," who would "go above and beyond the call of duty."[76]

### Disciplinary Action

After Ramirez's report was issued, Chief Jones asked Ramirez occasionally about the status of the investigation.  On June 24, 2016, he sent an email to Ramirez that simply asked, "Jyan Harris?"[77]  Ramirez responded that she sent her report to both him and Connor and that

---

[74] Doc. 153-10 at 66:2–5.

[75] *Id.* at 66:5–12.

[76] Doc. 139-5 at 28:3–5.

[77] Doc. 156-16 at 3.

she is "waiting on a decision from you."[78]  On August 17, 2016, Chief Jones sent an email to

Ramirez asking her to "check with Joe on [Plaintiff].  He needs to be held accountable."[79]  When

asked at her deposition whether Chief Jones ever complained to her about Plaintiff, Ramirez

testified that he "may have mentioned some things."[80]  She further testified that he would

"inquire about different things [and] would ask me about the investigation."[81]

On July 8, 2016, one week before the UG's meeting with Plaintiff about his time records,

Bach emailed Ramirez, and copied Connor:

> Last December I contacted you about previous concerns with
> firefighter Jyan Harris and his claims regarding a denied work
> comp request and other issues in the department.  At that time you
> told me you were investigating him on other matters and I agreed
> you should complete that investigation as you looked into the
> issues I presented you.  You took copies of documents I had in my
> possession regarding his claims at that time.
>
> It is now seven months later and I feel it is past time for follow-up
> on this matter.  I would like a follow-up on the status of this
> investigation.
>
> Additionally, Mr. Harris is now claiming that he has tried to
> schedule meeting with your office (through Shakeva) regarding
> racial discrimination and no one in your office will meet with him.
>
> Let Rocki know when you are ready to meet and she will schedule
> a time.[82]

Ramirez responded the same day and explained that the

> investigation was turned over to Joe and Chief Jones I believe in
> May or early June.  I've requested updates from Chief Jones and
> he stated that he needed to speak with Joe on moving forward.
> Chief Jones stated that he first wanted to have the support of CAO

---

[78] *Id.*

[79] *Id.* at 5.

[80] Doc. 153-1 at 118:6–8.

[81] *Id.* at 118:9–12.

[82] Doc. 156-1.

> since we recommended discipline up to and including termination.
> Ken and Henry have reviewed as well.  I'm not sure where he is at
> with this one.[83]

Connor eventually recommended termination in a memorandum addressed to Chief Jones dated September 21, 2016.[84]  He believed that there was enough evidence of double dipping by Plaintiff in 2015 to support his termination recommendation, despite the additional evidence Ramirez documented from 2013 and 2014.  Nonetheless, the memorandum recounts that after the July meeting with Plaintiff, Connor asked the HR Department to look at the 2013 and 2014 records.  "In 2013 there were 8 occasions where Jyan utilized sick leave from the Fire Department and was paid at the Parks Department.  In 2014 there were 6 occasions where Jyan was on duty as a firefighter and was paid at the Parks Department."[85]  Connor testified as follows about his termination recommendation:

> A.      Based on his response at that meeting
> to me, there was no hesitation in his answer of
> throwing those two ladies under the bus.  They were
> the problem, not him.  When I talked to them, it was
> the complete opposite.  So you take that plus the
> fact that he knowingly worked shifts at the fire
> department and took money from the parks and
> recreation department, that was enough for me.
> Q.      How did you determine that it was
> knowingly?
> A.      He told me.  He said, I can explain
> this.  He raised his hands up in the air and said, I
> can explain it.  And he looked at the documentation
> and he said, Shelly and Pam are the ones that told me
> to fill these out incorrectly because I'm such a good
> guy, I'm willing to work extra and I'm willing to do
> all this other stuff and they wanted to take care of
> me.

---

[83] *Id.*

[84] Doc. 161-18.  The report itself contains a typo for the year, showing that it is dated September 21, 2017, but the year is crossed out by hand and corrected to 2016 on the version submitted by Defendant.  The email to which the report was attached makes clear it was sent in 2016.  Doc. 156-16 at 6.

[85] Doc. 161-18 at 4.

Q.      And, again, were those his exact
words?
A.      Not his exact words.  The only thing I
can remember exactly is he said, I can explain this.[86]

Connor sent his memorandum to Bach on September 14, 2016, who reviewed it and agreed with

the termination recommendation.  Connor then forwarded his memorandum to Chief Jones on

September 26, 2016, informing him that he and the Office of the Administrator supported the

decision to terminate Plaintiff.

Chief Jones testified at his deposition that Plaintiff's conduct was "pretty unique . . .

based on this fraudulent activity," and that he could not recall a similar situation.[87]  He thought

because it involved multiple incidents of falsified documentation, suspension pending

termination was the appropriate discipline.  Chief Jones met with Plaintiff and a union

representative in his office and informed him that he was suspended pending termination on

September 28, 2016, after "laying out what the issues were."[88]  Chief Jones recalls that Plaintiff

declined to comment or add anything to the conversation.  Chief Jones followed the meeting up

with a letter to Plaintiff dated September 29, 2016.  It summarized the meeting and informed

Plaintiff of the following violations: (1) "fraudulently submitting documentation in order to

receive compensation through the [UG] Parks and Recreation Department for work that was

never performed;" and (2) "submitting documentation to receive compensation from the Parks

and Recreation Department for working hours that purportedly happened while you were on sick

---

[86] Doc. 153-8 at 35:3–24.

[87] Doc. 139-6 at 161:6–7.

[88] *Id.* at 157:5–6.

leave from the Fire Department."[89]  The letter stated that Plaintiff was suspended without pay pending termination.

Plaintiff testified at his deposition that he was not aware of facts that he was suspended pending termination for any reason other than the one provided by Chief Jones in his letter, nor was he told by anyone that he was suspended pending termination for any other reason.  He later clarified that the UG had not provided him with any contrary facts.

### Time Trading

Time trading is a KCKFD policy that allows employees to work for one another without affecting their pay, benefits, or pension, without having to take leave time.  It is a common practice at fire departments across the country and was provided for in the MOA.  During Holland's tenure as mayor, Holland and Bach requested that the legislative auditor conduct a study on time trading in the KCKFD.  The report was issued in March 2016 after reviewing all daily forms that documented time traded among KCKFD personnel in 2015.  The report explains:

> Per Article 26 of the MOA, all requests to trade time off are to be presented to the KCKFD Division Chief by at least the shift period prior to the requested shift of the time trade. There are variations of the authorization form, "Trading Time Request", but the timeframe for submission is noted at the bottom of each form.  A new form is to be completed for each time trade.  The form generally requires the following:
>
> • Signature of employee requesting the time trade
> • Signature of employee working the time trade
> • Captain approval
> • Battalion Chief approval
> • Shift Commander approval
>
> The MOA does allow for the Division Chief, at his discretion, to waive the authorization timeframe requirement in case of

---

[89] Doc. 139-18.

emergency.  The Shift Commander acts as the control for the trade
by ensuring the resulting trade does not jeopardize safety, reduce
effectiveness or violate policy.

Our audit testing found these forms are not always completed in
the required timeframe nor are they always authorized
appropriately.  As an example, when an employee is called for
overtime and immediately trades that time off to another employee,
the authorization form is often completed and dated the same day
of the overtime, however that is in compliance with the KCKFD
General Order No. 98.[90]

The report included findings on the Fire Department's internal controls over time trading:

The controls are designed to monitor the number of trades by
employees and to ensure the trades are authorized by management.
We tested those internal controls to determine their effectiveness
as it pertains to tracking the number of trades and proper
authorization.  Our testing included two steps.  First, we reviewed
the trading time request forms of 64 employees to determine if
they were properly authorized.  Secondly, we traced the daily shift
reports to the Fire Administration's system for monitoring trading.
Of the 644 request forms reviewed, we identified 44 where the
supervisory approval was incomplete or where the person involved
in the time trade also approved the request form.  Finally, we found
17 instances where the Shift Commander's daily report did not
align with the tracking system.  Inconsistencies between the two
systems were due to routine clerical errors or because reasons for
excused trades were not documented on the Shift
Commander's daily report.[91]

The report concluded that while the timesheet forms are tracked and notices sent to

firefighters approaching the MOA's 24-time trade limit, "[t]here is no monitoring of whether

traded time off is repaid."[92]  Further,

Payback for trading time is not monitored. KCKFD administration
states those arrangements are between the firefighters.  As shown
in the report chart of trade imbalances, there are a number of trades
that are not repaid—at least through working arrangements.
KCKFD administration is aware there may be cash payments made

---

[90] Doc. 153-14 at 10.

[91] *Id.* at 22.

[92] *Id.* at 19.

in some instances but there is no authorization or documentation
that KCKFD maintains for this method of repayment.  Such an
arrangement is outside of the MOA or any existing policies.[93]

This issue came up most often when employees accepted overtime shifts through the call-back

process and then traded off that shift.  "Essentially, the employee was paid for an overtime shift

that the employee traded off and did not work."[94]  The report notes that "trading out of an

overtime shift or an out-of-class pay shift but still receiving overtime pay or out-of-class pay for

a shift not worked is not contrary to labor law and is common among fire departments."[95]

Holland testified that he believed this practice amounted to

falsifying time sheets saying that they were at work when they
were not and being paid for work they did not do . . . they are
selling their shifts for cash under the table . . . .  It's the root of the
corruption in the fire department because you have 400 firefighters
taking a million dollars in salary annually that they did not earn in
addition to receiving pension benefits through the State of Kansas.
. . . It's a misinterpretation of the contract that no one has the
political courage to stop.[96]

As mayor, Holland wanted to eliminate time trading and claims that his efforts to that end are

one factor that cost him the following mayoral election.  He presented the results of the time

trading study at an April 28, 2016 Board of Commissioners meeting attended by Connor, Bach,

and Chief Jones.

Plaintiff testified that he traded time on several dates in the summers, although he did not

keep a record of which dates.  He explained that he would work shifts for other firefighters and

ask that they pay him back with eight-hour shifts in the summer.[97]  Ramirez did not speak to

---

[93] *Id.*

[94] *Id.*

[95] *Id.* at 24.

[96] Doc. 153-4 at 11:8–12:3.

[97] Doc. 161-5 at 233:1–234:10.

other firefighters about whether they had traded time with Plaintiff on the dates in question when she was conducting her investigation; she checked with Deputy Chief Peterson to see if there were time trading records for the specific dates in 2014 for which Plaintiff was on both payrolls, but there were none.  The 2015 time trade forms in the record indicate that Plaintiff traded the following shifts for the 2015 calendar year: (1) a full shift for Darnell Hamilton on February 19, 2015, in exchange for Hamilton working his full shift on September 25, 2015; and (2) a full shift for Don Reed on October 4, 2015.  There are also forms showing that Plaintiff worked a shift for Ryan Beasley on May 2, 2016, and for Barton Richardson on October 30, 2014, from 5:00 p.m. until the end of his shift.  These five shifts are the only records of Harris time trading between 2014 and 2016.

Plaintiff filed a Charge of Discrimination with the EEOC on July 19, 2017, alleging discrimination on the basis of disability or perceived disability, discrimination on the basis of race, and unlawful retaliation.  He was issued Right to Sue letters and filed a timely Complaint as to his claims of race discrimination and retaliation.

### *Grievance*

On Plaintiff's behalf, the union grieved his termination through the entire grievance process.  He was suspended without pay during the grievance process pending termination.  Although Plaintiff was represented by union counsel at the arbitration hearing, his request to have counsel for his discrimination case present at the hearing was denied.  Plaintiff provided his union counsel with the names of individuals he traded time with, but the union attorney did not call these individuals as witnesses during the hearing.  Nor did his union attorney call Steve Long as a witness, who had offered to testify about the inaccuracy of time trading records.  An arbitrator upheld the termination, finding that it was made for "just cause."  The arbitrator

considered evidence presented by the UG demonstrating that Plaintiff was double-paid for time as a KCK Firefighter and as an instructor or supervisor for the Parks and Recreation Department. The arbitrator also found that the evidence did not support Plaintiff's claim that he was trading shifts on the dates in question.  The arbitrator did not consider the issues of discrimination or retaliation on the basis of race.  Plaintiff was terminated effective May 18, 2018, the date of the arbitrator's decision.

## III.   Discussion

Defendant moves for summary judgment on the merits of all claims alleged in the Pretrial Order—discrimination and retaliation under both the ADA and Title VII.  Defendant also moves on the following issues: (1) Defendant KCKFD's capacity to be sued; (2) timely exhaustion of administrative remedies; and (3) punitive damages.  As Plaintiff correctly notes in his response, the Pretrial Order dropped his claims against the KCKFD, as well as his request for punitive damages.  Therefore, Defendant's motion as to these issues is moot.  Moreover, Plaintiff concedes in his response that Defendant is entitled to summary judgment on his ADA claims, and on his claims of harassment, failure to approve his IOD leave, and station transfers under Title VII because they were not timely exhausted.

The Court proceeds to consider the merits of Plaintiff's remaining Title VII claims of race discrimination and retaliation based on his suspension without pay and termination.  Both claims must be decided under the familiar *McDonnell Douglas Corp. v. Green*[98] burden-shifting framework because Plaintiff relies on circumstantial evidence.[99]  Under *McDonnell Douglas*, plaintiff initially bears the burden of production to establish a prima facie case of discrimination

---

[98] 411 U.S. 792, 802–05 (1973).

[99] *See, e.g.*, *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011).

or retaliation.[100]  The burden of establishing the prima facie case is "not onerous."[101]  If plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a facially nondiscriminatory reason for its actions.[102]  If defendant articulates a legitimate nondiscriminatory reason, the burden shifts back to plaintiff to present evidence from which a jury might conclude that defendant's proffered reason is pretextual, that is, "unworthy of belief."[103]

## A.    Race Discrimination under Title VII

Plaintiff may establish a prima facie case of race discrimination under Title VII by demonstrating (1) membership in protected class; (2) an adverse employment action; and (3) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.[104]  It is undisputed that Plaintiff belongs to a protected class and that he suffered adverse employment actions when he was suspended without pay on September 28, 2016, and terminated on May 22, 2018.  Defendant disputes that there is evidence to support the third prong of the prima facie case.  Defendant also challenges Plaintiff's evidence of pretext.

### 1.    Third Prong of the Prima Facie Case

Defendant first argues that Plaintiff cannot meet his prima facie burden because he fails to demonstrate that he was treated less favorably than others not in the protected class.  The Court agrees that Plaintiff has failed to come forward with admissible evidence that similarly-

---

[100] *McDonnell Douglas*, 411 U.S. at 802.

[101] *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

[102] *Id*.; *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007).

[103] *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995)).

[104] *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 & n.5 (10th Cir. 2007) (discussing how elements of prima facie case in discrimination cases vary depending on context); *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015) (acknowledging that the Tenth Circuit has used different versions of the prima facie test, but stating that it has "express[ed] a preference for more concise formulations." (citations omitted)).

situated coworkers not in his protected class were treated more favorably for the same conduct. Plaintiff attempts to make this showing by submitting evidence that two White firefighters were not disciplined as harshly for DUIs.  But to be "similarly-situated," the employees must share the same decisionmaker, and be "disciplined for conduct of comparable seriousness."[105]  Plaintiff has failed to show that a DUI is comparable to Plaintiff's misconduct.  And while Holland opined generally during his testimony that similarly-situated White firefighters were disciplined less harshly for time trading, he does not provide any specific information to support that that this opinion is rationally based on his perception, given that the only specific instances of complaints he received were generic.  Additionally, while time trading constitutes Plaintiff's explanation for his time discrepancies, it is not the stated reason for his discipline.  The UG maintains it disciplined Plaintiff for double dipping.

One way to demonstrate that the adverse employment actions occurred under circumstances giving rise to an inference of discrimination "is to show that the employer treated similarly situated employees more favorably."[106]  But this type of proof is just one way of showing such circumstances are present.[107]  Other ways of proving the third prong of the prima facie case include "'actions or remarks made by decisionmakers,' 'preferential treatment given to employees outside the protected class,' or 'more generally, upon the timing or sequence of events leading to plaintiff's termination.'"[108]

Plaintiff relies on Holland's testimony to support the third prong of his prima facie case. As discussed at the beginning of this opinion, the Court must disregard Holland's testimony to

---

[105] *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 540–41 (10th Cir. 2014).

[106] *PVNF*, 487 F.3d at 800–01 (citing *Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1173 (10th Cir. 2005)).

[107] *Sorbo*, 432 F.3d at 1173.

[108] *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 505 (10th Cir. 2012) (quoting *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005)).

the extent it lacks foundation. His extensive general and conclusory commentary on disparate discipline in the KCKFD is largely inadmissible except when it is based on specific instances of such reports to him, or other information he was privy to in his role as mayor or commissioner. Additionally, Plaintiff is unable to link Holland's testimony about the lack of diversity in the KCKFD with the decisions to suspend and terminate him for double dipping. While statistical data showing racial imbalance in the KCKFD could establish an inference of discrimination,[109] Plaintiff does not present statistical data. Moreover, in order for statistical evidence to create an inference of discrimination, it "should be closely related to the issues in the case."[110] Plaintiff fails to explain how the overall lack of diversity in the KCKFD relates to the decision to suspend and terminate him for double dipping. Therefore, evidence of a lack of diversity in the KCKFD does not support an inference of discrimination in this case.

Plaintiff also points to complaints of differential discipline made to Holland by other African-American firefighters employed by the KCKFD. As discussed earlier, this testimony is admissible. Holland testified that, in addition to Plaintiff, three firefighters reported instances of race discrimination to him. Two of those reports included the allegation that Black men in the department were held to a different disciplinary standard than white firefighters—the same claim that Plaintiff makes in this case. To be sure, there is a genuine issue of material fact about whether Holland requested a legislative audit of this issue; the auditor denies that a request was made. However, the Court agrees with Defendant that Plaintiff fails to establish that the other specific complaints to Holland support that Plaintiff was disciplined in a way that raises an inference of discrimination—there is no evidence about the timing or circumstances of their

---

[109] *See Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1147 (10th Cir. 2009).

[110] *Id.* (quoting *Bauer v. Bailar*, 647 F.2d 1037, 1045 (10th Cir. 1981)).

discipline or complaints.  Likewise, the Court disregards Plaintiff's evidence about other complaints of discrimination, harassment, or retaliation outside the Fire Department, or by individuals who are not members of the same protected class.  There is no evidence linking these incidents to Plaintiff's suspension or termination.

Finally, Plaintiff points to Holland's testimony that Chief Jones was racially biased and acted on those biases when he suspended Plaintiff without pay pending his termination. Defendant replies that Bach, not Chief Jones, made the decision to suspend and terminate Plaintiff and that Holland's testimony is inadmissible hearsay.  There is a genuine issue of material fact about whether Chief Jones was the decisionmaker with regard to Plaintiff's suspension without pay pending termination.[111]  While Bach testified that he made the disciplinary decisions, Chief Jones and Ramirez testified that Chief Jones was the one who ultimately decided to follow Connor's recommendation to terminate Plaintiff.  And the MOA explicitly provides that the Fire Chief has the authority to make disciplinary decisions.  The record demonstrates that while Connor sent his memorandum recommending termination to Bach first, it was addressed to Chief Jones and sent to Bach a few days before Chief Jones met with Plaintiff and advised him of the disciplinary decision.  Chief Jones sent the September 29, 2016 letter to Plaintiff informing him of the final disciplinary decision.  There is also evidence that Chief Jones was apprised of the double dipping investigation, well before Connor's final recommendation, and personally inquired about its status multiple times before the final decision was made, telling Ramirez and Connor that he believed Plaintiff should be held accountable.

---

[111] Although Plaintiff was not terminated until May 22, 2018, after Chief Jones' retirement, his termination was based on conduct outlined in Chief Jones' September 28, 2016 letter, which made Plaintiff's termination subject to the exhaustion of his grievance rights.  Doc. 139-19.

A reasonable jury could easily conclude from this record that Chief Jones was the decisionmaker, and that he took an active role in the disciplinary determination.  Therefore, when viewed in the light most favorable to Plaintiff, Holland's testimony about Chief Jones' remarks suggests that the decisionmaker in this case held a racial animus toward African-American employees, which supports the inference of discrimination prong of Plaintiff's prima facie case.  Plaintiff's burden on this element is not "onerous," as "evidenced by the 'small amount of proof necessary to create [an inference of discrimination].'"[112]

Defendant tries to negate this element of the prima facie case with Plaintiff's deposition testimony that he was unaware of any evidence suggesting there were reasons for his termination other than those provided by Chief Jones on September 28, 2016.  Plaintiff's subsequent affidavit states that he was confused by the question at deposition; he "thought [he] was being asked if the [UG] had given me any contrary facts."[113]  Defendant asks the Court to disregard this statement under the sham affidavit rule.  A "sham affidavit" is "when a witness submits an affidavit that contradicts the witness's prior testimony."[114]  If the Court determines the rule applies, it may disregard the affidavit.[115]  The Court does not find that this affidavit directly contradicts Plaintiff's deposition testimony; it merely clarifies his testimony.[116]  But even assuming that the sham affidavit rule applies to exclude the statement in Plaintiff's affidavit, the Court cannot find that Plaintiff's deposition testimony negates the evidence supporting an inference of

---

[112] *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005) (quoting *EEOC v. Flasher Co.*, 986 F.2d 1312, 1318 (10th Cir. 1992)).

[113] Doc. 153-23 ¶ 17.

[114] *Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1219 n.3 (10th Cir. 2014) (citing *Law Co. v. Mohawk Constr. & Supply Co.*, 577 F.3d 1164, 1169 (10th Cir. 2009)).

[115] *Id.*

[116] This ruling is consistent with the Court's acceptance on the spoliation motion of Burnett's subsequent affidavit clarifying her testimony.  *See* Doc. 168.

discrimination discussed above.  Chief Jones' racial animus would not necessarily be something

Plaintiff had personal knowledge about when he was deposed in 2019.  And, of course, he has

alleged since 2017 that the true reason for his suspension and termination is race discrimination.

Plaintiff's testimony does not negate the inference-of-discrimination evidence that supports his

prima facie case.

### 2. Legitimate Nondiscriminatory Reasons for Adverse Employment Actions

The burden of production thus shifts back to Defendant to articulate a facially

nondiscriminatory reason for suspending without pay and terminating Plaintiff.  Defendant

asserts that Plaintiff was suspended without pay and then terminated because he worked for the

UG's Parks and Recreation summer program while still employed as a firefighter by the

KCKFD, recording himself as working for both departments several times in 2013–2015, and

that he called in sick as a firefighter once in 2015 and eight times in 2013 in order to work at the

summer program.[117]  Defendant characterizes Plaintiff's conduct as falsifying records and

stealing time in order to be paid twice for working the same hours.  Defendant has met its burden

of providing a facially nondiscriminatory reason for suspending and terminating Plaintiff.

### 3. Pretext

Pretext may be shown by demonstrating "such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons

for its action that a reasonable factfinder could rationally find them unworthy of credence."[118]

---

[117] In its memorandum in support of the motion for summary judgment, Defendant states that Plaintiff double dipped on five occasions in 2015, and six occasions in 2016.  Doc. 139 at 35.  But 2016 was not the subject of the investigation that began in 2015, and although Connor testified that his recommendation to Chief Jones was strictly based on the dates he determined Plaintiff double dipped in 2015, his memorandum covered similar infractions in 2013 and 2014.

[118] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006).

Pretext can also be demonstrated by "direct evidence that the proffered rationale is false, or that the plaintiff was treated differently from similarly-situated employees."[119]  "The critical question regarding this aspect of the *McDonnell Douglas* rubric is whether 'a reasonable factfinder could rationally find [the employer's rationale] unworthy of credence and hence infer that the employer did not act for the asserted [non-retaliatory] reasons.'"[120]  The Court examines "the facts as they appear *to the person making the decision*."[121]

Plaintiff relies on the following arguments in support of his claim that Defendant's explanation for his suspension and termination was pretext a for race discrimination: (1) the UG provided false explanations for his discipline; (2) Plaintiff was time trading with other firefighters on the dates he is accused to have double dipped, a practice that was inconsistently and unfairly managed by the UG; and (3) the method and manner of the UG's investigation suggests it was looking for a reason to terminate Plaintiff.  Although a close call, Plaintiff's evidence of procedural irregularities with the UG's investigation coupled with fact issues surrounding time trading is sufficient to raise an inference of pretext.

## 1.    False Explanations

Plaintiff first contends that the UG's stated reason for his discipline for taking sick leave was false because the MOA only prohibited calling in sick to work for an outside employer.  By contrast, Plaintiff called in sick to work for another department within the UG.  "To support an inference of pretext, . . . a plaintiff must produce evidence that the employer did more than get it

---

[119] *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1196 (10th Cir. 2011) (citing *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007)).

[120] *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1234 (10th Cir. 2015) (alterations in original) (quoting *Crowe*, 649 F.3d at 1196) (alterations in original).

[121] *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007) (en banc) (quoting *Watts v. City of Norman*, 270 F.3d 1288, 1295 (10th Cir. 2001)).

wrong.  He or she must come forward with evidence that the employer didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda."[122]

The memoranda prepared by Ramirez and Connor both reference Plaintiff's use of sick leave in order to work for another employer as a violation of UG policy, and Chief Jones' termination letter also referenced Plaintiff submitting documentation stating he was on sick leave when he was not as a second basis for termination.  When presented with the MOA at her deposition, Ramirez admitted that the language of the MOA only prohibits taking sick leave to work for an outside-the-UG employer.  She further testified that regardless of whether Plaintiff was working for an outside employer or a UG employer, the MOA also only allows for paid sick leave when the employee has a bona fide illness, even though this provision was neither cited by her nor by Connor in their memoranda.  Regardless of the falsity of the UG's basis for its conclusion that Plaintiff's use of sick leave violated the MOA, the question is whether Ramirez, Connor, and Chief Jones held a good faith belief that Plaintiff's conduct was violative.  Plaintiff has failed to demonstrate that they did not hold such a good faith belief and were instead pursuing a hidden discriminatory agenda.

Plaintiff also suggests that falsifying documentation was a false explanation for the suspension and termination decisions because his similar conduct in 2004 as a pretrial services officer only resulted in a fifteen-day suspension.  Plaintiff's discipline in a different department of the UG over ten years prior to the facts giving rise to this case fails to demonstrate that the UG's stated reason for termination in 2016 was false and pretextual.  Although Ramirez testified that "people who falsify documents for the [UG] are terminated," she later admitted that

---

[122] *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1211 (10th Cir. 2010).

falsifying documents is not an offense that leads to mandatory termination; it is dependent on the circumstances of the offense as determined by a department head.[123]  Here, Connor and Chief Jones both testified extensively about how the circumstances of Plaintiff's misconduct here triggered the termination decision—multiple instances of double dipping coupled with blaming his supervisors at Parks and Recreation.  The Court does not find that Plaintiff's 2004 discipline supports his contention that the decisionmakers in this case lacked a good faith belief that falsifying documentation in this case was not a terminable offense.

### 2.    Time Trading

Plaintiff contends he was time trading on the dates that the UG claims he was working at both the Parks and Recreation Department and the KCKFD for regular pay.  In other words, he contends that he traded his KCKFD shifts with other firefighters on the dates he was on the regular payroll for the KCKFD, and that he was physically present at the Parks and Recreation Department.

First, Plaintiff points to Holland's deposition testimony that 400 firefighters each year fill out false time sheets stating that they are working when in fact they time traded their shifts, and that time trading was such an issue in the department that it triggered the legislative auditor's 2016 investigation and report.  Connor testified that he recalled Holland's opinion that the KCKFD was corrupt as it related to time trading and diversity in hiring.  And Holland made his opinion on time trading known at an April 28, 2016 UG Commission meeting, where he presented the results of the auditor's time trading report to the commissioners and other attendees including Bach, Connor, and Chief Jones, explaining:

> There were 3,100 shifts traded last year.  Almost 1,800 of those
> were not traded back.  What that means is that we paid about $1M

---

[123] Doc. 161-9 at 174:9–175:16.

in taxpayer money to firefighters who did not actually work their shifts including $250K in overtime to firefighters who did not actually work that overtime shift.

The assumption in the audit by the Command Staff is that cash payments were made to the firefighters who did do the work by the ones who were on shift and so instead of trading back time there was actually money traded.  We don't have any documentation about that at the Unified Government because that's not something we have tracked.

What I will say about this is this practice is largely outdated.  Many cities have put controls on this where they put a timeframe by which people have to trade back in.  That range is from as little as two weeks within the same pay period to as many as a year that you have time to actually trade back, but the provision is that people are required to trade it back.  It's a pretty outdated practice that city's allow people not to trade back and actually to sell a shift on their own.

I also think it's unfair.  I think it's unfair to our workers.  If we have a firefighter working an extra shift I think they ought to get paid time-and-a-half and I think it's unfair to some of our other departments who would love to have an overtime shift but actually have to work the shift in order to get paid.  Ultimately, I think it's unfair to our taxpayers to be paying people who aren't actually working.[124]

There is a genuine dispute of material fact about whether Plaintiff was time trading for the KCKFD on the dates Defendant maintains he was double dipping.  Defendant correctly argues that there are no time trading documents in the record that support Plaintiff's contention that he traded his time on the dates at issue.  But Plaintiff argues that time trading records were sometimes inaccurate—that they were sometimes used as a place holder and then torn up after use—and must be missing for the dates that Plaintiff traded time.  Wing testified at his

---

[124] Doc. 156-15 at 33–34.  Defendant's hearsay objection to this testimony is overruled.  Holland is expected to testify at trial—he is not unavailable—and he testified about this opinion and presentation during his deposition.  Therefore, the content of the evidence can be presented in an admissible form at trial.  Further, the time trading study upon which his opinions are based is part of the record.  To the extent Defendant contests Holland's interpretation of the policy or study, that is an issue that goes to the weight and not the admissibility of the evidence.

deposition that he had knowledge that this sometimes happened.[125]  And the 2016 time trading audit report showed that the shift commander daily time trade reports did not align with the reports in the fire administrator's monitoring system.  Defendant disagrees with Plaintiff's interpretation of the report, arguing that the records were redundant if anything and not necessarily missing, but reading the report, in addition to Plaintiff's and Wing's testimony, in the light most favorable to Plaintiff suggests that the records could be missing.

Plaintiff also relies on his own testimony and on statements by fellow firefighters Darnell Hamilton and Don Reed that they traded time with Plaintiff on the dates that the UG contends he worked for both departments.  Defendant objects to the admissibility of the Hamilton and Reed statements because they are unsworn.[126]  The Court sustains the objection.  Although a formal affidavit is not required on summary judgment, a sworn statement still must comply with the requirements of 28 U.S.C. § 1746, including that it be signed under penalty of perjury.[127] Neither statement contains such language.  Still, Plaintiff's testimony that he time traded on those dates, coupled with evidence that the time trading forms were not always completed, or not completed accurately, suffices to create a genuine issue of material fact that should be resolved by the factfinder at trial.

Defendant's reliance on the arbitrator's decision does not resolve the issue of pretext in its favor.  As discussed earlier in this order, that decision does not carry great weight in this Title

---

[125] The Court agrees with Defendant that Ex. EEE (Doc. 153-24) is inadmissible.  It is purportedly a transcript of an audio recording where Hamilton states that he witnessed time sheets being used as a place holder and then torn up, and asserts that he time traded with Plaintiff at least ten to fourteen times per year.  But Defendant states that the transcript was never produced in discovery, and that the recording is hearsay since it was not recorded during a deposition or other hearing.  The Court agrees that this is neither competent evidence under Fed. R. Civ. P. 56, nor permissible to consider due to the failure to disclose under Rule 37(c)(1).

[126] *See* Fed. R. Civ. P. 56(c)(1)(A).

[127] Fed. R. Civ. P. 56, advisory committee's notes to the 2010 amendments; *see also*  28 U.S.C. § 1746.

VII case.  The arbitrator determined that the UG had just cause for terminating Plaintiff, he did not consider whether the decision may have been a pretext for race discrimination or retaliation. And Plaintiff's failure to raise time trading at the July 15, 2016 and September 28, 2016 meetings does not negate his explanation.  He testified that he was blindsided by the information presented at the July meeting and did not have a chance to formulate an explanation.  Moreover, although Chief Jones allowed Plaintiff an opportunity to comment after informing him of the disciplinary decision, he admitted it was a short meeting designed to inform him of the decision. A reasonable jury could conclude that Plaintiff's explanations would not have changed the outcome at that point.  The Court does not assess Plaintiff's credibility on summary judgment.

### 3.    Investigation

Finally, Plaintiff argues that the investigation into his double dipping was conducted in a manner that gives rise to an inference of pretext for several reasons: (1) given the notoriety of the time trading issue at the KCKFD, UG officials should have known to investigate whether time trading explained the timesheet discrepancies it discovered during its investigation but they did not; (2) the UG failed to interview either Plaintiff or any other witnesses that could have established whether he time traded, such as coworkers from the summer program or firefighters with whom he traded time or coworkers from the summer program who could confirm his presence; (3) the UG failed to examine or preserve the Parks and Recreation sign-in sheets, which would have shown that he was in fact present on the dates in question at the Parks and Recreation Department rather than the Fire Department, buttressing his claim that he was trading time on those dates; and (4) Chief Jones was pushing for the investigation to resolve in termination, and his racial bias affected the outcome.

The "'failure to conduct what appeared to be a fair investigation of' the violation that purportedly prompted adverse action may support an inference of pretext."[128]  However, "an employer may ordinarily 'defeat the inference' of pretext stemming from an allegedly unfair investigation by 'simply asking an employee for his version of events.'"[129]  Here, it is uncontroverted that the UG asked Plaintiff for his version of events at the July 15, 2016 meeting.  Plaintiff told them that he could explain the discrepancies in his time records, but it is undisputed that he did not offer time trading as an explanation at this meeting.  The only evidence that he offered time trading as an explanation at the meeting is Wing's testimony,[130] but Wing retracted that testimony after reviewing Connor's notes from the meeting.  Tellingly, Plaintiff does not cite his own testimony, or that of anyone else at the meeting, to support the claim that he told them he was trading time.  Instead, according to Ramirez and Connor, Plaintiff told them that he was directed to turn in time sheets to the Parks and Recreation Department showing he worked full days even when he did not, an explanation rejected by his supervisors in that department when they were interviewed.

Although late in the process, the UG gave Plaintiff an opportunity to present his side of the story.  While the Court credits Plaintiff's testimony that he was caught off guard at the meeting and had trouble remembering what happened on the dates in question, there is no evidence that he provided them with the time trading explanation any time before the disciplinary decision was made, despite being given the opportunity to do so on July 15 and again on September 28.  After meeting with Plaintiff on July 15, Ramirez and Connor

---

[128] *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 542 (10th Cir. 2014) (quoting *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1160 (10th Cir. 2008)); *Dewitt v. S.W. Bell Tel. Co.*, 845 F.3d 1299, 1314 (10th Cir. 2017).

[129] *Dewitt*, 845 F.3d at 1314 (quoting *EEOC v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 488 (10th Cir. 2006)).

[130] Doc. 161 at 37 ¶ P76.

interviewed Plaintiff's Parks and Recreation supervisors to determine if they in fact instructed him to submit time sheets that were not accurate.  Connor's termination recommendation to Chief Jones was not made until after interviewing Plaintiff and investigating the explanation he gave during his interview.  In fact, he testified that an important part of his termination recommendation was the fact that Plaintiff blamed his Parks and Recreation supervisors for his own conduct.  This is sufficient to rebut Plaintiff's pretext argument that the investigation was unfair for failing to interview him.

Even though there is no evidence that the UG failed to interview Plaintiff and follow-up on his explanation for the time record discrepancies, Plaintiff may still be able to raise an inference of pretext if he can show "disturbing procedural irregularities" surrounding the investigation and disciplinary decision.[131]  However, "[f]or an inference of pretext to arise on the basis of a procedural irregularity, . . . there must be some evidence that the irregularity 'directly and uniquely disadvantaged a minority employee.'"[132]  Viewing the evidence in the light most favorable to Plaintiff, there are indications of procedural irregularities that directly and uniquely disadvantaged him.

The Court does not find that the missing sign-in sheets evidence a procedural irregularity sufficient to raise an inference of pretext.  For the reasons explained in the Court's spoliation order, Plaintiff has not demonstrated that those documents were ever received by Ramirez, nor that they were destroyed by the UG at a time when it had a duty to preserve the documents.  The evidence suggests Plaintiff himself discarded the 2015 sign-in sheets.  The time sheets are in the record and available to Plaintiff to show that he was physically present at the Parks and

---

[131] *See Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1122 (10th Cir. 2007).

[132] *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1213 (10th Cir. 2010) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 454 n.20 (10th Cir. 1995)).

Recreation Department on the dates at issue in 2013–2015.  However, the UG's failure to meet

with Plaintiff earlier in the process and interview other witnesses was a procedural irregularity

that directly disadvantaged Plaintiff.  Viewing the evidence in the light most favorable to

Plaintiff, he had no knowledge of the investigation prior to the July 15, 2016 meeting, when he

was presented with the results of the UG's months-long investigation.  Connor and Christian

admitted it was customary to speak to the employee during an investigation like this, but

Ramirez completed her investigation and report in April 2016 without interviewing Plaintiff and

sent it to Connor.  At this early point in the process, Connor relayed Ramirez's findings to Chief

Jones, who was "interested in how to move forward."[133]  Several months went by before the UG

scheduled the meeting with Plaintiff to discuss the time record discrepancies and get his side of

the story.  In fact, the meeting was not scheduled until one week after Bach emailed Ramirez and

copied Connor to find out why the investigation was taking so long, and to ask why she had not

met with Plaintiff about his race discrimination complaint.  Ramirez responded that she had

"turned [it] over to Joe and Chief Jones I believe in May or early June."[134]

In addition, Chief Jones inquired twice about Plaintiff, on June 24, 2016, and again on

August 17, 2016.  And Ramirez recalls that Chief Jones may have complained to her about

Plaintiff.   In August, he told Ramirez that Plaintiff "needs to be held accountable," before

receiving Connor's report and recommendation for termination.  Ramirez also testified that Chief

Jones "may have mentioned some things" when she was asked if Chief Jones ever complained

about Plaintiff.  A reasonable jury could conclude from the sequence of these communications

that Chief Jones was intent on Plaintiff's termination.  When coupled with evidence of Chief

---

[133] Doc. 153-8 at 18:23–19:2.

[134] Doc. 156-1.

Jones' racial bias, this evidence of procedural irregularities raises an inference of pretext sufficient to withstand summary judgment.

### B.      Retaliation under Title VII

The elements of a prima facie claim of retaliation under Title VII are: (1) the employee engaged in protected opposition to discrimination; (2) the employee suffered an adverse employment action during or after his protected opposition that a reasonable employee would have found materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse action.[135]  Although Defendant does not appear to dispute that Plaintiff engaged in protected activity or that his suspension without pay and termination were materially adverse actions, it disputes the timing of Plaintiff's protected opposition and argues that the relevant protected activity happened after HR initiated the double dipping investigation and after Ramirez's recommendation to suspend him pending termination.  Accordingly, Defendant argues there is no causal connection between Plaintiff protected activity under Title VII and the adverse employment actions.  Defendant also argues there is insufficient evidence demonstrating an inference of pretext for retaliation.

### 1.      Protected Opposition

Under the first element, Plaintiff must have "opposed any practice made an unlawful employment practice by" Title VII.[136]  It is enough if the employee has a "good faith belief that Title VII ha[d] been violated."[137]  Moreover, to constitute protected opposition, the employer must know that the employee opposed an action by the employer, and "that the opposition was

---

[135] *McGowan v. City of Eufala*, 472 F.3d 736, 741 (10th Cir. 2006).

[136] 42 U.S.C. § 2000e-3(a).

[137] *Peterson v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002) (alteration in original) (quoting *Love v. Re/Max of Am., Inc.*, 738 F.2d 383, 385 (10th Cir. 1984)).

based on a belief that the employer's action constituted discrimination prohibited by Title VII."[138]

Plaintiff argues that he engaged in protected opposition to discrimination as early as September 21, 2015, citing Bach's email on that date to Ramirez and Connor asking for Plaintiff's employment date and a summary of his personnel file.  But this email chain makes no reference to the substance of any complaint made by Plaintiff.  Bach told Connor that he needed to proceed with an "investigation of personnel practices," and Connor responded that the KCKFD should be able to "give their side of the story" since their Code of Conduct "does not encourage complaining outside of the Fire Department."[139]  While the Court can reasonably infer from Connor's response that some sort of complaint was made by Plaintiff, there is no information about the content of the complaint Bach referenced in his email.  A generic complaint about "personnel practices" does not demonstrate protected opposition under Title VII, particularly here where Plaintiff previously asserted claims associated with an injury that would be covered by the ADA.

Similarly, Plaintiff points to Bach's July 8, 2016 email to Ramirez, referencing contact with her in December 2015 about Plaintiff's "claims regarding a denied work comp request and other issues in the department."[140]  Plaintiff argues that this email, in conjunction with the email Bach sent to Chief Jones on December 14, 2015 about an outside inquiry, prove that Plaintiff opposed discrimination sometime prior to December 2015.  But again, these emails do not reference the substance of Plaintiff's complaints, and could easily constitute complaints protected under the anti-retaliation provisions of the ADA rather than Title VII—claims that

---

[138] *Zokari v. Gates*, 561 F.3d 1076, 1081 (10th Cir. 2009).

[139] Doc. 156-28.

[140] Doc. 156-1.

Plaintiff originally raised in this case but now concedes were not administratively exhausted.[141] And while Bach testified that it is possible Plaintiff complained of race at this time, he has no notes or specific recollection of such a complaint.  There is no evidence in the summary judgment record demonstrating that in 2015 the UG had knowledge of an action Plaintiff believed was unlawful under Title VII.

Plaintiff also argues that he engaged in protected opposition in 2016 when he: (1) reported race discrimination to Christian on June 9, 2016; (2) met with Bach and Banks on June 30, 2016, and complained that the UG was not addressing his complaints about Blevins' harassment; (3) emailed and then met with Holland on July 7, 2016 and told him he was being treated differently due to his race; and (4) told Wing after the July 15, 2016 meeting that Blevins was harassing him, and that he tried to report Blevins' conduct to his captain but nothing was done to address the behavior.

Plaintiff's complaint to Christian about race discrimination on June 9, 2016 constitutes protected opposition under Title VII.  Despite Christian's failure to recollect the specifics of his complaint, Plaintiff testified that he complained of race discrimination, and Bach's July 8, 2016 email references Plaintiff's race discrimination complaint.  While the Court agrees that there is no evidence that Blevins harassed Plaintiff because of his race—the evidence all points to harassment due to his use of leave time—to the extent Plaintiff complained that his allegations about harassment by Blevins were not taken seriously because of his race, this would also be protected opposition.  Therefore, Plaintiff's meeting with Bach and Banks on June 30 was also

---

[141] Oddly, Plaintiff cites no evidence from his own deposition or declaration clarifying the content of his complaints to the UG in the fall of 2015.

protected opposition.  Plaintiff also engaged in protected opposition when he met with Mayor

Holland on July 7 and complained that he was being treated differently because of his race.

However, Plaintiff has not produced evidence that his complaint to Wing about Blevins

on July 15, 2016 was protected opposition under Title VII.  Although he reported Blevins'

harassment, he did not complain that this harassment was based on race or that it was not being

addressed due to his race; therefore, he did not engage in opposition to a practice made unlawful

under Title VII on July 15, 2016.

### 2.       Causal Connection

The parties agree that the actionable adverse employment actions on Plaintiff's retaliation

claim are his suspension without pay pending termination and his termination.  Defendant argues

that there is no evidence of a causal connection between Plaintiff's protected conduct and the

double dipping investigation because the protected activity happened well after the investigation

was underway.  Plaintiff responds that there is evidence of a causal connection based on the

temporal proximity between his complaints and the adverse employment actions, and based on

Holland's testimony that employees of the Fire Department who complained were retaliated

against.

A causal connection exists between the protected activity and the materially adverse

action "where the plaintiff presents evidence of circumstances that justify an inference of

retaliatory motive."[142]  "In order to make a *prima facie* case, one must only introduce evidence

from which an inference can be drawn that an employer would not have taken the adverse action

had the employee not [engaged in the protected activity]."[143]  Courts typically consider

---

[142] *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1091 (10th Cir. 2007).

[143] *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

"protected conduct *closely followed by* adverse action" as sufficient evidence.[144]   However, "[u]nless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation."[145]   Although temporal proximity does not require a specific amount of time, the Tenth Circuit has found that "a period of six weeks gives rise to a rebuttable inference of a causal connection."[146]

Plaintiff's earliest complaint in June 2016 to HR happened well after the double dipping investigation began in October 2015.   According to Defendant, "the machinery was in motion before any alleged protected activity."[147]   The Court disagrees.[148]   While it is true that the investigation was well underway before Plaintiff's 2016 race discrimination complaints, no disciplinary action had been taken yet.   Plaintiff's protected opposition occurred just a few weeks before his meeting with the UG where he was confronted with the evidence from the double dipping investigation for the first time.   Bach was aware of Plaintiff's race discrimination complaint by July 8, 2016, when he emailed Ramirez asking why she had not yet set up a meeting with him to discuss.   Connor was aware of the complaint too but gave Ramirez the opposite directive—to hold off on meeting with Plaintiff about his complaint until after they met with him about the double dipping allegations.   None of these officials documented Plaintiff's complaint or investigated it, despite acknowledging that they were under a duty to do so under UG policy, and despite Plaintiff's complaints occurring more than two months before Connor

---

[144] *Id.* (emphasis added).

[145] *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001).

[146] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006).

[147] Doc. 161 at 104–05.

[148] To the extent this is true, it only buttresses Plaintiff's pretext claim that the investigation was already complete before the UG met with Plaintiff, and he therefore was not given a meaningful opportunity to present his side of the story.

issued his termination recommendation.  Additionally, Chief Jones made two inquiries after Plaintiff's race discrimination complaint was made, asking about the status of the investigation.  Given Bach's testimony that around this time Plaintiff complained about Chief Jones, this timing also raises an inference of retaliation.

Viewing the evidence in the light most favorable to Plaintiff, Chief Jones made the ultimate decision to suspend Plaintiff without pay pending termination after the grievance was decided.  Connor made his termination recommendation to Bach and Chief Jones with knowledge of Plaintiff's race discrimination complaint in early September 2016, about three months after Plaintiff's phone call to Christian.  Plaintiff was suspended without pay on September 28, 2016.  Although the temporal proximity between Plaintiff's complaint and the adverse employment actions is greater than six weeks, there is sufficient additional evidence of circumstances that justify an inference of retaliatory motive sufficient to establish a causal connection.[149]

### B.      Legitimate Non-Retaliatory Reason for Adverse Employment Actions

The burden of production thus shifts back to Defendant to articulate a facially nonretaliatory reason for suspending without pay and terminating Plaintiff.  As with the discrimination claim, Defendant asserts that Plaintiff was suspended without pay and then terminated because he worked for the UG's Parks and Recreation summer program while still employed as a firefighter by the KCKFD, recording himself as working for both departments several times in 2013–2015, and that he called in sick as a firefighter once in 2015 and eight times in 2013 in order to work at the summer program.  Defendant characterizes Plaintiff's

---

[149] The Court reaches this conclusion without regard for Holland's testimony that KCKFD employees who complained were fired.  As discussed earlier in this opinion, there is no foundation in the attached deposition testimony for this conclusory opinion.

conduct as falsifying records and stealing time in order to be paid twice for working the same hours.  Defendant has met its burden of providing a facially nonretaliatory reason for suspending and terminating Plaintiff.

### C.    Pretext

The parties incorporate by reference the same pretext arguments they made on the discrimination claim.  For the same reasons described above, the Court finds that Plaintiff has met his summary judgment burden on pretext.  The Court notes however, that there is some additional evidence in the summary judgment record that makes Plaintiff's pretext showing stronger on the retaliation claim: the procedural irregularities involved in the UG's failure to investigate his race discrimination complaint after it was made in June 2016.  Plaintiff submits evidence that, despite the UG's anti-harassment policy encouraging reporting and requiring complaints to be documented and investigated, Ramirez affirmatively cancelled a scheduled meeting with Plaintiff to discuss his complaints in order to prioritize the double dipping investigation at Connor's directive.  Plaintiff met with Bach and Banks on June 30, and Bach spoke to Chief Jones about Plaintiff's allegations, yet no UG official ever documented the complaint or initiated an investigation.  After Plaintiff cancelled the rescheduled meeting to discuss his complaints, it was never rescheduled again, despite the fact that Plaintiff was not suspended without pay until September 28, 2016.

As further evidence of pretext, Plaintiff submits Bach's deposition testimony, during which he recalled that Plaintiff's June 2016 race discrimination complaint included a complaint about Chief Jones, and that he relayed this complaint to Chief Jones.  This evidence, in tandem with procedural irregularities and Chief Jones' questions during this same time period about the status of Plaintiff's discipline, raises an inference of pretext.  Viewing the evidence in the light

most favorable to Plaintiff, he has come forward with sufficient evidence that double dipping was a pretext for retaliation.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants City of Kansas City, Kansas Fire Department and Unified Government of Wyandotte County/Kansas City, Kansas's Motion for Summary Judgment (Doc. 138) is **granted in part and denied in part**. The motion is **granted** on Plaintiff's ADA claims and on the harassment and failure to approve IOD leave under Title VII; it is **denied** on the remaining Title VII claims, and **denied as moot** on Defendant's motion to dismiss the KCKFD and Plaintiff's request for punitive damages because those claims were omitted from the Pretrial Order.

**IT IS SO ORDERED.**

Dated: March 2, 2021

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE